UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

LSH CO, and WELLS FARGO BANK,
NATIONAL ASSOCIATION, as securities
intermediary for LSH CO,

               Plaintiffs,

    v.

LINCOLN NATIONAL CORPORATION,
and THE LINCOLN NATIONAL LIFE
INSURANCE COMPANY,

              Defendants.

**Case No. \_\_\_-cv-\_\_\_\_\_**

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs LSH CO ("LSH"), and Wells Fargo Bank, National Association ("Wells

Fargo"), solely in its capacity as securities intermediary for LSH, by and through their attorneys,

file this Complaint against Defendants Lincoln National Corporation and The Lincoln National

Life Insurance Company, and allege as follows:

<u>NATURE OF THE ACTION</u>

1.     This is an action based on Lincoln's unlawful and excessive cost of insurance

("COI") increase applicable to certain of its JPF Legend 300 and Universal Lifesight UL 32

universal life insurance policies.  Plaintiffs own six Lincoln policies issued between 1995 and

2005 (the "LSH Policies").  The LSH Policies were originally issued by Jefferson-Pilot Life

Insurance Company, which was subsequently acquired by Lincoln.  Lincoln imposed the

challenged increases to the LSH Policies (and other similar policies) in 2016 and 2017.

2.     By drastically raising the COI Rates (defined below) on the LSH Policies, Lincoln

has forced LSH either to (1) pay exorbitant premiums that Lincoln knows would substantially

reduce the value of the policies, or (2) lapse or surrender their policies, thereby forfeiting the

premiums LSH or its predecessors in interest have paid for a number of years.  Lincoln, on the

other hand, stands to gain a huge windfall through either unallowable higher premium payments, both past and future, or by holding onto premiums it already has received for policies on which it never needs to pay death benefits.

3.  The cost and harm to LSH, and other policyholders, is substantial.  For instance, for the LSH Policies alone, the improper COI Rate increases will result in a total *increase* of millions of dollars in premiums through the maturity of the LSH Policies.

4.  Lincoln's misconduct, as described more fully herein, constitutes express breaches of Plaintiffs' policies, breaches of the implied covenant of good faith and fair dealing, and a violation of California's Unfair Competition Law ("UCL").  Therefore, Plaintiffs seek compensatory and punitive damages, as well as equitable relief and attorneys' fees.

<u>THE PARTIES</u>

5.  Plaintiff LSH is a public limited liability company (société anonyme) incorporated and existing under the laws of the Grand-Duchy of Luxembourg, having its registered office at 14, rue Edward Steichen, L- 2540 Luxembourg.

6.  LSH is the owner of the LSH Policies and the successor in interest to LSH CO and LSH II CO, both formerly public limited liability companies (société anonyme) incorporated and existing under the laws of the Grand-Duchy of Luxembourg.

7.  Plaintiff Wells Fargo is a national banking association with its principal place of business in Sioux Falls, South Dakota.  LSH is the ultimate beneficiary of the Policies at issue in this case, which it holds in a securities account maintained by Wells Fargo, solely as securities intermediary for LSH pursuant to a Securities Account Control Agreement.  As the securities intermediary, Wells Fargo is "a person, including a bank or broker, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity."  U.C.C. § 8-102(a)(14)(ii).  Each life insurance policy at issue constitutes a "Financial Asset" that Wells

Fargo, as securities intermediary, has credited to the securities account. LSH is the "entitlement holder" and is entitled to exercise the rights with respect to each Financial Asset credited to the securities account. LSH owns the ultimate financial interests in the policies. Wells Fargo, as securities intermediary for LSH, is identified as the owner and beneficiary on the records of the insurance company, Lincoln.

8. Upon information and belief, Defendant Lincoln National Corp. ("LNC") has its home office and principal place of business at 150 North Radnor-Chester Rd., Radnor, Pennsylvania 19087. LNC is and has been at all relevant times a corporation organized under Indiana law. LNC acquired Jefferson-Pilot Corporation (together with Jefferson-Pilot Life Insurance Company, "Jefferson-Pilot") for about $7.5 billion in cash and stock in a merger consummated in 2006.

9. Defendant The Lincoln National Life Insurance Company ("Lincoln Life") is a subsidiary of LNC. Upon information and belief, The Lincoln National Life Insurance Company is an Indiana corporation with its principal place of business in Radnor, Pennsylvania. Except where context requires distinguishing them, Defendants LNC and Lincoln Life are referred to collectively, and in the singular, as "Lincoln" herein.

10. As a result of the merger of LNC and Jefferson-Pilot in 2006, on information and belief, all of Jefferson-Pilot's insurance policies that are the subject of this lawsuit were absorbed, owned and controlled by the combined company, LNC, which sold and operated its universal life insurance products through its subsidiary Lincoln Life and LNC's marketing arm doing business as Lincoln Financial Group.

<u>JURISDICTION AND VENUE</u>

11. This Court has jurisdiction over this matter under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, and there is complete diversity of citizenship, as

Plaintiffs are citizens of Luxembourg and South Dakota, and Lincoln is a citizen of the State of Indiana.

12. This Court has personal jurisdiction over Lincoln because, upon information and belief, Lincoln regularly conducts and transacts business in Pennsylvania.

13. Venue is proper pursuant to 28 U.S.C. § 1391(a)(1), (a)(2), and 1391(b) because, upon information and belief, Lincoln resides in the Eastern District of Pennsylvania.

FACTUAL ALLEGATIONS

A. Plaintiffs Are Owners of Universal Life Insurance Policies
   Subject to Lincoln's COI Rate Increase

14. The LSH Policies are universal life insurance policies that were developed, marketed, and originally issued between 1995 and 2005 by Jefferson-Pilot, which, as noted, was subsequently acquired by Lincoln. Lincoln is the successor-in-interest to Jefferson-Pilot. Universal life insurance has an insurance element and a cash value element. Universal life insurance provides flexibility and choices to policyholders, allowing them the option, within limits, to increase or decrease their premiums at their discretion based on their individual circumstances and choices, and based on the cash balance of the policy.

15. The LSH Policies range in face amount from $1 million to $10 million and are listed in the attached *Exhibit 1*. The LSH Policies were issued and delivered in the States of California and Florida, to LSH's predecessors in interest, whose rights and interests have been assigned in full to LSH. An exemplar LSH Policy, redacted for privacy, is attached as *Exhibit 2* ("LSH Doe Policy"). As noted above, Wells Fargo is listed on Lincoln's records as the owner and beneficiary of the LSH Policies, but solely as securities intermediary for LSH. LSH provides the funding to maintain the LSH Policies in force and, as the entitlement holder, owns the ultimate financial interest in the LSH Policies.

16.      Although LSH holds two different types of Lincoln universal life insurance policies, they share key features.  As noted, universal life insurance consists of two separate components.  The first is the life insurance or "mortality" component, for which an insurance company charges premiums to cover the risk of the insured's death.  This component often is referred to in the insurance industry as the insurer's "cost of insurance" or "COI."  The second is the accumulated cash value or "savings" component, which functions as an investment vehicle and is where excess premiums accumulate and earn interest.  The excess premium is the amount of the premium above what the insurer charges for the insurance portion of a life insurance policy.  Universal life insurance "unbundles" these two components to allow policyholders to choose whether to pay just enough premiums to cover the risk of death (i.e., pay solely for the life insurance) or pay more (subject to certain limitations) and build up a cash value that earns tax-deferred interest.

17.      When an owner of a universal life insurance policy makes a premium payment, that payment is credited towards the funds in the policyholder's account, and Lincoln deducts the COI and other charges from the policy account (the "Monthly Deduction").  After deducting the Monthly Deduction from the policy account, any balance that is left reflects the ending policy account value, or "Policy Value."  See Exhibit 2 at 8.  The Policy Value accrues interest at a rate that cannot be lower than the guaranteed minimum interest rate (4% for the LSH Policies; see, e.g., Exhibit 2 at 4, 8).  If the funds in the policy account become insufficient to cover the amounts owed for expenses and COI, the policy will enter a grace period and eventually lapse if the policyholder does not make the necessary payments to bring the policy back into force.

18.      Under the LSH Policies at issue here (and similar Lincoln policies held by other policyholders), the Monthly Deduction is calculated by a contractual formula where a "cost of

5

insurance rate" ("COI Rate") is multiplied by the net amount of risk (the difference between the cash value of the policy and the death benefit) at the beginning of the policy month.  For example, the LSH Doe Policy provides that the "Cost of Insurance" is:

> determined on a monthly basis as the cost of insurance rate for the month multiplied by the number of thousands of net amount at risk for the month. The net amount at risk for a month is computed as (1) minus (2) where
>
> (1) is the death benefit for the month before reduction for any indebtedness, discounted to the beginning of the month at the guaranteed interest rate.
> (2) is the policy value at the beginning of the month.

Exhibit 2 at 8.[1]

19.     The COI is designed to cover the cost of the life insurance policy and is the largest and most significant charge under the LSH Policies.

20.     The COI Rates are based initially on certain characteristics of the insured, such as the insured's gender, age, and risk class.  The COI Rate increases every year as the insured ages.

21.     Universal life insurance policies, like the LSH Policies, have guaranteed and non-guaranteed components.  "Guaranteed" elements, such as the guaranteed minimum interest rate on the savings component, described below, are fixed and cannot be changed by the insurer.  Guaranteed elements are subject to review and approval by regulatory authorities, the parameters of which are made available to the general public.  The COI Rate is an example of a "non-guaranteed" component, meaning the insurer retains the right to adjust that element subject to the terms of the contract.  At the time the LSH Policies were issued, non-guaranteed components usually were not reviewed by, and not limited or approved by, regulatory authorities.

---

[1] Four of the LSH Policies, including the Doe Policy, have the same formula for calculating COI set forth above. Although to date Plaintiffs have only been able to obtain a Policy Certificate for one LSH policy—which is also a JPF Legend 300 UL product—upon information and belief, this policy too contains the same COI definition.  One of the LSH policies has a COI definition which differs slightly, but is materially similar.

22.     The LSH Policies state that Lincoln will determine the COI Rate for each policy on a monthly basis.  But, although the COI Rate is a non-guaranteed component, Lincoln's ability to change the COI Rate is limited under each of the LSH Policies.

23.     First, the LSH Policies provide that Lincoln will not discriminate among policyholders within the same rate class in determining the COI Rate:  "Any change in the monthly cost of insurance rates used will be on a uniform basis for Insureds of the same rate class."  See, e.g., Exhibit 2 at 8.  A "rate class" is a category of insured that corresponds to a level of risk; for example, "pref[erred] plus non-tobacco user" is a rate class for one of the LSH Policies; so is "std [i.e., standard] non-tobacco user."

24.     Second, the LSH Doe Policy, and the other LSH Policies, also provide that: "Rates will be based on our expectation of future mortality, interest, expenses, and lapses."  See, e.g., Exhibit 2 at 8.  Accordingly, under the terms of the LSH policies, Lincoln may not increase its cost of insurance rates to compensate for past experience, including losses or diminished profits.  Consistent with this express contractual limitation, in a 2015 filing with the National Association of Insurance Commissioners ("NAIC"), Lincoln confirmed that, "[c]ost factors that can vary are periodically reviewed and may be adjusted based on changes in prospective assumptions. These adjustments are made in such a way that past losses (i.e., experience less favorable to the Company than expected) are not recouped."  Exhibit 10, 2015 NAIC Annual Statement of The Lincoln National Life Insurance Company, at Exhibit 5, Interrogatory 3.

25.     In addition to this being an express contractual limitation, insurers such as Lincoln are not permitted to increase insurance premiums to make up for past losses or lower profits.  The Interstate Insurance Product Regulation Commission provides that adjustments to non-guaranteed elements "shall be based on future anticipated or emerging experience."

Similarly, Actuarial Standard of Practice No. 2, ("ASOP No. 2"), which provides guidance to

actuaries with respect to the determination of non-guaranteed elements of life insurance policies,

states that "[t]he actuary should consider conducting tests of illustrated nonguaranteed charges or

benefits to ascertain whether those could be supported by reasonably anticipated experience,"

and further states that when available and appropriate, the actuary should disclose "the

*anticipated* experience factors used in the determination of nonguaranteed charges and benefits

and any material changes in such factors from the last determination." See ASOP No. 2,

available at http://www.actuarialstandardsboard.org/asops/nonguaranteed-charges-benefits-life-

insurance-policies-annuity-contracts/#21-anticipated-experience-factor (last accessed Dec. 21,

2018) (emphasis added).  ASOP No. 2 defines "anticipated experience factors" as an

"assumption that reflects anticipated experience and may be used to determine nonguaranteed

charges or benefits.  A particular anticipated experience factor reflects *future* experience of a

specific type.  Examples of experience factors include investment income, mortality, policy

termination, and expense rates."  Id. (emphasis added).  Thus, rate increases must be based on

projections of what the insurer believes will occur in the future.

     26.     The LSH Policies all are contracts of adhesion in that they are form policies

drafted by Lincoln, and policyholders are not permitted to negotiate different terms.  All six LSH

Policies are substantially similar and are subject to the same or similar material terms and

conditions.

    B.  Lincoln Unlawfully Increased COI Rates

     27.     Beginning on or around September 6, 2016, Lincoln notified Wells Fargo, as

securities intermediary for LSH, by letter that it was increasing COI Rates on the LSH Policies.

An example of such a letter (for the LSH Doe Policy) is attached hereto as Exhibit 3.  Lincoln

sent five letters to Wells Fargo, as securities intermediary for LSH, in September 2016 ("2016

Notice Letters") which stated that Lincoln was increasing the COI Rates on five of the LSH policies. The letters stated that the increases would begin in October 2016 for four of the LSH policies and in November 2016 for one LSH Policy. In addition, Lincoln sent a letter to Wells Fargo, as securities intermediary for LSH, in July 2017 ("2017 Notice Letter") stating that COI Rates would increase beginning the following month for one of the LSH policies.

28.     All six of the LSH Policies were subject to significant COI Rate increases. Lincoln has never explained the methodology used to determine the rate increases, nor did its notice letters specify the amount of the increases. The 2016 Notice Letters stated that the "amount of the COI rate change depends upon the product, underwriting class and duration." See, e.g., Exhibit 3 at FAQ 3. Lincoln's statement that a policy's increase would depend on "duration" indicates that increases were not applied uniformly across policies within the same rate class, in violation of the LSH Policies. Recent calculations estimate that Lincoln has increased COI Rates on the LSH Policies by between 30% and 57%.

29.     Lincoln purported to justify these increases by claiming that it was "operating in a challenging and changing environment as we continue to face nearly a decade of persistently low interest rates, including recent historic lows, and volatile financial markets." See, e.g., Exhibit 3. In addition, in statements to Lincoln's brokers and agents that have become public in pending litigation, Lincoln attempted to justify the COI Rate increases using three factors: (1) "Lower investment income as a result of continued low interest rates;" (2) "Updated mortality assumptions, including instances of both higher and lower expected mortality rates versus prior expectations;" and (3) "Updated expenses, including higher reinsurance rates." See Exhibit 4, Abbreviated Preview Edition of the Upcoming August 29, 2016, Lincoln Leader.

30.     The stated reasons by Lincoln, however, were and are false, as Lincoln has neither experienced, nor reasonably can expect to experience, higher mortality rates, lower investment income going forward, or other adverse changes in expenses for its policies, including the LSH Policies.  Rather, Lincoln wanted to induce policy lapses on policies on which it already received millions of dollars in premium payments by driving up COI Rates, thereby avoiding its obligation to make death benefit payments, and boosting its profits.

31.     Lincoln also never explained to policyholders how its mortality and investment income assumptions had altered.  Indeed, to LSH's knowledge, Lincoln has not publicly disclosed, made available for public comment, or publicly filed any of its revised COI Rates or the documents supporting its decision to increase such rates.  Lincoln has resisted public disclosure of underlying analyses that could supposedly support the COI Rate increase.

32.     The illegality of Lincoln's COI Rate increases became apparent over time, as Lincoln refused to explain the bases for the increases and gave pretextual justifications.  In November 2016, counsel representing other Lincoln policyholders subject to the COI Rate increase sent a letter to Lincoln requesting an explanation for the increase.  Lincoln's responses were vague and misleading.  For example, having been asked to identify which of Lincoln's future cost factors have changed, in one letter response dated January 4, 2017, Lincoln simply repeated the language in the policies by stating, "[t]he policies' costs of insurance rates are based on certain cost factors including mortality, interest, expenses, and lapses.  Lincoln's future expectations for these cost factors have changed."  See EFG Bank et al. v. The Lincoln National Life Insurance Company, 17-cv-02592 (E.D. Pa.), Dkt. 7-10.  In addition, in the same letter, when asked how the duration of a policy impacts the COI Rate and the amount of the rate increase, Lincoln simply reformulated its prior statement in an FAQ to the Notice Letters, that

"[t]he amount of the COI rate change depends upon duration, as well as the product and underwriting class." Id.

33.     Despite Lincoln's efforts to shield the information it has regarding the actual basis for its COI Rate increase, it is now apparent from its evasive and misleading explanations that Lincoln breached its duties under the LSH Policies in at least the following ways. First, though expressly required by the LSH Policies, the COI Rate increases were not applied "on a uniform basis for Insureds of the same rate class." Second, the COI Rate increases were not "based on [Lincoln's] expectation of future mortality, interest, expenses, and lapses," but rather were an impermissible attempt to recoup past losses and boost its profit margins. Third, the COI Rate increases were imposed to evade and defeat policyholders' right to the contractually guaranteed minimum crediting rate of 4% under the LSH policies. Fourth, the COI Rate increases breached the implied covenant of good faith and fair dealing that is inherent in every insurance contract by seeking to force policy lapses that would deny policyholders the benefits of the LSH Policies (which conduct also violated the UCL). Each of these breaches is detailed further below.

C.  Lincoln's COI Rate Increase Was Not Uniform for Insureds of the Same Rate Class

34.     Lincoln breached the provision of the LSH Policies which requires that any change in COI Rates be made "on a uniform basis for Insureds of the same rate class" because the COI Rate increase was not applied uniformly for each rate class. Instead, as Lincoln itself conceded in the 2016 Notice Letters, "[t]he amount of the COI rate change depends upon the product, underwriting class and duration"; that is, Lincoln acknowledged that it did not apply the COI increase uniformly for each rate class, and that instead it discriminated within the same rate class on the basis of a policy's "duration." See Exhibit 3 at FAQ 3. As noted, Lincoln also admitted in its January 4, 2017 letter to counsel for other policyholders that the COI increase was dependent in part on a policy's "duration" — and hence was not applied uniformly within the

same rate class — by stating "[t]he amount of the COI rate change depends upon duration, as well as the product and underwriting class." See EFG Bank et al. v. The Lincoln National Life Insurance Company, 17-cv-02592 (E.D. Pa.), Dkt. 7-10, Exh. 7.

35.     Similarly, in the 2017 Notice Letter, Lincoln stated that rates are based on factors including "mortality, interest, expenses, and the length of time policies stay in force." But whether labeled "duration" or the "length of time policies stay in force," this is not a permissible factor on which to base increases under the LSH Policies or to discriminate among policyholders within the same rate class. If it were, Lincoln could raise COI Rates more on policies that were closer to maturity (and hence payment of the death benefit), in the hopes of forcing those policies to lapse; while increasing rates less on policies further from maturity, which will pay premiums for longer. Such a difference in treatment is inconsistent with Lincoln's promise that "[a]ny change in the monthly cost of insurance rates used will be on a uniform basis for Insureds of the same rate class." See, e.g., Exhibit 2 at 8.

D. Lincoln's COI Rate Increase
   Was Not Based on Permissible Factors, but Sought to Boost Profits

36.     The LSH Policies state that Lincoln may change the COI Rates, but only uniformly within rate classes, and only on the basis of four permissible factors under the Policies, namely, Lincoln's expectation regarding future mortality, interest, expenses, and lapses. Further, in order to be made in good faith, the amount of any COI Rate increase must be reasonably calibrated to the magnitude of Lincoln's changes in expectations. No contractually permissible factor supports the COI Rate increase on the LSH Policies, and even if expectations as to those future factors had changed, they would not support the severe rate hikes imposed by Lincoln—up to 57% for all but one of the LSH policies.

37.     Though it was initially unclear from Lincoln's vague, general statements in the Notice Letters precisely which future cost factors purportedly justify the COI Rate increases and how, it now appears that Lincoln relies primarily on mortality, interest and reinsurance rates. But none of these factors, nor any other permissible factor, credibly warrants the substantial increases imposed.

### i.      Changes in mortality do not justify the increases

38.     In the Notice Letters and statements to its agents and brokers Lincoln cited future expectations for mortality as one of the cost factors that could justify the COI Rate increase.  But this assumption is far from reasonable and, indeed, the exact opposite is true.

39.     As a general matter, mortality rates have improved steadily each year since the LSH Policies were issued.  That is, mortality rates have gotten *better* over time.  For example, in 2015, the National Center for Health Statistics ("NCHS") reported "[s]ignificant decreases in mortality in 2014 compared with 2013" and observed that the year-to-year improvement was consistent with long term trends.  Sherry L. Murphy, et al., *Mortality in the United States, 2014*, NCHS Data Brief No. 229, at 5 (Dec. 2015).  In 2017, the NCHS reported that "the age-adjusted death rate decreased by 0.6% from 733.1 deaths per 100,000 standard population in 2015 to 728.8 in 2016."  Kenneth D. Kochanek, et al., *Mortality in the United States, 2016*, NCHS Data Brief No. 293, at 2 (Dec. 2017).

40.     The National Association of Insurance Commissioners periodically issues (or requests the Society of Actuaries to issue) a series of Commissioners Standard Ordinary ("CSO") mortality tables, which are industry standard and commonly used by insurers to calculate the cap for universal life COI charges, like the COI Rates at issue here.

41.     Upon information and belief, for the mortality assumptions underlying the LSH Policies, Lincoln relied upon the "1980 Commissioners Standard Ordinary Male or Female, Smoker or Non-Smoker Mortality Tables" (for attained ages 18 and over) ("1980 CSO")

42.     However, since the time of the 1980 CSO that Lincoln relied upon, there have been multiple studies and updates to the mortality tables.  For example, major updates include the 1990-1995 Basic Select and Ultimate Mortality Tables, the 2001 Valuation Basic Table, the 2008 Valuation Basic Table, and the 2015 Valuation Basic Table.  The 2001, 2008, and 2015 Valuation Basic Tables each show significant mortality improvements from the 1990-1995 Basic Tables and the 1980 CSO.  These new mortality tables demonstrate that since Lincoln originally priced the policies, mortality has *improved*, not worsened, which would support a *decrease*, not an increase, of COI Rates.

43.     The trend of improving mortality is even more pronounced for older aged insureds, as shown in both the 2008 and 2015 Valuation Basic Tables.  For example, the mortality rates at ages 90–100 are lower in the recent tables than in the 1980 CSO.  Moreover, the NCHS recently reported that death rates decreased significantly between 2015 and 2016 for age groups 65–74 (0.5%), 75–84 (2.3%), and 85 and over (2.1%).  See Kochanek at 3.

44.     There is simply no negative mortality experience, or any reasonable projection of negative experience to come, that could justify an increase in the COI Rate, let alone the severe increases that Lincoln imposed.

45.     Notably, Lincoln has not identified any negative experience or projections in its statements to its regulators.  Each year, life insurance companies file with state insurance departments a Statement of Nonguaranteed Elements, which answers certain interrogatories about the nonguaranteed elements of their policies.  Interrogatory No. 4, for example, asks

14

whether Lincoln's "anticipated experience factors underlying any nonguaranteed elements [are] different from current experience." Lincoln's Statements of Nonguaranteed Elements from 2010 to 2015, filed publicly in another pending action in this District, are attached hereto as *Exhibits 5 to Exhibit 10*, respectively. In the four years preceding Lincoln's initial rate increase in 2016, Lincoln never once stated that its anticipated mortality was worse than its current experience. In fact, in each year from 2010-2014, Lincoln filed responses with NAIC, stating that it expected mortality experience to *improve*. In addition, Lincoln's 2015 NAIC Annual Statement explained that "mortality experience is also predicted to *improve* in the future."

46.     On January 25, 2016 Lincoln filed its 2015 NAIC Annual Statement, less than nine months before it began notifying the LSH policyholders of the COI Rate increase. It is implausible that, in such short order, Lincoln went from anticipating no adverse changes in mortality to anticipating negative mortality changes that could possibly justify increases of up to 57% increase in the cost of insurance as Lincoln has actually imposed on the LSH Policies.

47.     Lincoln's failure to inform its regulators contemporaneously of the supposed negative mortality experience further belies any assertion by Lincoln that it has suffered a serious setback in mortality assumptions and demonstrates that Lincoln's mortality justification for the COI Rate increase is pretextual. Lincoln's actual motivation is to cause policyholders to lapse their policies by making them too expensive to maintain and not a worthwhile investment. That way, Lincoln will have collected premiums for years, but never have to pay out the death benefit.

### ii.     Historical interest rates and lower past investment income cannot, and do not, justify the COI increase

48.     Lincoln also has attempted to justify its COI Rate increase based on a "challenging and changing environment" and "nearly a decade of persistently low interest rates, including recent historic lows, and volatile financial markets." See, e.g., Exhibit 3. However,

neither changes in the financial environment nor historical interest rates can warrant Lincoln's significant rate hike for a number of reasons.

49.     First, upon information and belief, Lincoln's rate increase is based on a decline in interest rates that began several decades ago.  This historical decline cannot be the basis for an increase in COI Rates because such changes must be prospective; that is, any change must be based only on "expectation of *future* mortality, interest, expenses, and lapses."  Exhibit 2 at 8 (emphasis added).  In other words, any COI Rate increase must be grounded in expectations as to "future" cost factors and cannot be implemented to recover past losses or reduced investment income due to lower interest rates.  But Lincoln's attempt to justify the COI Rate increases in the 2016 Notice Letters — by stating that it was "operating in a challenging and changing environment as we *continue* to face nearly a decade of persistently low interest rates, including recent historic lows" — demonstrates that it impermissibly utilized *past* cost factors, including "persistently low interest rates" in raising COI Rates.  As to the future, it is well known that interest rates are on the rise, and have been for some time.

50.     Second, even if lower interest rates over the past several decades were a permissible factor upon which Lincoln could raise the COI Rate (they are not), they would not justify the massive increase imposed by Lincoln because interest rates should be a relatively minor factor in calculating Lincoln's cost of insurance (and, consequently, its COI Rate).

51.     To begin with, as it relates to COI Rates, "interest" (one of the cost factors Lincoln may consider) can refer only to the interest that Lincoln earns (or expects to earn) on its profits from providing insurance, and not on funds in its policyholders' accounts.  As explained above, universal life insurance policies, like the LSH Policies, consist of two distinct components

— (a) the life insurance, or "mortality," component; and (b) the Policy Value, or "savings," component.  Lincoln earns interest on both of these components.

52.     However, although a life insurance company may earn interest on both the mortality component and the savings component, it can consider interest it earns only on the mortality component when determining the cost of insurance; the interest it earns from investing funds in policyholder accounts is relevant only to setting the interest rate credited to those accounts.  This is because the cost of insurance, the mortality charge, is intended to cover the risk of the insured's death, not the interest rate risk associated with policyholder accounts (and guaranteeing policyholders a minimum interest rate on their policy accounts).

53.     The cost of insurance charge also includes an expected profit over the insurance company's expected cost of paying out death benefits (i.e., its mortality).  The insurance company then expects to invest this profit and earn interest on it.  The company then factors this profit and the interest on this profit in setting the cost of insurance rates (or, here, COI Rate increases).  Lower interest rates may result in lower interest income, but lower interest rates would not result in a loss unless the insurance company's investments had a negative return.  But this is highly unlikely to occur because most life insurance companies invest primarily in fixed-income securities, such as bonds.  Thus, to the extent Lincoln is raising COI Rates because it is earning less interest on its mortality profits, it is highly unlikely that this lower interest income would justify an increase in COI Rates, much less one as high as 57%.

54.     To illustrate this, assume Lincoln's cost of insurance contemplated a 20% mortality profit.  For every $120 in cost of insurance charges received in a year, Lincoln would expect to pay out $100 in claims, leaving $20 in mortality profits to invest.  If it assumed it would earn 5% interest on the profit of $20 in that year, it would expect to earn $1.00 of interest.

If it now expects to earn 1% instead of 5%, the interest would drop to $0.20 instead of $1.00. In other words, Lincoln is earning $20.20 instead of $21.00 on the mortality component, which is a difference of less than 4%, assuming mortality is as expected. If Lincoln experienced favorable mortality, that favorable mortality experience should also offset the cost associated with the lower than expected interest. Although this is a very rudimentary example, it illustrates how a decline in interest is not likely to result in a rate increase as high as 57%.

55.      As to the interest earned on the savings component of a universal life insurance policy, a life insurance company expects to earn a spread on the funds that policyholders maintain in their policy accounts. That is, if the life insurance company is earning 8% interest on policyholder accounts, it may credit policyholders 7% and earn a spread of 1%. If interest rates are low and the company is earning only 5% interest, it may lower the crediting rate to 4% and still earn a 1% spread. Thus, even if Lincoln could consider the interest it earns from investing funds in policyholders' accounts (which it cannot), this would not justify an increase in COI Rates, but only a change in the interest rate credited to policyholder accounts.

56.      However, if Lincoln expects to earn only 3% interest from investing funds in policyholders' accounts, Lincoln cannot reduce the crediting rate to 2% because this rate would be below the 4% guaranteed minimum interest rate credited to policyholders. Nor, however, can Lincoln attempt to offset this loss by raising the COI Rates. If it could, the cost of insurance (which is calculated by using COI Rates) would not be a mortality charge, but a way for Lincoln to guarantee its profitability on the policies by transferring to policyholders all risk under the policies, including the interest rate risk on policy account values and the risk of interest rates falling below the guaranteed minimum interest rate. This would render the guaranteed minimum interest rate meaningless.

57.     Furthermore, even if Lincoln is considering only interest on its mortality profits, it is simply not credible that Lincoln projects less interest income going forward.  Interest rates have been rising for a number of years, as is widely known, which means that, if anything, Lincoln should expect interest income to increase.  Of course, a projection that interest rates are likely to rise would tend to justify a decrease, rather than an increase, in the COI Rate.

58.     Moreover, Lincoln indicated in its financial statements in the years prior to the COI Rate increases that its "investment income" had actually *grown*.  For example, Lincoln reported the following for investment income in 2015 and 2016: $4.611 billion (2015), $4.631 billion (2016).

### iii.     Reinsurance rates are not an enumerated factor under the LSH Policies and cannot justify the COI increase

59.     As noted, Lincoln also attempted to justify the COI Rate increases on the basis of higher reinsurance rates, which it misleadingly characterized as "updated expenses."  However, reinsurance costs cannot provide material support for the increase, and reinsurance costs are not an enumerated permissible factor for an increase.  While "expenses" are one of the permissible COI-rate setting factors under the LSH policies, it is clear that Lincoln's reinsurance costs do not qualify as policy expenses, such as the relatively small "administrative charges" referenced in the LSH policies (which do not mention reinsurance costs at all).  Rather, reinsurance is a cost that the insurer voluntarily undertakes with an undisclosed third party; it is not a cost of administering the policy.  Indeed, Lincoln itself distinguishes between "expenses" and "reinsurance costs" in its 2015 and 2017 NAIC Annual Statement.  See Exhibits 10 and 11. Finally, Lincoln National's recent earnings releases do not mention losses due to increased reinsurance costs at all — in fact, its Q4 2014 results show a $53 million profit on recapturing

policies from out of reinsurance contracts.  Whatever changes there have been in Lincoln's
future reinsurance costs cannot provide material support for the increase.

### iv.   The basis for the increase was Lincoln's desire to boost its profits

60.     Because none of the future cost factors Lincoln has cited to justify its COI Rate
increases in fact justifies them, LSH believes, and on that basis (among others) alleges, that
Lincoln is raising COI Rates to achieve its original profit expectations.  By drastically raising
COI Rates on the LSH Policies, Lincoln seeks to force LSH either to (a) pay exorbitant
premiums that Lincoln knows would no longer justify the ultimate death benefits or (b) lapse or
surrender its policies, thereby forfeiting the premiums paid by LSH and its predecessors over the
last decades.  Lincoln, in turn, will make a huge profit — either through higher premium
payments or by eliminating a large group of policies (through lapses or surrenders) and keeping
the premiums that have been paid to date.

61.     Allowing Lincoln to do so would be impermissible not only because it would fail
to meet the criteria for a permissible increase pursuant to the express language of the LSH
Policies, but also because using cost of insurance increases to guarantee Lincoln's original
profitability assumptions constitutes prioritizing its own interests over the rights of
policyholders, which is a breach of the implied covenant of good faith and fair dealing.

E.  The COI Rate Increase
    Circumvents the Guaranteed Minimum Interest Rate

64.     Under the express terms of the LSH Policies, a policyholder has the right to pay
just enough premiums to cover the monthly policy charges, including the Cost of Insurance.  If
the policyholder contributes more than needed to cover the monthly policy charges, leaving a
balance remaining in the policy account, the LSH Policies provide that the balance will accrue
interest at a rate no lower than the guaranteed minimum interest rate.  Exhibit 2, at 8.  As noted,

the guaranteed minimum interest rate provided for under the LSH Policies is 4%.  See, e.g., id. at 4, 8.

65.     Lincoln suggested that low interest rates were at least one reason for its increase in the COI Rates.  To the extent Lincoln considered the interest it earns on funds in policyholder accounts, the rate increase also violates the LSH Policies' guaranteed minimum interest rate provision.  Lincoln had planned to generate income on the spread between the guaranteed minimum interest rate it credits to policyholders and the higher rates Lincoln believed it could earn by investing funds in policyholder accounts.   Under the LSH Policies, Lincoln could choose to credit policyholders with an interest rate higher than the guaranteed minimum rate.  If Lincoln was crediting policyholder accounts with an interest rate higher than the 4% minimum guaranteed rate, it could compensate for any reduction in interest it earned on policy accounts due to lower interest rates by reducing the (non-guaranteed) crediting rate.  But if interest rates dropped below the 4% threshold, Lincoln could not recover any resulting losses by lowering the interest rate on policy accounts any further because the LSH Policies provide for a minimum guaranteed interest rate of 4%.  By instead raising COI Rates to account for such losses, however, Lincoln is trying to do indirectly what it cannot do directly:  it is using COI Rates to achieve an interest crediting rate that is lower than the guaranteed minimum interest crediting rate, which violates the LSH Policies.

66.     In short, Lincoln is trying to take the "guarantee" out of the guaranteed minimum interest rate by recouping profits it lost when it guaranteed policyholders what ultimately turned out to be a favorable interest rate.  By depriving policyholders of the right to the guaranteed minimum interest rate, Lincoln has breached not just the express terms of the LSH Policies, but also the implied covenant of good faith and fair dealing.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

67.     Plaintiffs repeat and reallege paragraphs 1 through 66 as if fully set forth herein.

68.     The LSH Policies are valid and enforceable contracts.

69.     Plaintiffs have performed their obligations under the LSH Policies and are not in breach thereof.

70.     Lincoln's COI Rate increase has breached the LSH Policies materially and in several respects, including but not limited to the following:

    a.    Basing the COI Rate increase on factors other than those enumerated in the policies;

    b.    Increasing the COI Rates in order to recoup past lost profits and boost its profit margins, rather than basing the increase on expectations of future costs;

    c.    Increasing the COI Rates in an attempt to circumvent the contractually guaranteed minimum crediting rate; and

    d.    Applying the COI Rates in a manner that was not on a uniform basis for insureds of the same rate class.

71.     As a direct and proximate cause of Lincoln's material breaches of the LSH Policies, Plaintiffs have suffered and will suffer damages in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
### (Breach of Implied Duty of Good Faith, Contractual)

72.     Plaintiffs repeat and reallege paragraphs 1 through 71 as if fully set forth herein.

73.     The LSH Policies are valid and enforceable contracts.

74.     Plaintiffs have performed their obligations under the LSH Policies and are not in breach thereof.

75.     As valid and enforceable insurance contracts, each of the LSH Policies contains an implied covenant that the parties will exercise good faith and fair dealing with respect to the performance of the contract.

76.     Lincoln materially breached the implied covenant of good faith and fair dealing contained in the LSH Policies in several respects, including but not limited to:

     a.     Charging excessive COI Rate increases that deprived Plaintiffs of the benefit of their actual policy account values;

     b.     Using COI Rate increases to enhance Lincoln's profitability, thereby placing its interest in maximizing gains over the rights of policyholders;

     c.     Basing COI Rate increases on considerations of interest income earned on policy accounts rather than mortality profits;

     d.     Using its discretion over COI Rate increases to circumvent contractual requirements for the guaranteed minimum crediting rate;

     e.     Increasing the COI Rate in order to recoup past lost profits and boost its profit margins, rather than basing the increase on expectations of future costs; and

     f.     Attempting to coerce Plaintiffs either to allow the LSH Policies to lapse or to pay exorbitant premiums that Lincoln knows would substantially reduce the value of the policies.

77.     Lincoln's acts were consciously and deliberately designed to destroy Plaintiffs' rights to receive the fruits of their contracts and violated covenants which LSH reasonably believed were included in the contracts.

78.     As a direct and proximate cause of Lincoln's material breaches of the covenant of good faith and fair dealing contained in the LSH Policies, Plaintiffs have suffered and will suffer damages in an amount to be proven at trial.

THIRD CLAIM FOR RELIEF
(Breach of Implied Duty of Good Faith, Tortious)

79.     Plaintiffs repeat and reallege paragraphs 1 through 78 as if fully set forth herein.

80.     LSH Policy Nos. JP5517504, JP5517505, JP5515525, and JF5517035 were issued in California ("California Policies").

81.     The California Policies are valid and enforceable contracts.

82.     Plaintiffs have performed their obligations under the California Policies, and are not in breach thereof.

83.     As valid and enforceable insurance contracts, each of the California Policies contains an implied covenant that the parties will exercise good faith and fair dealing with respect to the performance of the contract.

84.     Lincoln's conduct constitutes bad faith breaches of the California Policies in several respects, including but not limited to:

   a.   Charging excessive COI Rates that deprived Plaintiffs of the benefit of their actual policy account values;

   b.   Using COI Rate increases to enhance Lincoln's profitability, thereby placing its interest in maximizing gains over the rights of policyholders;

   c.   Basing COI Rate increases on considerations of interest income earned on policy accounts rather than mortality profits;

   d.   Using its discretion over COI Rate increases to circumvent contractual requirements for the guaranteed minimum crediting rate;

   e.   Increasing the COI Rates in order to recoup past lost profits and boost its profit margins, rather than basing the increase on expectations of future costs; and

   f.   Attempting to coerce Plaintiffs either to allow their California Policies to lapse or to pay exorbitant premiums that Lincoln knows would substantially reduce the value of the California Policies.

85.     Lincoln's acts constitute tortious bad faith breaches of Plaintiffs' insurance contracts with respect to the California Policies.

86.     As a direct and proximate cause of Lincoln's bad faith breaches with respect to the California Policies, Plaintiffs have suffered and will suffer damages in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF
### (Injunctive and Restitutionary Relief Pursuant to the UCL)

87.     Plaintiffs reallege the allegations contained in paragraphs 1 through 86 as if fully set forth herein.

88.     LSH's predecessors in interest under the California Policies assigned all rights, including rights to bring claims under the UCL, to LSH.

89.     Lincoln committed acts of unfair competition by engaging in, among others, the following practices:

      a.  Charging excessive COI Rates that deprived Plaintiffs of the benefit of their actual policy account values;

      b.  Using COI Rates to guarantee Lincoln's profitability assumptions, thereby placing its interest in maximizing gains over the rights of policyholders;

      c.  Basing COI Rates on considerations of interest income earned on policy accounts rather than mortality profits;

      d.  Using its discretion over COI Rates to circumvent contractual requirements for the guaranteed minimum crediting rate;

      e.  Increasing the COI Rate in order to recoup past lost profits and boost its profit margins, rather than based on future expectations; and

      f.  Engaging in all of the foregoing practices for the purpose and with the intention of coercing Plaintiffs either to allow their policies to lapse or to pay exorbitant premiums that Lincoln knows would substantially reduce the value of the policies.

90.     A claim under the UCL's "unfair" prong is predicated on a "business practice" that "violates established public policy" or is "immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its benefits." Lincoln violated the "unfair" prong by excessively raising the COI Rate for reasons not authorized under the policies, with the

intention of causing the policies to lapse, depriving policyholders of the benefits of their policies while creating a windfall for Lincoln.

91.     LSH is informed and believes and on that basis alleges that the "unfair" practices alleged above are continuing in nature and are widespread practices engaged in by Lincoln.

92.     Plaintiffs respectfully request that the Court issue an injunction against Lincoln preliminarily and permanently enjoining it from increasing COI charges based on the reasons and factors Lincoln has identified to date.  Unless an injunction is entered, Plaintiffs will suffer irreparable harm because, even if Plaintiffs are awarded money damages for past increases, Lincoln can continue to increase rates wrongfully in the future based on the same unfair business practice, which would defeat the purpose of the UCL.

93.     Plaintiffs furthermore respectfully request that this Court order restitution to be paid by Lincoln to Plaintiffs for COI charges, premiums, and other amounts wrongfully required, obtained and collected as the result of the improper COI Rate increase.

FIFTH CLAIM FOR RELIEF
<u>(Declaratory Judgment)</u>

94.     Plaintiffs reallege the allegations contained in paragraphs 1 through 93 as if fully set forth herein.

95.     For reasons including, but not limited to, those stated herein, there exists an actual dispute and controversy between Plaintiffs and Defendant concerning Plaintiffs' rights and Defendant's obligations under the LSH Policies, including but not limited to how Defendant must implement any change in the COI Rates and under what circumstances Defendant may change the COI Rates.

96.     Accordingly, Plaintiffs seek a declaration that Defendant's increase in the COI Rates is improper under the LSH Policies and that any excess premiums received must be returned or the LSH Policies' account values recalculated according to the original COI Rates.

97.     Such a declaration will help prevent or limit any future controversies under the LSH Policies by declaring when and how Defendant can change the COI Rates on its in-force policies.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

1.      Awarding Plaintiffs compensatory and punitive damages in an amount to be determined at trial;

2.      Awarding pre-judgment and post-judgment interest;

3.      Awarding the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law;

4.      Awarding restitution;

5.      Enjoining Lincoln from imposing COI Rate increases for the reasons Lincoln has identified to date;

6.      Declaring the rights and duties of the parties as indicated herein; and

7.      Any other and further relief as the Court may deem just and proper under the circumstances.

DATED:   New York, New York
         December 21, 2018

_____
John G. Papianou, Esquire (PA ID No. 88149)
Brett M. Waldron, Esquire (PA ID No. 316773)
Montgomery McCracken Walker & Rhoads LLP
1735 Market Street, 21st Floor
Philadelphia PA, 19103
Telephone:  215-772-1500
Facsimile:  215-772-7620
Email:  jpapianou@mmwr.com
Email:  bwaldron@mmwr.com


Avi Israeli, Esquire*
Holwell Shuster & Goldberg LLP
425 Lexington Avenue, 14th Floor
New York, New York 10017
Telephone: 646-837-5151
Facsimile: 646-837-5150
Email: aisraeli@hsgllp.com




*Counsel for LSH, and Wells Fargo Bank,
National Association, as securities intermediary
for LSH*

*\*Application for admission pro hac vice to be
submitted*

<u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure.

DATED:   New York, New York
         December 21, 2018

_____
John G. Papianou, Esquire (PA ID No. 88149)
Brett M. Waldron, Esquire (PA ID No. 316773)
Montgomery McCracken Walker & Rhoads LLP
1735 Market Street, 21st Floor
Philadelphia PA, 19103
Telephone:  215-772-1500
Facsimile:  215-772-7620
Email:  jpapianou@mmwr.com
Email:  bwaldron@mmwr.com


Avi Israeli, Esquire*
Holwell Shuster & Goldberg LLP
425 Lexington Avenue, 14th Floor
New York, New York 10017
Telephone: 646-837-5151
Facsimile: 646-837-5150
Email: aisraeli@hsgllp.com



*Counsel for LSH, and Wells Fargo Bank,
National Association, as securities intermediary
for LSH*

*Application for admission pro hac vice to be
submitted*

# EXHIBIT 1

**List of Lincoln Policies**

|    | Owner | Policy Number | Issue State |
|----|-------|---------------|-------------|
| 1. | The Lincoln National Life Insurance Company | JP5166265 | FL |
| 2. | The Lincoln National Life Insurance Company | JP5517504 | CA |
| 3. | The Lincoln National Life Insurance Company | JP5517505 | CA |
| 4. | The Lincoln National Life Insurance Company | JF5515525 | CA |
| 5. | The Lincoln National Life Insurance Company | JP4382435 | FL |
| 6. | The Lincoln National Life Insurance Company | JF5517035 | CA |

# EXHIBIT 2

**Document Cover sheet**

Original 





# Jefferson-Pilot
# Life Insurance Company

Home Office:  100 North Greene Street
              P.O. Box 21008
              Greensboro, North Carolina 27420

This policy is a legal contract between the policy owner and the Company. **It is important that you read your contract carefully.**

**Jefferson-Pilot Life Insurance Company** will pay the proceeds of this policy to the beneficiary upon receipt of due proof that the death of the Insured occurred while the policy was in force. This payment and all other rights, options and benefits will be subject to the terms of this policy.

**Right to Cancel Policy   Within 20 days after you receive this policy , you may have it cancelled by returning it to us, to the agent from whom you bought it, or to any of our agents.  The return of this policy will void it from the beginning and we will refund any premiums paid.**

Chief Executive Officer                    Secretary

| Guide to Policy Provisions | Page No. |
|---|---|
| Annual Report | 9 |
| Benefits and Premiums | 3 |
| Definitions | 5 |
| General Provisions | 6 |
| Insurance Coverage Provisions | 2 |
|   Death Benefit | |
|   Death Benefit Qualification Test | |
|   Death Benefit Options | |
| Nonforfeiture Provisions | 8 |
|   Surrender and Surrender Value | |
|   Partial Surrender | |
| Owner and Beneficiary | 5 |
| Policy Loans | 10 |
| Policy Specifications | 3 |
| Premium Provisions | 7 |
|   Grace Period | |
|   No Lapse Guarantee | |
|   Reinstatement | |
| Settlement Options | 13 |
| Table of Maximum Insurance Rates | 11 |

Riders providing supplemental benefits or policy changes, if any, and a copy of the application follow Page 14.

---

Insured:

Policy Number:      JP5517504              Policy Date:       JANUARY  17, 2005

Age and Sex:        77          MALE

Specified Amount:   $10,000,000

Death Benefit Option:   I

**FLEXIBLE PREMIUM
ADJUSTABLE LIFE**

Proceeds payable at death. Flexible premiums payable during lifetime of Insured. Policy values may increase or decrease as determined by declared interest and risk rates.  Non-participating.

Form UL3000                          Page 1

# Insurance Coverage Provisions

**Death Benefit**   The death benefit of the policy is the larger of:

(a)  The death benefit under the Death Benefit Option in effect; or

(b)  The policy value at the beginning of the policy month of death times the Corridor Factor shown in the table on page 4.

The death benefit will be reduced by any indebtedness on the date of death.  The policy value at the beginning of the policy month of death used in calculating the death benefit is after subtracting all parts of the monthly deduction for the policy month except for the cost of insurance.

**Death Benefit Qualification Test**   This policy is intended to qualify as life insurance under the Internal Revenue Code. The death benefit provided by this policy is intended to qualify for the Federal income tax exclusion.  Two methods of qualifying as life insurance are the Cash Value Accumulation Test and the Guideline Premium Test, as defined in Internal Revenue Code Section 7702.  The Death Benefit Qualification Test for this policy is shown on page 4 and cannot be changed.  Unless You elected otherwise, the Death Benefit Qualification Test is the Guideline Premium Test.

**Death Benefit Options**

**Option I**   The death benefit is the Specified Amount on the date of death.

**Option II**   The death benefit is the Specified Amount on the date of death plus the policy value at the beginning of the policy month of death.

If this policy is in force at the attained age 100 of the Insured, the Specified Amount and Death Benefit Option will change automatically as described in the General Provisions under Changes in Insurance Coverage.

```
SCHEDULE OF BENEFITS AND PREMIUMS - POLICY NUMBER   JP-5517504
```

| FORM NUMBER | BENEFIT | | EFFECTIVE DATE | MONTHLY DEDUCTION | RATE CLASS | YEARS PAYABLE |
|---|---|---|---|---|---|---|
| UL3000 | INITIAL SPECIFIED AMOUNT | 10,000,000 | JAN 17, 2005 | SEE PAGE 8 | PREF PLUS NON-TOBACCO USER | 23 |
| J387 | ACCELERATED BENEFITS RIDER | | JAN 17, 2005 | 0.00 | | |

## POLICY SPECIFICATIONS

NOTE:  IF YOU PAY THE PLANNED PREMIUM ON TIME, COVERAGE WILL CONTINUE UNTIL
JAN 17, 2010 BASED ON GUARANTEED INTEREST AND GUARANTEED COST OF
OF INSURANCE RATES SHOWN IN THE POLICY.  IF YOU MAKE POLICY LOANS,
PARTIAL SURRENDERS, OR CHANGES IN COVERAGE, PREMIUMS PAID OR RIDERS,
YOUR COVERAGE MAY TERMINATE BEFORE THE ABOVE DATE.

OWNER                    ███████████████████████████

BENEFICIARY              AS STATED IN APPLICATION UNLESS LATER CHANGED.


INSURED            ████████████
POLICY NUMBER    JP-5517504                POLICY DATE    JAN 17, 2005
AGE AND SEX    77 MALE
SPECIFIED AMOUNT        $10,000,000
DEATH BENEFIT OPTION I


PLAN OF INSURANCE    FLEXIBLE PREMIUM
                     ADJUSTABLE LIFE

F3100-D                            PAGE 3

INSURED          ███████

POLICY NUMBER    JP-5517504

FORM NUMBER      UL3000

PLANNED PREMIUM        $377,026.00   ANNUAL
                       PLUS ADDITIONAL INITIAL PREMIUM OF $67,698

MINIMUM SPECIFIED AMOUNT        $100,000.00


FACTORS USED IN CALCULATION OF POLICY VALUES

MONTHLY ADMINISTRATIVE CHARGE
     $14.00 FOR POLICY MONTHS 1-12
     $4.00 FOR POLICY MONTHS 13 AND LATER

ADMINISTRATIVE CHARGE PER $1,000 OF SPECIFIED AMOUNT
     $ .06 FOR POLICY MONTHS 1-12


NET PREMIUM FACTOR
     65% FOR POLICY MONTHS 1-12 OF THE FIRST $389,200.00   OF GROSS PREMIUM
     93% FOR POLICY MONTHS 1-12 OF ANY ADDITIONAL GROSS PREMIUM
     93% FOR POLICY MONTHS 13 AND LATER


MORTALITY TABLE USED TO CALCULATE MINIMUM CASH SURRENDER VALUES -
     1980 CSO   MALE OR FEMALE   NONSMOKER OR SMOKER

INTEREST RATE USED TO CALCULATE MINIMUM CASH SURRENDER VALUES - 4.00%

NO LAPSE GUARANTEE FACTORS

NO LAPSE MONTHLY PREMIUM              $20,373.12

NO LAPSE GUARANTEE PERIOD      JAN 17, 2005   TO    JAN 17, 2010

NO LAPSE TEST - THE NO LAPSE TEST IS MET
IF (1) MINUS (2) MINUS (3) IS GREATER THAN OR EQUAL TO (4), WHERE:
(1) IS THE TOTAL GROSS PREMIUMS PAID;
(2) IS ALL PARTIAL SURRENDERS;
(3) IS ANY INDEBTEDNESS; AND
(4) IS THE CUMULATIVE NO LAPSE PREMIUMS DUE.


PLAN OF INSURANCE     FLEXIBLE PREMIUM
                      ADJUSTABLE LIFE

F3100-D                              PAGE 4

INSURED          ████████

POLICY NUMBER    JP-5517504

FORM NUMBER      UL3000

```
     TABLE OF GUARANTEED POLICY VALUES FOR $  10,000,000 INITIAL SPECIFIED AMOUNT
DEATH BENEFIT OPTION   I
---------------------------------------------------------------------------
```

THE TABLE BELOW SHOWS THE MINIMUM GUARANTEED CASH VALUES OF THE
POLICY.  THESE VALUES ARE BASED ON  4.00% INTEREST, COST OF INSURANCE RATES
SHOWN ON PAGE 11, NO PARTIAL SURRENDERS, AND PAYMENT OF THE PLANNED PREMIUM
AS INDICATED ON PAGE 4 TO THE END OF THE POLICY YEAR SHOWN.  A CHANGE IN
ANY OF THESE ASSUMPTIONS WILL CHANGE THE STATED VALUES.

| END OF<br>POLICY<br>YEAR | PLANNED<br>PREMIUM<br>FOR<br>YEAR | CASH<br>SURRENDER<br>OR LOAN<br>VALUE |
|---|---|---|
| 1 | 444,724 | 0 |
| 2 | 377,026 | 0 |
| 3 | 377,026 | 0 |
| 4 | 377,026 | 0 |
| 5 | 377,026 | 0 |

EXPIRATION YEAR    6  (AGE  83) THIS IS THE YEAR THE POLICY WILL EXPIRE
ASSUMING THE PAYMENT OF THE PLANNED PREMIUM AS SHOWN ON PAGE 4 AND BASED
ON THE USE OF GUARANTEED INTEREST AND COST OF INSURANCE RATES.

PLAN OF INSURANCE    FLEXIBLE PREMIUM
                     ADJUSTABLE LIFE

F3100~D                          PAGE 4 (CONTINUED)

INSURED ███████████

POLICY NUMBER    JP-5517504

FORM NUMBER     UL3000

## TABLE OF SURRENDER CHARGES PER $1,000 OF INITIAL SPECIFIED AMOUNT

| POLICY MONTH | SURRENDER CHARGE |
|---|---|
| 1- 12 | 22.51 |
| 13- 24 | 20.61 |
| 25- 36 | 17.82 |
| 37- 48 | 14.64 |
| 49- 60 | 11.39 |
| 61- 72 | 8.41 |
| 73- 84 | 5.88 |
| 85- 96 | 3.90 |
| 97-108 | 2.46 |
| 109-120 | 1.47 |
| 121-132 | 0.83 |
| 133-144 | 0.44 |
| 145-156 | 0.22 |
| 157-168 | 0.11 |
| 169-180 | 0.05 |
| 181 & LATER | 0.00 |

POLICY LOAN INTEREST RATE 5.00%

POLICY LOAN INTEREST RATE ON PREFERRED LOANS 4.00%

PARTIAL SURRENDER MINIMUM AMOUNT $500.00

PARTIAL SURRENDER FEE $50.00

PLAN OF INSURANCE     FLEXIBLE PREMIUM
                      ADJUSTABLE LIFE

F3100-D                          PAGE 4 (CONTINUED)

INSURED ██████████

POLICY NUMBER    JP-5517504

FORM NUMBER    UL3000

DEATH BENEFIT QUALIFICATION TEST - GUIDELINE PREMIUM TEST

TABLE OF CORRIDOR FACTORS

| ATTAINED AGE | CORRIDOR FACTOR |
|---|---|
| 77 | 1.05 |
| 78 | 1.05 |
| 79 | 1.05 |
| 80 | 1.05 |
| 81 | 1.05 |
| 82 | 1.05 |
| 83 | 1.05 |
| 84 | 1.05 |
| 85 | 1.05 |
| 86 | 1.05 |
| 87 | 1.05 |
| 88 | 1.05 |
| 89 | 1.05 |
| 90 | 1.05 |
| 91 | 1.04 |
| 92 | 1.03 |
| 93 | 1.02 |
| 94 | 1.01 |
| 95 AND OVER | 1.00 |

PLAN OF INSURANCE    FLEXIBLE PREMIUM ADJUSTABLE LIFE

F3100-D                    PAGE 4 (CONTINUED)

## Definitions

Where all of the terms below appear in the policy, we define them as follows:

**We, Our, Us**   Jefferson-Pilot Life Insurance Company.

**You, Your**   The Owner of the policy.

**Home Office**   Home Office of Jefferson-Pilot Life Insurance Company, PO Box 21008, Greensboro, North Carolina 27420. **The Jefferson-Pilot Home Office Telephone Number is (336) 691-3000.**

**Policy Date**   The date we use to determine policy anniversaries and monetary values.

**Age**   The Insured's age, nearest birthday, on the policy date.

**Attained Age**   The Insured's age as measured from the policy date with allowance for time elapsed.

**Indebtedness**   The principal of a policy loan together with interest due.

**Nonparticipating**   No dividends will be paid on this policy.

**Notice, Election, Request**   Writings satisfactory to us that have been received at our Home Office. We will not be held responsible for any payment or other action we have taken before your writings are recorded at our Home Office.

**Irrevocable Beneficiary**   A beneficiary, named by you as irrevocable, whose written consent is necessary for you to exercise any right specified in this policy.

**Monthly Anniversary Day**   The same day in each month as the policy date.

**Cash Surrender Value**   The policy value as of the date of surrender less the charge, if any, for full surrender, and less any indebtedness.

**Proceeds**   The money we will pay if this policy matures as a death benefit or is surrendered for its cash surrender value.

1.  As a Death Claim   The proceeds will be the amount of insurance as described on page 2.

2.  Upon Surrender   The proceeds will be the cash surrender value.

## Owner and Beneficiary

**Owner**   The Owner is shown on page 3 or in a rider attached to this policy. While the Insured is alive, the Owner may exercise every right and option and receive every benefit provided by this policy. These rights, however, are subject to the written consent of any irrevocable beneficiary.

**Beneficiary**   The beneficiary is as stated in the application unless later changed.

**Change of Owner or Beneficiary**   While the Insured is alive, the Owner or beneficiary may be changed. Any change will take effect as of the date the request is signed. The Insured need not be living when the requested change is recorded at our Home Office.

**Death of the Owner or Beneficiary**   If an Owner other than the Insured dies while the Insured is living, all rights and options of the Owner will belong to the Owner's executors or administrators unless otherwise provided. Unless otherwise provided, the interest of any beneficiary, including any irrevocable beneficiary, who dies before the Insured, will belong to the Owner.

Policy Number   JP5517504

F3200

# General Provisions

**The Contract**  This policy is issued in consideration of the application and payment of the initial premium. This policy, the attached copy of the application and/or endorsements, and any attached riders form the entire contract. Statements in the application are, in the absence of fraud, considered to be representations and not warranties. No statement will be used to void this policy or be used to deny a claim unless it is contained in the application.

**Policy Changes**  Only one of our authorized officers can change the terms of this policy. A change must be in writing.

**Incontestability**  We will not contest this policy after it has been in force during the Insured's lifetime for 2 years from the effective date.

An increase in the Specified Amount will not be contested after it has been in force during the Insured's lifetime for 2 years from its effective date.

**Suicide**  If the Insured, while sane or insane, commits suicide within 2 years from the effective date, the amount payable will be no more than the sum of the premiums paid less any indebtedness and any partial surrenders.

If the Insured, while sane or insane, commits suicide within 2 years from the effective date of an increase in the Specified Amount, the amount payable under such increase will be the sum of the monthly deductions for such increase.

**Assignment**  You may assign this policy. We are not bound by an assignment unless we receive notice of it at our Home Office. Policy rights and benefits are subject to any assignment. We are not obliged to see that an assignment is valid or sufficient.

**Misstatement of Age or Sex**  If the age or sex of the Insured has been misstated, the amount of death benefit will be adjusted to the amount which would have been provided by the most recent cost of insurance deduction at the true age and sex. The policy value will not be affected.

**Compliance with the Internal Revenue Code**  This policy is intended to qualify as life insurance under the Internal Revenue Code. The death benefit provided by this policy is intended to qualify for the Federal income tax exclusion. If at any time the premium under the policy exceeds the amount allowable for such qualification, we will refund the premium to you with interest within sixty days after the end of the policy year in which the premium was received. If, for any reason, we do not refund the excess premium within sixty days after the end of such policy year, the excess premium will be held in a separate deposit fund and credited with interest until refunded to you. The interest rate used on any refund or credited to the separate deposit fund created by this provision will be the current rate of interest we are paying on this policy.

We also reserve the right to refuse to make any change in the Specified Amount or the Death Benefit Option or any other change if such change would cause this policy to fail to qualify as life insurance under the Internal Revenue Code.

**Modified Endowment**  This policy will be allowed to become a modified endowment contract under the Internal Revenue Code only with your consent. Otherwise, if at a time the premiums paid under the policy exceed the limit avoiding modified endowment contract status, the excess premium will be refunded to you with interest within sixty after the end of the policy year in which the premium was received. If, for any reason, we do not refund the excess premium within sixty days after the end of such policy year the excess premium will be held in a separate deposit fund and credited with interest until refunded to you. The interest rate used on any refund or credited to the separate deposit fund created by this provision will be the current rate of interest we are paying on this policy.

**Changes in Insurance Coverage**  Upon request, the insurance coverage may be changed at any time after the first policy year and prior to the attained age 86 of the Insured. Changes that result in a decrease in the amount payable at death may be made prior to the attained age of the Insured.  The changes which can be made are:

1.   increase in the Specified Amount,

2.   decrease in the Specified Amount,

3.   change in the existing Death Benefit Option.

If a change would result in an increase in the amount payable at death, such change will be subject to satisfact evidence of insurability. The Specified Amount may not be decreased below the minimum shown on page 4. A decrease in the Specified Amount will apply first against insurance with the most recent effective date, with the Initial Specified Amount being last to be decreased. A change will be effective on the monthly anniversary day on or next following the date of approval by us of the request for the change, unless another date acceptable to us is requested.

If the policy is in force at the attained age 100 of the Insured the Specified Amount will automatically be set equal to the greater of the Specified Amount or the cash surrender value and the Death Benefit Option will be set to Option I. The Death Benefit Option may not be changed after that date no further premium payments may be made. Monthly deductions for all policy months after that date will not apply.

**Settlement**  Payment or settlement under this policy will be made at our Home Office. At the time of settlement, any policy indebtedness will be deducted. At the time of settlement, we reserve the right to require surrender of this policy.

**Deferment**  Except for the purpose of paying premiums to us, payment of cash values or making a policy loan may be deferred. The deferral may not be more than 6 months from the date you request the cash value or loan.

## Premium Provisions

**Premium Payment**   The initial premium is due on the policy date and is payable on or before delivery of this policy. Thereafter, premiums may be paid at any time and in any amount, subject to the following conditions, unless otherwise agreed to in writing by us.

The amount of each premium must be at least $25.

We reserve the right to limit the amount of premiums that we will accept in any policy year to an amount equal to the guideline level premium determined for your policy under the Internal Revenue Code unless a larger amount is necessary to prevent the termination of the policy on or before the end of the policy year.

Your premiums are payable in United States currency. They are payable at our Home Office, at one of our authorized collection offices, or to an agent authorized to collect premiums in exchange for a receipt signed by one of our officers.

**No Lapse Guarantee**   The no lapse monthly premium, the no lapse guarantee period and the no lapse test are shown on page 4.  The no lapse monthly premium is due on each monthly anniversary day during the no lapse guarantee period.  This policy will not terminate according to the grace period provision during the no lapse guarantee period if the no lapse guarantee provision is in effect and the no lapse test is met.

The no lapse guarantee provision will cease to be in effect on the earliest of the following dates:

1.   the expiration of the no lapse guarantee period;

2.   the effective date of an increase in Specified Amount;

3.   the effective date of a change in Death Benefit Option;

4.   the effective date of an added or increased benefit;

5.   the policy terminates and is reinstated; or

6.   the continued payment of the no lapse monthly premium would result in the policy failing to qualify as life insurance under the Internal Revenue Code.

**Grace Period**   If on a monthly anniversary day the cash surrender value is less than the monthly deduction due, a grace period of 60 days from that date will be allowed for the payment of the minimum amount needed to continue the policy.  If the no lapse guarantee provision is in effect and the no lapse test has been met, the grace period will not begin and the policy will not be subject to termination under this provision.

We will notify you and any assignee of the minimum amount due at least 30 days before the end of the grace period.  If the amount specified is not paid within the grace period, the policy will terminate without value at the end of such period. If the Insured dies within the grace period, the amount needed to continue the policy to the end of the policy month of death will be deducted from the amount otherwise payable.

**Reinstatement**   Application to reinstate this policy may be made within 5 years after the date of termination provided the policy has not been surrendered for its cash surrender value.

In addition to the application, reinstatement will require all of the following:

1.   You must furnish evidence of insurability satisfactory to us;

2.   You must pay an amount sufficient to keep the policy in force for at least 2 months;

3.   You must pay or reinstate any indebtedness.

Reinstatement will be effective on the date we approve the application unless another date acceptable to us is requested.

We will not contest this policy for misrepresentations made in the applications for reinstatement after the policy has been in force during the lifetime of the Insured for 2 years from the date of the last reinstatement.

The no lapse guarantee provision will not be in effect upon reinstatement.

**Premium Refund at Death**   Any premium paid after the beginning of the policy month of death will be refunded as part of the proceeds, unless you request otherwise prior to such payment.

Policy Number   JP5517504

F330

## Nonforfeiture Provisions

**Policy Value**   On each monthly anniversary day, the policy value will be (1) plus (2) plus (3) plus (4) minus (5), where

(1)   is the policy value as of the preceding monthly anniversary day minus the monthly deduction for the month ending on the monthly anniversary day.

(2)   is one month's interest on (1).

(3)   is all net premiums received since the preceding monthly anniversary day.

(4)   is interest on (3) from the date the premium is received to the end of the policy month.

(5)   is the reduction in policy value caused by any partial surrender since the preceding monthly anniversary day.

On any day other than a monthly anniversary day, the policy value will be (1) minus (5) where

(1)   is the policy value as of the preceding monthly anniversary day minus the monthly deduction for the current policy month, with

(5)   defined as above.

In addition, on surrender we will refund any premium received since the preceding monthly anniversary day.

The policy value on the policy date, after payment of the initial premium, will be the net premium.

**Net Premium**   Each net premium will be computed by multiplying each gross premium by the guaranteed net premium factor shown on page 4.  A higher net premium factor may be applied as determined by us.

**Interest Rate**   The guaranteed interest rate credited in the calculations described above is shown on page 4. Interest in excess of the guaranteed rate may be applied as determined by us. Such interest is referred to in this policy as excess interest. No excess interest will be credited on any policy value held as security for a policy loan.

**Monthly Deduction**   The monthly deduction for a policy month will be computed as (1) plus (2) where

(1)   is the cost of insurance and the cost of additional benefits provided by rider for the policy month.

(2)   is the sum of all administrative charges for the policy and any attached riders shown on page 4 as being due for the policy month.

If there is an increase in the Specified Amount, additional charges may be in effect for the increase.  If there is an additional charge in effect for an increase in Specified Amount, a new schedule of charges will be provided after such increase.

**Cost of Insurance**   The cost of insurance is determined on a monthly basis as the cost of insurance rate for the month multiplied by the number of thousands of net amount at risk for the month. The net amount at risk for a month is computed as (1) minus (2) where

(1)   is the death benefit for the month before reduction for any indebtedness, discounted to the beginning of the month at the guaranteed interest rate.

(2)   is the policy value at the beginning of the month.

For months in which Death Benefit Option I is in effect, for the purpose of allocating the cost of insurance between different parts of the Specified Amount, the policy value will be considered as part of the Initial Specified Amount. If such value exceeds the Initial Specified Amount, any excess will be considered part of the earliest addition to the Specified Amount. This allocation will continue in order of all additions to the Specified Amount until all value is allocated.

**Cost of Insurance Rates**   The monthly cost of insurance rates are determined by us. Rates will be based on our expectation of future mortality, interest, expenses, and lapses. Any change in the monthly cost of insurance rates used will be on a uniform basis for insureds of the same rate class. Rates will never be larger than the maximum rates shown on page 11. The maximum rates are based on the mortality table shown on page 4.

**Continuation of Insurance**   This policy and all riders will continue in force according to the terms as long as the cash surrender value is sufficient to cover the monthly deduction. If such value is not sufficient, the policy will terminate according to the grace period provision. If premiums are discontinued on any date, the value on that date will be used to provide insurance under this provision.

**Basis of Values**   Minimum policy values are based on the mortality assumptions and interest rates shown on page 4. The values for this policy are at least equal to the minimum required by law. A detailed statement of the method used to determine policy values and reserves has been filed with the state where this policy is delivered.

## Nonforfeiture Provisions(Continued)

**Surrender and Surrender Value**   Upon request, you may surrender this policy and take its cash surrender value. Surrender within 31 days after a policy anniversary date will be treated as a surrender on that date.

**Partial Surrender**   Upon request, you may make a partial surrender of this policy. The partial surrender may be for any amount equal to or greater than the Partial Surrender Minimum Amount shown on page 4, not to exceed the cash surrender value less $500.

When a partial surrender is made:

1. the policy value will be reduced by the amount of the partial surrender, plus the Partial Surrender Fee shown on page 4;

2. the death benefit will be reduced by the amount at least equal to the reduction in value. Such a reduction may be produced without changing the Specified Amount. If not, we will reduce the Specified Amount so that the reduction in death benefit is equal to the reduction in value. A partial surrender cannot be allowed if it would reduce the Specified Amount below the minimum shown on page 4.

**Surrender Charges**   The charge for full surrender will be the amount shown on Page 4 for the number of completed policy months preceding surrender.  There will be a partial charge if there is a decrease in the Specified Amount while there is a surrender charge in effect.  If there is an increase in the Specified Amount, an additional surrender charge may be in effect for the increase.  If there is an additional surrender charge in effect for an increase in Specified Amount, a new schedule of surrender charges will be provided after such increase.

Surrender charges are computed based on the number of thousands of Specified Amount.  The partial charge for a decrease in Specified Amount will be based on the per thousand charge for the number of thousands of the decrease.  A decrease in Specified Amount will apply first against insurance with the most recent effective date.

A new schedule of surrender charges will be provided after a change in such charges.

## Annual Report

We will provide you an Annual Report. This report will show the activity of the policy for the past year. It will list premiums paid, expenses charged, monthly deductions, interest credited, and partial surrenders. It will show the then current death benefit and values and the loan balance outstanding. It will also provide a projection of future values of the policy using the then current values and both guaranteed and current rates of interest and mortality.

Upon request, we will provide, without charge, an illustration showing projected policy values based on guaranteed as well as current mortality and interest factors. The first illustration in any policy year will be furnished free of charge. Any illustration after the first in any policy year may be obtained for a fee of $10.00.

F340C

Policy Number    JP5517504

# Policy Loans

**When Available**   A loan may be obtained by request when this policy has a loan value. This policy will be the sole security for the loan.

**Amount Available**   The loan value at any time is the then current policy value if the policy were surrendered on the date of determination.

The maximum additional loan at any time is the loan value at that time less:

1.   any existing loan;

2.   accrued interest on any existing loan; and

3.   interest on the total outstanding loan to the end of the policy year.

**Loan Interest**   Interest on a policy loan is due and payable on each policy anniversary. Interest not paid when due will be added to the loan and bear interest at the same rate.

The effective annual policy loan interest rate is shown on page 4.

**Loan Repayments**   You may repay all or part of a loan at any time while this policy is in force. Each partial repayment must be at least $25.

Every payment to us on this policy will be considered a premium payment unless clearly marked for loan repayment or for payment of loan interest.

**Preferred Loan Amounts**   Beginning with the earlier of the attained age 100 of the Insured or the 21st policy year, all loan balances will be considered to be preferred loan amounts.

**Maximum Loan Amount**   If the indebtedness at any time equals or exceeds the loan value, this policy will terminate without value 31 days after notice has been mailed to your last known address and to that of any assignee of record.

## Table of Guaranteed Maximum Cost of Insurance Rates - Male

**Basis of Calculation**
Non-Tobacco-User:  1980 CSO Male Nonsmoker Table
Tobacco-User:  1980 CSO Male Smoker Table

| Attained Age | Non-Tobacco-User | Tobacco-User | Attained Age | Non-Tobacco-User | Tobacco-User | Attained Age | Non-Tobacco-User | Tobacco-User | Attained Age | Non-Tobacco-User | Tobacco-User |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | .34912 | .34912 | 25 | .12677 | .17854 | 50 | .41026 | .80062 | 75 | 5.06274 | 7.31730 |
| 1 | .08922 | .08922 | 26 | .12343 | .17353 | 51 | .44713 | .87496 | 76 | 5.62182 | 7.99178 |
| 2 | .08254 | .08254 | 27 | .12176 | .17186 | 52 | .48989 | .95760 | 77 | 6.21387 | 8.68058 |
| 3 | .08171 | .08171 | 28 | .12009 | .17019 | 53 | .53771 | 1.05216 | 78 | 6.83324 | 9.37272 |
| 4 | .07921 | .07921 | 29 | .12009 | .17186 | 54 | .59311 | 1.15868 | 79 | 7.49616 | 10.08913 |
| 5 | .07504 | .07504 | 30 | .12009 | .17520 | 55 | .65444 | 1.27212 | 80 | 8.22966 | 10.86205 |
| 6 | .07170 | .07170 | 31 | .12260 | .18105 | 56 | .72255 | 1.39507 | 81 | 9.05445 | 11.71251 |
| 7 | .06670 | .06670 | 32 | .12510 | .18689 | 57 | .79493 | 1.52246 | 82 | 9.99708 | 12.66752 |
| 8 | .06336 | .06336 | 33 | .12928 | .19608 | 58 | .87327 | 1.65858 | 83 | 11.07332 | 13.73779 |
| 9 | .06169 | .06169 | 34 | .13428 | .20694 | 59 | .96182 | 1.80005 | 84 | 12.26712 | 14.88656 |
| 10 | .06086 | .06086 | 35 | .14096 | .21948 | 60 | 1.06061 | 1.95717 | 85 | 13.55591 | 16.07811 |
| 11 | .06419 | .06419 | 36 | .14764 | .23452 | 61 | 1.17052 | 2.13432 | 86 | 14.91787 | 17.27457 |
| 12 | .07087 | .07087 | 37 | .15683 | .25375 | 62 | 1.29585 | 2.33420 | 87 | 16.34412 | 18.45789 |
| 13 | .08254 | .08254 | 38 | .16685 | .27549 | 63 | 1.43921 | 2.56130 | 88 | 17.80841 | 19.76999 |
| 14 | .09589 | .09589 | 39 | .17854 | .30059 | 64 | 1.60155 | 2.81241 | 89 | 19.33267 | 21.08692 |
| 15 | .10758 | .13762 | 40 | .19107 | .32904 | 65 | 1.78129 | 3.08515 | 90 | 20.94168 | 22.42853 |
| 16 | .11926 | .15599 | 41 | .20611 | .36252 | 66 | 1.97513 | 3.37018 | 91 | 22.66794 | 23.82264 |
| 17 | .12844 | .17102 | 42 | .22115 | .39686 | 67 | 2.18574 | 3.67025 | 92 | 24.57677 | 25.33222 |
| 18 | .13345 | .18021 | 43 | .23870 | .43623 | 68 | 2.41241 | 3.98026 | 93 | 26.76407 | 27.31458 |
| 19 | .13846 | .18856 | 44 | .25626 | .47731 | 69 | 2.66044 | 4.31179 | 94 | 29.63735 | 29.94249 |
| 20 | .14013 | .19274 | 45 | .27717 | .52428 | 70 | 2.94130 | 4.67927 | 95 | 33.93112 | 33.93112 |
| 21 | .13929 | .19441 | 46 | .29975 | .57128 | 71 | 3.31274 | 5.08855 | 96 | 41.27938 | 41.27938 |
| 22 | .13679 | .19191 | 47 | .32401 | .62251 | 72 | 3.63093 | 5.55642 | 97 | 56.03986 | 56.03986 |
| 23 | .13428 | .18856 | 48 | .34996 | .67630 | 73 | 4.05630 | 6.08662 | 98 | 83.33333 | 83.33333 |
| 24 | .13094 | .18439 | 49 | .37927 | .73685 | 74 | 4.54126 | 6.66862 | 99 | 83.33333 | 83.33333 |

## Table of Guaranteed Maximum Cost of Insurance Rates - Female

**Basis of Calculation**
Non-Tobacco User:  1980 CSO Female Nonsmoker Table
Tobacco-User:  1980 CSO Female Smoker Table

| Attained Age | Non-Tobacco-User | Tobacco-User | Attained Age | Non-Tobacco-User | Tobacco-User | Attained Age | Non-Tobacco-User | Tobacco-User | Attained Age | Non-Tobacco-User | Tobacco-User |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | .24121 | .24121 | 25 | .09089 | .10758 | 50 | .34996 | .54694 | 75 | 3.17455 | 3.98816 |
| 1 | .07253 | .07253 | 26 | .09339 | .11175 | 51 | .37592 | .58556 | 76 | 3.58552 | 4.45292 |
| 2 | .06753 | .06753 | 27 | .09506 | .11509 | 52 | .40523 | .62923 | 77 | 4.02941 | 4.94359 |
| 3 | .06586 | .06586 | 28 | .09756 | .11842 | 53 | .43959 | .68050 | 78 | 4.50679 | 5.45796 |
| 4 | .06419 | .06419 | 29 | .10007 | .12343 | 54 | .47480 | .73264 | 79 | 5.03160 | 6.01271 |
| 5 | .06336 | .06336 | 30 | .10340 | .12928 | 55 | .51254 | .78735 | 80 | 5.62720 | 6.63228 |
| 6 | .06086 | .06086 | 31 | .10591 | .13428 | 56 | .55114 | .84209 | 81 | 6.31509 | 7.33831 |
| 7 | .06002 | .06002 | 32 | .10924 | .14013 | 57 | .58975 | .89434 | 82 | 7.11783 | 8.15276 |
| 8 | .05836 | .05836 | 33 | .11258 | .14597 | 58 | .62671 | .94326 | 83 | 8.05280 | 9.08725 |
| 9 | .05752 | .05752 | 34 | .11842 | .15516 | 59 | .66621 | .99389 | 84 | 9.10225 | 10.19935 |
| 10 | .05669 | .05669 | 35 | .12260 | .16184 | 60 | .71246 | 1.04963 | 85 | 10.26879 | 11.32663 |
| 11 | .05752 | .05752 | 36 | .13011 | .17436 | 61 | .76715 | 1.12147 | 86 | 11.53529 | 12.62729 |
| 12 | .06002 | .06002 | 37 | .13929 | .19024 | 62 | .83619 | 1.20861 | 87 | 12.91426 | 13.90110 |
| 13 | .06253 | .06253 | 38 | .14931 | .20778 | 63 | .92301 | 1.32636 | 88 | 14.39531 | 15.36669 |
| 14 | .06670 | .06670 | 39 | .16100 | .22784 | 64 | 1.02598 | 1.45789 | 89 | 16.00739 | 16.7857 |
| 15 | .07003 | .07837 | 40 | .17353 | .25041 | 65 | 1.13753 | 1.60580 | 90 | 17.75602 | 18.4526 |
| 16 | .07337 | .08254 | 41 | .18856 | .27800 | 66 | 1.25772 | 1.75230 | 91 | 19.68512 | 20.2692 |
| 17 | .07670 | .08672 | 42 | .20360 | .30393 | 67 | 1.37980 | 1.90505 | 92 | 21.86462 | 22.3007 |
| 18 | .07921 | .09089 | 43 | .21864 | .33071 | 68 | 1.50291 | 2.04355 | 93 | 23.29047 | 24.6682 |
| 19 | .08171 | .09422 | 44 | .23369 | .35750 | 69 | 1.63474 | 2.19946 | 94 | 27.67145 | 27.6714 |
| 20 | .08421 | .09673 | 45 | .24957 | .38513 | 70 | 1.78726 | 2.36513 | 95 | 32.32212 | 32.3221 |
| 21 | .08505 | .09640 | 46 | .26629 | .41361 | 71 | 1.97000 | 2.58026 | 96 | 40.04678 | 40.0467 |
| 22 | .08672 | .10090 | 47 | .28469 | .44378 | 72 | 2.19689 | 2.84786 | 97 | 55.15920 | 55.1592 |
| 23 | .08755 | .10257 | 48 | .30477 | .47480 | 73 | 2.47434 | 3.17541 | 98 | 83.33333 | 83.33 |
| 24 | .09005 | .10591 | 49 | .32569 | .50834 | 74 | 2.80204 | 3.55933 | 99 | 83.33333 | 83.3333 |

Policy Number   JP5517504

F350

This page intentionally left blank.

# Settlement Options

Instead of payment in one sum, all or part of the proceeds may be applied under one or more of the settlement options shown below. The right to elect and payments under a settlement option are subject to the conditions stated in this provision.

You may make, change or revoke an election at any time while the insured is alive. Following the death of the insured, the beneficiary may elect an option if you have not elected one or if proceeds are payable in one sum. A beneficiary may make a change in payment under a settlement option only if you provided for it in your election.

A change of beneficiary automatically cancels a previous election of a settlement option.

If this policy is assigned, the assignee's portion of proceeds will be paid in one sum. Any balance of proceeds may be applied under settlement options.

Proceeds placed under a settlement option for the benefit of any beneficiary must be at least $2,500 and payments to any payee must be at least $25.

If proceeds are payable to an executor, administrator, trustee, corporation, partnership or association, payment will be in one sum unless we agree to payment under a settlement option.

## Options

**1. Income for a Fixed Period**   Monthly installments will be paid for a period agreed upon.

**2. Life Income**   Monthly installments will be paid as elected under a, b or c:

   a. Life Only   Installments will be paid for as long as the payee lives.

   b. Guaranteed Period   Installments will be paid during the guaranteed period. After that, installments will be paid for as long as the payee lives.

   c. Installment Refund   Installments will be paid until the sum of payments equals all proceeds retained. After that, installments will be paid for as long as the payee lives.

The amount of each installment is determined by the payee's sex and age nearest birthday when payments begin.

**3. Interest**   For a period agreed upon, proceeds will be held by us and will earn interest at a rate we declare annually. This rate will be at least the rate shown on page 14.

During the period agreed upon:

   a. Interest will be paid monthly to the payee; or

   b. Interest can be allowed to accumulate.

At any time during the period agreed upon, proceeds may be placed under one of the other settlement options.

**4. Income of Fixed Amount**   Monthly installments will be paid in an amount agreed upon until proceeds and interest are exhausted.

**5. Annuity Settlement Option**   Instead of any other settlement option, the proceeds may be used to provide an income based on our Single Premium Immediate Annuity rates and rules in effect on the date the proceeds are payable. The amount of each installment will be adjusted to make it payable at the beginning of the payment period.

The amount of each installment provided by the proceeds will be 103% of the installment which normally would be paid under our Single Premium Immediate Annuity.

The amount of each installment based on our Single Premium Immediate Annuity is determined by the payee's sex and age nearest birthday when installments begin.

**When Installment Payments Begin**   Interest under option 3 will be paid at the end of each payment period. Payments under other options are made at the beginning of each payment period. Payment periods begin on the date proceeds become due and payable.

**Guaranteed and Excess Interest**   Payments are calculated at the guaranteed interest rate as shown on page 14. When we declare more than that rate, the excess will be paid as part of each payment under options 1, 3 and 4 and during the guaranteed and refund periods under option 2.

**Protection Against Creditors**   Funds held and payments made under settlement options shall not be assigned and, to the extent permitted by law, shall not be subject to levy, attachment or other judicial process.

**Other Conditions and Provisions**   Before payments begin under a settlement option, this policy must be exchanged for a supplementary contract expressing the terms of settlement.

Unless otherwise provided in the supplementary contract, the present value of any payments due after the death of the last surviving payee will be paid to that payee's estate.

Any indebtedness will decrease the amount placed under a settlement option unless the indebtedness is paid before installment payments begin.

# Settlement Option Tables

**Monthly Installments per $1,000 of Proceeds**

**Guaranteed Basis of Calculation for Settlement Option Installments**
Options 1, 3 and 4:  3% interest compounded annually.
Options 2 and 5:  3% interest compounded annually and the Progressive Annuity Table.

## Option 1 - Income for Fixed Period

| No. of Years | Monthly Instm't | No. of Years | Monthly Instm't | No. of Years | Monthly Instm't | No. of Years | Monthly Instm't | No. of Years | Monthly Instm't | No. of Years | Mon Ins |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 84.47 | 6 | 15.14 | 11 | 8.86 | 16 | 6.53 | 21 | 5.32 | 26 | 4 |
| 2 | 42.86 | 7 | 13.16 | 12 | 8.24 | 17 | 6.23 | 22 | 5.15 | 27 | 4 |
| 3 | 28.99 | 8 | 11.68 | 13 | 7.71 | 18 | 5.96 | 23 | 4.99 | 28 | 4 |
| 4 | 22.06 | 9 | 10.53 | 14 | 7.26 | 19 | 5.73 | 24 | 4.84 | 29 | 4 |
| 5 | 17.91 | 10 | 9.61 | 15 | 6.87 | 20 | 5.51 | 25 | 4.71 | 30 | 4 |

## Option 2 - Life Income

| Age of Payee Male | Female | Life Only | 5 Yrs. | 10 Yrs. | 15 Yrs. | 20 Yrs. | Instm't Refund |
|---|---|---|---|---|---|---|---|
| 15 & under | 19 & under | 2.96 | 2.98 | 2.97 | 2.96 | 2.95 | 2.95 |
| 16 | 20 | 2.98 | 3.00 | 2.99 | 2.98 | 2.97 | 2.97 |
| 17 | 21 | 3.00 | 3.01 | 3.00 | 2.99 | 2.98 | 2.99 |
| 18 | 22 | 3.01 | 3.03 | 3.02 | 3.01 | 3.00 | 3.01 |
| 19 | 23 | 3.03 | 3.05 | 3.04 | 3.03 | 3.02 | 3.02 |
| 20 | 24 | 3.06 | 3.07 | 3.06 | 3.05 | 3.04 | 3.05 |
| 21 | 25 | 3.08 | 3.10 | 3.09 | 3.08 | 3.07 | 3.07 |
| 22 | 26 | 3.10 | 3.12 | 3.11 | 3.10 | 3.09 | 3.09 |
| 23 | 27 | 3.12 | 3.14 | 3.13 | 3.12 | 3.11 | 3.11 |
| 24 | 28 | 3.15 | 3.17 | 3.16 | 3.15 | 3.14 | 3.13 |
| 25 | 29 | 3.18 | 3.19 | 3.18 | 3.17 | 3.16 | 3.16 |
| 26 | 30 | 3.20 | 3.22 | 3.21 | 3.20 | 3.19 | 3.18 |
| 27 | 31 | 3.23 | 3.25 | 3.24 | 3.23 | 3.22 | 3.21 |
| 28 | 32 | 3.26 | 3.27 | 3.26 | 3.25 | 3.24 | 3.24 |
| 29 | 33 | 3.29 | 3.30 | 3.29 | 3.28 | 3.27 | 3.26 |
| 30 | 34 | 3.32 | 3.34 | 3.33 | 3.32 | 3.31 | 3.29 |
| 31 | 35 | 3.36 | 3.37 | 3.36 | 3.35 | 3.34 | 3.33 |
| 32 | 36 | 3.39 | 3.40 | 3.39 | 3.38 | 3.37 | 3.36 |
| 33 | 37 | 3.43 | 3.44 | 3.43 | 3.42 | 3.41 | 3.39 |
| 34 | 38 | 3.47 | 3.48 | 3.47 | 3.46 | 3.44 | 3.43 |
| 35 | 39 | 3.51 | 3.52 | 3.51 | 3.50 | 3.48 | 3.46 |
| 36 | 40 | 3.55 | 3.56 | 3.55 | 3.54 | 3.52 | 3.50 |
| 37 | 41 | 3.60 | 3.60 | 3.59 | 3.58 | 3.56 | 3.54 |
| 38 | 42 | 3.65 | 3.65 | 3.64 | 3.62 | 3.60 | 3.58 |
| 39 | 43 | 3.70 | 3.70 | 3.69 | 3.67 | 3.65 | 3.63 |
| 40 | 44 | 3.75 | 3.75 | 3.74 | 3.72 | 3.69 | 3.67 |
| 41 | 45 | 3.80 | 3.80 | 3.79 | 3.77 | 3.74 | 3.72 |
| 42 | 46 | 3.86 | 3.86 | 3.85 | 3.82 | 3.79 | 3.77 |
| 43 | 47 | 3.92 | 3.92 | 3.90 | 3.88 | 3.84 | 3.82 |
| 44 | 48 | 3.99 | 3.98 | 3.97 | 3.94 | 3.89 | 3.87 |
| 45 | 49 | 4.05 | 4.05 | 4.03 | 4.00 | 3.95 | 3.93 |
| 46 | 50 | 4.13 | 4.12 | 4.10 | 4.06 | 4.00 | 3.99 |
| 47 | 51 | 4.20 | 4.19 | 4.17 | 4.13 | 4.06 | 4.05 |
| 48 | 52 | 4.28 | 4.27 | 4.25 | 4.20 | 4.12 | 4.12 |
| 49 | 53 | 4.36 | 4.36 | 4.33 | 4.27 | 4.18 | 4.18 |
| 50 | 54 | 4.46 | 4.44 | 4.41 | 4.35 | 4.25 | 4.26 |

| Age of Payee Male | Female | Life Only | 5 Yrs. | 10 Yrs. | 15 Yrs. | 20 Yrs. | Instm't Refund |
|---|---|---|---|---|---|---|---|
| 51 | 55 | 4.55 | 4.54 | 4.50 | 4.42 | 4.31 | |
| 52 | 56 | 4.65 | 4.64 | 4.59 | 4.51 | 4.38 | |
| 53 | 57 | 4.76 | 4.74 | 4.69 | 4.59 | 4.44 | |
| 54 | 58 | 4.87 | 4.85 | 4.79 | 4.68 | 4.51 | |
| 55 | 59 | 4.99 | 4.97 | 4.90 | 4.77 | 4.58 | |
| 56 | 60 | 5.12 | 5.09 | 5.01 | 4.86 | 4.65 | |
| 57 | 61 | 5.25 | 5.23 | 5.13 | 4.96 | 4.72 | |
| 58 | 62 | 5.40 | 5.37 | 5.25 | 5.06 | 4.79 | |
| 59 | 63 | 5.56 | 5.52 | 5.39 | 5.16 | 4.85 | |
| 60 | 64 | 5.72 | 5.68 | 5.52 | 5.27 | 4.92 | |
| 61 | 65 | 5.90 | 5.84 | 5.67 | 5.37 | 4.99 | |
| 62 | 66 | 6.09 | 6.02 | 5.82 | 5.48 | 5.05 | |
| 63 | 67 | 6.29 | 6.21 | 5.97 | 5.59 | 5.11 | |
| 64 | 68 | 6.51 | 6.41 | 6.13 | 5.69 | 5.16 | |
| 65 | 69 | 6.74 | 6.63 | 6.30 | 5.80 | 5.21 | |
| 66 | 70 | 6.99 | 6.86 | 6.48 | 5.90 | 5.26 | |
| 67 | 71 | 7.26 | 7.10 | 6.66 | 6.01 | 5.31 | |
| 68 | 72 | 7.55 | 7.36 | 6.84 | 6.11 | 5.34 | |
| 69 | 73 | 7.86 | 7.64 | 7.03 | 6.20 | 5.38 | |
| 70 | 74 | 8.19 | 7.93 | 7.22 | 6.29 | 5.41 | |
| 71 | 75 | 8.55 | 8.24 | 7.41 | 6.38 | 5.43 | |
| 72 | 76 | 8.94 | 8.57 | 7.60 | 6.46 | 5.45 | |
| 73 | 77 | 9.36 | 8.91 | 7.79 | 6.53 | 5.47 | |
| 74 | 78 | 9.82 | 9.28 | 7.98 | 6.59 | 5.49 | |
| 75 | 79 | 10.31 | 9.66 | 8.17 | 6.65 | 5.50 | |
| 76 | 80 | 10.85 | 10.06 | 8.35 | 6.70 | 5.50 | |
| 77 | 81 | 11.43 | 10.48 | 8.52 | 6.74 | 5.50 | |
| 78 | 82 | 12.06 | 10.92 | 8.68 | 6.77 | 5.51 | |
| 79 | 83 | 12.70 | 11.30 | 8.83 | 6.80 | 5.51 | |
| 80 | 84 | 13.50 | 11.83 | 8.96 | 6.82 | 5.51 | |
| 81 | 85 & over | 14.31 | 12.32 | 9.08 | 6.83 | 5.51 | |
| 82 | | 15.20 | 12.80 | 9.19 | 6.85 | 5.51 | |
| 83 | | 16.18 | 13.28 | 9.28 | 6.85 | 5.51 | |
| 84 | | 17.24 | 13.76 | 9.36 | 6.86 | 5.51 | |
| 85 & over | | 18.38 | 14.25 | 9.42 | 6.86 | 5.51 | |

## Option 3 - Interest Installments

| | |
|---|---|
| Monthly | 2.47 |
| Quarterly | 7.42 |
| Semiannually | 14.89 |
| Annually | 30.00 |

## Option 4 - Income of Fixed Amount

| Monthly Instm't | Years | Months | Monthly Instm't | Years | Months | Monthly Instm't | Years | Months |
|---|---|---|---|---|---|---|---|---|
| 5.00 | 22 | 10 | 10.00 | 9 | 6 | 30.00 | 2 | 10 |
| 6.00 | 17 | 10 | 12.50 | 7 | 4 | 33.33 | 2 | 7 |
| 6.67 | 15 | 6 | 15.00 | 6 | 0 | 35.00 | 2 | 5 |
| 7.00 | 14 | 7 | 16.67 | 5 | 4 | 40.00 | 2 | 1 |
| 7.50 | 13 | 5 | 17.50 | 5 | 1 | 45.00 | 1 | 10 |
| 8.00 | 12 | 5 | 20.00 | 4 | 5 | 50.00 | 1 | 8 |
| 9.00 | 10 | 9 | 25.00 | 3 | 6 | | | |

At the end of the periods shown in Option 4 there is often a small remaining balance which will also be paid.

 JEFFERSON PILOT FINANCIAL

Please check appropriate underwriting company:
☑ Jefferson-Pilot Life Insurance Company, PO Box 21008, Greensboro, NC 27420-1008
☐ Jefferson Pilot Financial Insurance Company, PO Box 515, Concord, NH 03302-0515

# AMENDMENT TO APPLICATION FOR INSURANCE

Policy No. JP5517504

The undersigned hereby amends his or her application for insurance dated 05/10/2005 on the life of

████████

We are authorized to make the following alterations in or additions to the application and to issue a policy as may be necessary to conform to said application as modified herein. I hereby accept the policy as issued.

The undersigned hereby makes the same representations, statements, answers and agreements to Jefferson Pilot Financial Life Insurance Company as were made on the Medical Application Part II, dated 12/2/04, a copy of which is attached to and made part·of this policy.

I certify that all the statements and answers on the ████████ Life Insurance continuation are full, completed and true to the best of my knowledge and belief, and are made part of the application # JP5517504 to Jefferson Pilot Financial Insurance Company. A copy of the ████████ Life Insurance continuation is attached and made part of this policy.

The undersigned hereby makes the same representations, statements and agreements to Jefferson Pilot Financial Life Insurance Company as were made on Exhibit #1 dated 12/31/04, a copy of which is attached to and made part of this policy.

The application for insurance was signed on May 5, 2005 in Los Angeles, California.

Dated at _____ this _____ day of _____ 20_____

_____
Signature of Proposed Insured
(Parent or Guardian if under 14 years of age)

_____
Signature of Proposed Insured
(Parent or Guardian if under 14 years of age)

_____
Signature of Owner (if other than Proposed Insured)

_____
Signature of Owner (if other than Proposed Insured)

_____
Signature of Witness

_____
Signature of Spouse (if coverage applied for)

BJF-01003

 **JEFFERSON PILOT FINANCIAL**

Please check appropriate underwriting company:
☑ Jefferson-Pilot Life Insurance Company, PO Box 21008, Greensboro, NC 27420-1008
☐ Jefferson Pilot Financial Insurance Company, PO Box 515, Concord, NH 03302-0515

## AMENDMENT TO APPLICATION FOR INSURANCE

Policy No. JP5517504

The undersigned hereby amends his or her application for insurance dated 05/10/2005 on the life of

███████████████

We are authorized to make the following alterations in or additions to the application and to issue a policy as may be necessary to conform to said application as modified herein. I hereby accept the policy as issued.

Question 30: This policy is issued with Terminal Illness Accelerated Benefit Rider

Question 35: The Tax Identification Number for the owner, ████████████████████
███████████████

Question 36: The relationship of the owner, ████████████████████████████ is trust

Question 39: The Tax Identification Number for the beneficiary, ████████████████████
███████████████

Question 40: The relationship of beneficiary is, ████████████████████████ is trust

Dated at _____ this _____ day of _____ 20_____

_____
**Signature of Proposed Insured**
(Parent or Guardian if under 14 years of age)

_____
**Signature of Proposed Insured**
(Parent or Guardian if under 14 years of age)

_____
**Signature of Owner (if other than Proposed Insured)**

_____
**Signature of Owner (if other than Proposed Insured)**

_____
**Signature of Witness**

_____
**Signature of Spouse (if coverage applied for)**

BJF-01003

Page 1 of 1
2/01

05/08/2005 12:34 FAX                                                      ☒003/030

**JP** JEFFERSON PILOT
FINANCIAL

Please check appropriate underwriting company:
☐ Jefferson Pilot Life Insurance Company Service Office: PO Box 21008, Greensboro, NC 27420-1008
☐ Jefferson Pilot Financial Insurance Company, Service Office: PO Box 515, Concord, NH 03302-0515
(hereinafter referred to as "the Company")

## APPLICATION FOR LIFE INSURANCE — PART I

### I. PROPOSED INSURED

| 1. Name of Proposed Insured ☒ Male ☐ Female (First, Middle, Last) | | 2. Date of Birth (mm/dd/yy) | 3. Place of Birth (State, Country) | 4. Social Security Number |
|---|---|---|---|---|
| | | | | 5. Driver License # & State of Issue |

| 6. Home Address (Street, City, State, Zip Code) | | | 7. Years At This Address |
|---|---|---|---|

| 8. Employer | 9. Business Address (Street, City, State, Zip Code) | |
|---|---|---|

| 10. Occupation/Duties | 11. Home Telephone | 12. Business Telephone | 13. Citizen of (Country) |
|---|---|---|---|

### II. PROPOSED ADDITIONAL INSURED - Complete for Survivorship Life Policy or Term Rider on Spouse/Other Insured for Individual Life Policy.

| 14. Name of Proposed Insured ☐ Male ☐ Female (First, Middle, Last) | | 15. Date of Birth (mm/dd/yy) | 16. Place of Birth (State, Country) | 17. Social Security Number |
|---|---|---|---|---|
| | | | | 18. Driver License # & State of Issue |

| 19. Home Address (Street, City, State, Zip Code) | | | 20. Years At This Address |
|---|---|---|---|

| 21. Employer | 22. Business Address (Street, City, State, Zip Code) | |
|---|---|---|

| 23. Occupation/Duties | 24. Home Telephone | 25. Business Telephone | 26. Citizen of (Country) |
|---|---|---|---|

### III. COVERAGE INFORMATION

27. Plan of Insurance (If Ensemble®, also complete Question 32) | 28. Amount of Insurance: $
    JPF Legend 300                                                    $ 10,000,000

29. (i) Death Benefit Option    ☒ Level    ☐ Increasing    ☐ Specified Amount plus premiums less withdrawals
    (ii) Death Benefit Qualification Test  ☒ Guideline Premium Test  ☐ Cash Value Accumulation Test (not available on all products)
    (Cannot be changed after issue. If no selection is made, Guideline Premium Test will apply.)

30. Additional   ☐ Disability Waiver of Premium                    ☐ (Graded Premium) Lapse Protection Rider
    Benefits:    ☐ Accidental Death Benefit $ _____        ☐ Term on Spouse/Other Insured Rider $ _____
                 ☐ Guaranteed Insurability $ _____         ☐ Children's Rider $ _____ / Units _____
                 ☐ Waiver of Specified Premium $ _____       (Complete Child's Supplement)
                 ☐ Accelerated Benefit Rider                       ☐ Other _____
                 ☐ Supplemental Coverage/                          ☐ Other _____
                   Additional Specified Amount Rider $ _____     ☐ Other _____

31. Automatic Premium Loan   ☐ Yes (if available) ☒ No

32. Complete only if applying for Variable Life Insurance with Jefferson Pilot Financial Insurance Company.
    Submit Premium Allocation and Disclosure Form for Variable Universal Life with Application.

    (i) Monthly insurance and administrative charges will be deducted from the General Account and divisions of the
        Separate Account on a pro rata basis unless the box is checked below (not available on all VUL products):

        ☐ Deduct all charges from the _____ division (any single division or
          the General Account may be noted).

05/09/2005 12:34 FAX 004/030

(i) Suitability

| | Yes | No |
|---|---|---|
| 1. Have you, the Proposed Insured(s) and the Owner, if other than the Proposed Insured(s), received a current Prospectus dated _____ for the policy applied for and have you had sufficient time to review it? | ☐ | ☐ |
| 2. Do you understand that the amount and duration of the death benefit may increase or decrease depending on the investment performance of funds in the Separate Account? | ☐ | ☐ |
| 3. Do you understand that the cash values may increase or decrease depending on the investment performance of the funds held in the Separate Account? | ☐ | ☐ |
| 4. With this in mind, do you believe that the policy applied for is in accord with your insurance objective and your anticipated financial needs? | ☐ | ☐ |

CASH VALUES MAY INCREASE OR DECREASE IN ACCORDANCE WITH THE EXPERIENCE OF THE SEPARATE ACCOUNT. THE DEATH BENEFIT MAY BE VARIABLE OR FIXED UNDER SPECIFIED CONDITIONS.

## IV. OWNER INFORMATION (Complete if Different from Proposed Insured(s))

33. (i) Owner Name (First, Middle, Last) _____ (ii) Citizen of (Country)

34. Owner Address

35. Owner Social Security or Tax ID #  36. Relationship to Proposed Insured(s)  37. Trust Date (if no Trust, leave blank)

## V. BENEFICIARY DESIGNATION

| 38. Primary Beneficiary(ies): | 39. Social Security or Tax ID #: | 40. Relationship(s) to Proposed Insured(s): |
|---|---|---|
| | | |
| 41. Contingent Beneficiary(ies): | 42. Social Security or Tax ID #: | 43. Relationship(s) to Proposed Insured(s): |
| | | |
| 44. Beneficiary for Spouse/Other Insured Term Rider: | | 46. Relationship to Spouse/Other Insured: |
| 45. Social Security or Tax ID #: | | |

## VI. BILLING INSTRUCTIONS

47. Cash with Application $  0  Was the Conditional Receipt Given?  ☐ Yes  ☒ No

48. Planned Premium: $  439,287  49. Lump Sum: $  64,453  ☐ 1035 Amount

50. Premiums to be Paid:  ☒ Annually  ☐ Semi-Annually  ☐ Quarterly  ☐ Monthly  ☐ List Bill #_____
☐ DRAFT/PAC  ☐ PDP (Complete Transmittal)  ☐ Other: _____

51. Premium Bill to be Sent to:  ☐ Proposed Insured at:  ☐ Other ("Care Of" Name and Mailing Address)
    ☐ Home Address
    ☐ Business Address; or
    ☐ Proposed Additional Insured at:  ☐ Other ("Care Of" Name and Mailing Address)
    ☐ Home Address
    ☐ Business Address; or
    ☒ Owner at address listed in #34

52. Special Instructions:

Backdate to save 77.

Complete each question for the Proposed Insured and any Additional Insured.

| VII. PERSONAL FINANCE | Proposed Insured | Additional Insured |
|---|---|---|
| 53. Annual Earned Income: | a) $ | b) $ |
| 54. Annual Unearned Income: | a) $ _Sm_ | b) $ |
| 55. Total Assets: | a) $ _estimated_ | b) $ |
| 56. Total Liabilities: | a) $ _Financing_ | b) $ |
| 57. Net Worth: | a) $ | b) $ |
| 58. In the last 5 years have you filed for bankruptcy? If "Yes", COMPLETE the Financial Supplement. | a) ☐ Yes ☒ No | b) ☐ Yes ☐ No |
| **VIII. LIFE INSURANCE IN FORCE** | | |
| 59. Have you ever applied for life, health or disability insurance and been declined, postponed or charged an increased premium? | a) ☐ Yes ☒ No | b) ☐ Yes ☐ No |
| 60. Do you have any applications pending with any other life insurance company now? | a) ☒ Yes ☐ No | b) ☐ Yes ☐ No |

If answered "Yes" to question 59-60, please give details here for each Proposed Insured.

60  New York Life      $ 10,000,000  United Life   —   Pending
    AXA/Equitable      $ 10,000,000  United Life   —   Pending

61. Have you or will you replace, discontinue coverage, stop paying premiums, initiate a reduction in face amount, borrow or surrender cash value on any Life Insurance or Annuity if this insurance is issued?   ☐ Yes   ☒ No
If yes, please complete all required replacement forms and check the appropriate box in Question 62.

62. List all insurance in force on any Proposed Insured. If none, check this box. ☐

| Insured's Name & Company | Face Amount | Policy Number | Issue Year | Replacement or Change of Policy? | Check here if 1035 Exchange |
|---|---|---|---|---|---|
| | | | | ☐ Yes ☒ No | ☐ |
| | | | | ☐ Yes ☐ No | ☐ |
| | | | | ☐ Yes ☐ No | ☐ |
| | | | | ☐ Yes ☒ No | ☐ |

| IX. GENERAL RISK INFORMATION | Proposed Insured | Additional Insured |
|---|---|---|
| 63. In the past 3 years, have you smoked a cigarette, cigar or pipe, chewed tobacco or used tobacco or nicotine in any form? If "Yes", last used (form) Month, Year | | b) ☐ Yes ☐ No |
| 64. Do you plan to travel or reside outside the US or Canada within the next 12 months? | a) ☐ Yes ☒ No | b) ☐ Yes ☐ No |
| 65. Are you a member of, or applied to be a member of, or received a notice of required service in, the armed forces, reserves or National Guard? If "Yes", please list: branch of service, rank, duties, mobilization category and current duty station. | a) ☐ Yes ☒ No | b) ☐ Yes ☐ No |
| 66. In the past 3 years, have you engaged in, or in the future do you plan to engage in, flying in noncommercial aircraft; racing of any kind; skin or scuba diving; parachuting or sky diving; hang gliding; mountain, rock or technical climbing? If "Yes", complete Aviation-Avocation Supplement. | a) ☐ Yes ☒ No | b) ☐ Yes ☐ No |
| 67. Have you ever been convicted of a felony or misdemeanor (except for a minor traffic violation)? | a) ☐ Yes ☒ No | b) ☐ Yes ☐ No |
| 68. In the past 5 years, have you been convicted of (i) two or more moving violations, (ii) driving under the influence of alcohol or other drugs, or (iii) had your driver's license suspended or revoked? | a) ☐ Yes ☒ No | b) ☐ Yes ☐ No |

05/08/2005 12:35 FAX                                    ☎ 008/030

## LIFE INSURANCE
### AT 12/31/04

| EQUITABLE POLICY # | DATE OF POLICY | FACE AMT. | LOAN OUTSTANDING | CASH VALUE | TERM INSURANCE | NET PAYABLE TO BENEFICIARIES |
|---|---|---|---|---|---|---|
| 652220798 | 2/8/1959 | $50,000 | $34,115 | $43,650 | $0 | $15,885 |
| 652220797 | 2/8/1959 | $50,000 | $30,480 | $43,650 | $0 | $19,840 |
| 652220798 | 2/8/1959 | $10,000 | $4,551 | $7,930 | $0 | $5,433 |
| 16581421 | 11/19/1957 | $10,000 | $4,215 | $7,830 | $0 | $5,762 |

| MANULIFE POLICY # (formerly Danchise Life) | | | | | | |
|---|---|---|---|---|---|---|
| 84870870 | 3/2/1963 | $50,000 | $30,815 | $41,650 | $0 | $19,185 |

| | | | | | | |
|---|---|---|---|---|---|---|
| TOTAL | | $170,000 | $104,175 | $144,160 | $0 | $66,925 |

EQUITABLE (888) 855-6100
MANULIFE (800) 387-2717

J:\XL\DATA\LCH\2005\[CURRENT.xls]SCHD

| IX.  GENERAL RISK INFORMATION (Continued) | Proposed Insured | Additional Insured |
|---|---|---|
| 69. Have you ever been diagnosed by or received treatment from a medical professional for Acquired Immunodeficiency Syndrome (AIDS)? | | b) ☐ Yes  ☐ No |

If answered "Yes" to questions 63-69, please give details here for each Proposed Insured.

Proposed Insured: _____

_____
_____
_____

Additional Insured: _____

_____
_____
_____

**X.   MEDICAL INFORMATION**

Proposed Insured:

70. Name /address/phone number of your personal physician and /or health care facility? (If none, indicate "None".)

   a. Date and reason last consulted? _____
   b. Treatment or medication prescribed? _____

71. Height _____ ft. _____ in.     Weight _____ lbs.
   a. Has your weight changed by more than 10 pounds during the past 12 months?     ☐ Yes  ☒ No
   b. If "Yes", by how many pounds? _____     ☐ Gain  ☐ Loss

Additional Insured:

72. Name/address/phone number of your personal physician and/or health care facility? (If none, indicate "None".)

   a. Date and reason last consulted? _____
   b. Treatment or medication prescribed? _____

73. Height _____ ft. _____ in.     Weight _____ lbs.
   a. Has your weight changed by more than 10 pounds during the past 12 months?     ☐ Yes  ☐ No
   b. If "Yes", by how many pounds? _____     ☐ Gain  ☐ Loss

| 74. Have you ever had, or been told by a medical professional to seek treatment because of, any of the following: | Proposed Insured | Additional Insured |
|---|---|---|
| i.  Chest pain, high blood pressure, heart attack, heart murmur, disease of the heart or blood vessels? | | |
| ii. Cancer, tumor, leukemia, blood disorder (excluding HIV status), melanoma, or lymphoma? | | |
| iii. Diabetes or high blood sugar? | | |
| iv. Shortness of breath, asthma, sleep apnea, emphysema, tuberculosis, or other lung disease? | | |
| v.  Disease of the nervous system, stroke, seizure, paralysis? | | |
| vi. Mental or nervous disorder, depression, anxiety? | | |
| vii. Hepatitis, cirrhosis, or other disease of the liver or pancreas? | | |
| viii. Ulcer, colitis, or other disorder of the stomach or intestines? | | |
| ix. Disease or disorder of the kidneys, bladder or prostate, or a sexually transmitted disease (excluding HIV status)? | | |
| x.  Arthritis, disease or injury of the muscles, bones, or joints? | | |
| xi. In the past 10 years, any other health impairment, congenital deformity or medically or surgically treated condition not mentioned above? | | |
| 75. Have you ever used or experimented with cocaine, marijuana, or other non-prescription stimulants, depressants, or narcotics? | | |
| 76. Have you ever been treated, or advised to receive treatment, for use of alcohol or drugs? | | |
| 77. In the past 30 days, have you taken any medication or non-prescription drug? | | |
| 78. Are you now planning to seek medical advice or treatment for any reason? | | |

☒ 008/030

**Proposed Insured:**

| 78. Family Record | Age If Living | Present Health | Age at Death | Cause of Death |
|---|---|---|---|---|
| Father | | | | |
| Mother | | | | |
| Brothers | | | | |
| Sisters | | | | |

**Additional Insured:**

| 80. Family Record | Age If Living | Present Health | Age at Death | Cause of Death |
|---|---|---|---|---|
| Father | | | | |
| Mother | | | | |
| Brothers | | | | |
| Sisters | | | | |

If answered "Yes" to questions 71, 73, 74-78, please give complete details including date of last treatment and name/ address/phone number of the attending physician.

Proposed Insured:

Additional Insured: _____

XI.  SERVICE OFFICE ENDORSEMENTS (Attach an additional sheet of paper, if necessary)

05/08/2005 12:38 FAX                              🖂 005/030

## AGREEMENT AND ACKNOWLEDGEMENT

I, the Owner, declare that my tax identification or social security number as shown is correct. I also certify that I am not subject to backup withholding.

Each of the Undersigned declares that:

1. This Application consists of: a) Part I Application; b) Part II Medical Application, if required; c) any amendments to the application(s) attached thereto; and d) any supplements, all of which are required by the Company for the plan, amount and benefits applied for.

2. Unless otherwise provided by the Conditional Receipt, the Company will have no liability under this application unless and until: a) it has been received and approved by the Company at its Service Office; b) the policy has been issued and delivered to the policyowner; c) the first premium has been paid to and accepted by the Company; and d) at the time of delivery and payment, the facts concerning the insurability of each person proposed for insurance are as stated in this application.

3. No agent, broker or medical examiner has the authority to make or modify any Company contract or to waive any of the Company's requirements.

4. Corrections, additions or changes to this application may be made by the Company. Any such changes will be shown under "Service Office Endorsements". Acceptance of a policy issued with such changes will constitute acceptance of the changes. No change will be made in classification (including age at issue), plan, amount, or benefits unless agreed to in writing by the Applicant.

5. I ACKNOWLEDGE receipt of the Notices on the Medical Information Bureau and Fair Credit Reporting Act.

6. I HAVE READ, or have had read to me, the completed Application for Life Insurance before signing below. All statements and answers in this application are correctly recorded, and are full, complete and true. I UNDERSTAND that any false statements or material misrepresentations may result in the loss of coverage under the policy.

## STATE DISCLOSURES

Any person who, with intent to defraud or knowing that he/she is facilitating fraud against an insurer, submits an application or files a claim containing a false or deceptive statement may be guilty of insurance fraud.

## TO BE COMPLETED BY AGENT ONLY

(i) Do you know or have you any reason to believe that replacement of insurance is involved? ☐ Yes ☒ No

If a replacement is involved, I certify that only company approved sales materials were used in this sale and that copies of all sales materials were left with the applicant.

(ii) I declare that I asked the Proposed Insured(s) each question on the application. The answers have been recorded by me exactly as stated and I know of nothing affecting the insurability of the Proposed Insured(s) which is not fully recorded in this application.

(iii) I declare that I have accurately answered any questions contained in the Agent's Report completed by me in connection with this application.

(iv) Did you see the Proposed Insured(s) on the date of application? ☐ Yes ☒ No (If not seen, an examination is required.)

(v) I verified the Owner/Applicant's identity by viewing the individual's photograph on a driver's license, passport or other official document and have transcribed the number of such identification below. If applicant is a business or trust entity, I viewed documentation confirming the entity's legal status and state of formation.

☒ Yes ☐ No    Driver's License, Passport or Other ID#: _____

         010/030

# AUTHORIZATION

Each of the Undersigned declares that:

I authorize any licensed physician, medical practitioner, hospital, clinic or any other medically related facility, insurance support organizations, insurance company, Medical Information Bureau (MIB), consumer reporting agency, employer, financial source or government agency that has any records or knowledge of:

Proposed Insured/Patient _____

Date of Birth _____

Proposed Additional Insured/Patient _____

Date of Birth _____

or the proposed insured's health, including but not limited to transaction records, employment records, financial records, and complete medical records (including information regarding insurance, demographics, referral documents and records from other facilities) or if other, indicate here: _____

to give all such information to Jefferson-Pilot Life Insurance Company or Jefferson Pilot Financial Insurance Company (the Company), their licensed representatives and/or their reinsurers, MediConnect.net Inc, or if other, indicate here: GIS _____.

I understand that an authorization for release or disclosure of psychotherapy notes may not be combined with an authorization for release or disclosure of any other information (a separate Authorization Page must be completed for release or disclosure of psychotherapy notes).

I understand that the information obtained may be used by the Company to determine eligibility for insurance, or to administer my coverage. The Company may not give the information to any person or entity except: 1) a reinsurer, or other insurers to whom I have applied or may apply; 2) MIB; or 3) any other person or entity who performs business or legal services in connection with the administration of my insurance coverage. I understand that some of these people or entities may not be covered by federal or state privacy regulations and that the information they receive may be redisclosed, however the Company contractually requires them to protect the information we disclose to them. Information may be disclosed as allowed by law or regulation.

I have received a Privacy Practices Notice which details the method I must use to exercise my right to access, correct, and amend any information gathered about me or my children which relates to this application. I understand that I can provide written revocation of this Authorization to the Company at any time, except: 1) if the Company has taken action in reliance on the Authorization; or 2) the Company is using the Authorization in connection with a contestable claim under my policy.

This is not authorization to release HIV-related information unless on HIV Consent Form with authorization for optional release of information to my personal physician has been signed by me.

## AUTHORIZATION - CONTINUED

I understand that if I refuse to sign this authorization to release my complete medical record, the Company may not be able to process my application.

I agree that a copy of this authorization shall be as valid as the original and this authorization shall be valid for 24 months from the date shown below. I may have a copy upon request.

☐ I elect to be interviewed if an Investigative Consumer Report is prepared.



SIGNATORY SECTION

Signed at _____ this ____ day of _____ _____
                    (city and state)                                                    (month)          (year)

Signature of Proposed Insured                          Signature of Proposed Additional Insured (if coverage applied for)
(Parent or Guardian if minor 14 years of age)

Signature of Owner (if other than Proposed Insured)

Signature of Licensed Agent, Broker or Registered Representative          Name of Licensed Agent, Broker or Registered Representative
                                                                          (Please Print)

## APPLICABLE TO VARIABLE LIFE ONLY

I have reviewed the Application, New Account Form and Premium Allocation and Disclosure Form and find the transaction suitable.

Signature of Registered Principal of Broker/Dealer          Name of Registered Principal of Broker/Dealer (Please Print)



# Medical Examination Form

☐ ReliaStar Life Insurance Company, 20 Washington Avenue South, Minneapolis, MN 55401
☐ Security-Connecticut Life Insurance Company, 20 Security Drive, Avon, CT 06901-4237
☑ Security Life of Denver Insurance Company, 1290 Broadway, Denver, CO 80203-5699
☐ Southland Life Insurance Company, Atlanta, GA–Administrative Office: 1290 Broadway, Denver, CO 80203-5699

# Medical Examiner's Report
*Give further details needed for clarification in space at bottom of form.*

## Accelerated Benefits Rider

**Rider forming a part of the policy to which attached.**

**Benefit**

We will pay you a portion of the death benefit of the policy upon occurrence of one of the Qualifying Events shown below while the policy and this rider are in force.

The portion of the death benefit available under this rider for a Qualifying Event will be the applicable benefit percentage for that event applied to the death benefit of the base policy only, **not** including the Rider Specified Amount of any in force Additional Specified Amount Rider attached to the policy.

In no event, however, will the rider benefit paid be greater than:

(1)   $250,000 in total for all Qualifying Events; and

(2)   $25,000 in total for all Qualifying Event (3).

An administrative charge, not to exceed $300, will be deducted from any benefit payable under this rider.

The maximum amount available on all policies with an Accelerated Benefits Rider in force with us is $250,000 per Insured.

**Qualifying Events**

Each of the following is a Qualifying Event:

(1)   The Insured's life expectancy is reduced to less than 6 months;

(2)   The Insured is confined to an eligible nursing home for the balance of life; or

(3)   The Insured experiences a covered catastrophic health condition.  Covered catastrophic health conditions are:
   (a)   heart attack;
   (b)   stroke;
   (c)   major organ transplant; or
   (d)   the diagnosis for the first time of:
      (i)   life threatening cancer;
      (ii)   end stage renal failure;
      (iii)   permanent paralysis; or
      (iv)   Alzheimer's Disease.

**Benefit Percentages**

The benefit percentages are 50% for Qualifying Event (1), 40% for Qualifying Event (2), and 5% for Qualifying Event (3).  If the Insured experiences more than one covered catastrophic health condition, only 5% of the death benefit, subject to the $25,000 maximum, will be paid for all covered catastrophic health conditions under Qualifying Event (3).

**Catastrophic Health Conditions Definitions**

**Heart Attack (Myocardial Infarction)** – The death of a portion of the heart muscle, as a result of inadequate blood supply to the relevant area. This rider will not cover angina or the chance finding of EKG changes suggestive of a previous heart attack.

> Benefits paid under this rider may be taxable. If so, you or your beneficiary may incur a tax obligation. As with all tax matters, you should consult your personal tax advisor to assess the impact of this benefit.

**Stroke** – Cerebrovascular accident or infarction (death) of brain tissue caused by hemorrhage, embolism or thrombosis producing measurable, neurological deficit persisting for at least 30 days following the occurrence of the stroke. This rider will not cover Transient Ischemic Attacks.

**Major Organ Transplant** – The receipt by transplant of any of the following organs or tissues: heart, liver, lung or bone marrow when such receipt is necessary because of a life-threatening situation.

**Life Threatening Cancer** – Cancer as manifested by the uncontrolled growth and spread of malignant cells including tumors and malignant melanomas which have spread through the epidermis. This rider will not cover benign tumors or polyps, Stage A prostate cancer, carcinoma in situ and any skin cancer.

**End Stage Renal Failure** – Chronic irreversible failure of both the kidneys which requires the undergoing of regular dialysis or transplant.

**Permanent Paralysis** – Any permanent paralysis of two or more limbs, paraplegia or quadriplegia, which has existed continuously for 180 days since the paralysis began.

**Alzheimer's Disease** – A definitive diagnosis of Alzheimer's Disease by a Physician who is a certified Neurologist supported by medical evidence that the Insured exhibits the loss of intellectual capacity resulting in the impairment of memory and judgement such that permanent daily personal supervision is required.

**Qualifying Event Certification**

Before any benefit can be paid under this rider, you must furnish evidence satisfactory to us. Such evidence must be in the form of a certification of the Insured's medical condition from a licensed physician. The certification must state that in the physician's opinion:

1.   The Insured's life expectancy has been reduced to less than 6 months;

2.   Due to a medical condition, the Insured will be confined to an eligible nursing home for the balance of life; or

3.   The Insured has experienced one of the covered catastrophic health conditions.

An eligible nursing home is an institution or special nursing unit of a hospital which meets at least one of the following requirements:

1.   It is Medicare approved as a provider of skilled nursing care services;

2.   It is licensed as a skilled nursing home, an intermediate care facility or a hospice facility by the state in which it is located; or

Jefferson-Pilot
Life Insurance Company
Policy Number   JP5517504

3.  It meets all requirements listed below:

    a.  It is licensed as a nursing home by the state in which it is located;

    b.  Its main function is to provide skilled, intermediate, or custodial nursing care;

    c.  It is engaged in providing continuous room and board accommodations to 3 or more persons;

    d.  It is under the supervision of a Registered Nurse;

    e.  It maintains a daily medical record of each patient; and

    f.  It maintains control and records for all medications dispensed.

Institutions which primarily provide residential facilities are not eligible nursing homes.

## Further Medical Exams

In regard to any Qualifying Event, in addition to the requirement that a written diagnosis or statement be provided by the Insured's physician, we may also require, at our expense, an examination of the Insured by a physician we choose, or such other evidence we think is necessary. If there is a difference of opinion between the Insured's physician and our physician as to the Insured's condition, expectation of life and/or expectation of staying in a nursing home for the balance of life, we will require that a third opinion be obtained from a physician acceptable to us and to you. This opinion will be at our expense and will be mutually binding.

## Right to Exercise Rider Benefit

Your right to exercise the options of and receive payments under this rider are conditioned on the following:

1.  The policy must be in force other than under an extended term nonforfeiture option on the date your request for benefits is received in the Home Office;

2.  The cash surrender value of the policy must be sufficient to cover the monthly deductions for the policy for a period of five years following the payment of the accelerated death benefit (accelerated benefit continuation period);

3.  Your request must be made in writing; and

4.  The policy must not be assigned except as security for a policy loan.

Accelerated death benefits provided through the use of this rider are made available to you on a voluntary basis. The use of this rider is not meant to cause you to involuntarily access proceeds. Therefore, you are not eligible for benefits under this rider if:

1.  You are required by law to use this benefit to meet the claims of creditors, whether in bankruptcy or otherwise; or

2.  You are required by a government agency to use this benefit in order to apply for, obtain, or otherwise keep a government benefit or entitlement.

## Payment of Rider Benefit

The conditions for payment of the rider benefit are as follows:

1.  Any rider benefit paid will be first used to repay a portion of any outstanding indebtedness. The portion to be repaid will be determined by applying the applicable benefit percentage to the indebtedness as of the date the benefit is paid.

2.  The remaining rider benefit will be paid to you in a lump sum. Payments other than as a lump sum may be made at your request in a manner mutually agreed upon.

3.  If a benefit less than the maximum is paid, the balance of the maximum benefit can be applied for at a later date.

4.  The maximum benefit at any time will be (a) minus (b) where:

    a.  is the lesser of the death benefit of the policy at the time of the claim times the applicable benefit percentage, or $250,000; and

    b.  is any rider benefit that has already been paid.

For example, if 5% of the death benefit has been paid due to a covered catastrophic health condition, an additional 45% (50% less 5%) could be claimed at a later date if terminal illness is diagnosed.

## Effect on Your Policy

The accelerated benefit paid plus accrued interest will be treated as a lien against your policy. Access to the cash value of your policy through policy loans, partial surrenders or a full surrender will be limited. The amount available for such usage will be the amount of cash value in excess of an amount determined by applying the applicable benefit percentage to the cash value of your policy.

Following payment of the accelerated death benefit, a policy loan or partial surrender that would reduce the cash surrender value to an amount which is insufficient to cover the monthly deductions for the policy from the date of the loan or partial surrender to the end of the accelerated benefit continuation period will not be allowed.

Death proceeds as defined in the policy will be reduced by the amount of the accelerated benefit paid plus accrued interest.

If this policy contains an Interest Rate provision, interest credited on any value held as security for a lien under this rider may be at a different rate than that used for other value. Any benefits payable under other riders attached to your policy will not be affected by any benefit paid under this rider.

## Repayment

You may repay all or part of the accelerated benefit at any time while this rider is in force. Each partial repayment must be at least $25 and clearly marked for repayment of the accelerated benefit.

**Interest**

We will charge interest on the amount of the accelerated benefit. The interest accrues daily at the interest rate described below. On the policy anniversary, the accrued interest will be added to the accelerated benefit and bear interest at the rate then in effect. Additional interest will not accrue if the accelerated benefit plus accrued interest equals the death benefit.

**Interest Rate**

The interest rate on any lien will be determined by us. The rate which applies to a policy year will be determined at least 30 days before the beginning of that policy year. The rate will not change during that year.

The interest rate on the portion of the lien which is equal to the policy value at the time you request the accelerated benefit less any indebtedness will be the policy loan interest rate.

The interest rate on the remaining portion of the lien will not exceed the maximum rate permitted by law for policy loans. This maximum rate is determined as follows:

The rate for a policy year will not be more than the higher of the following:

1.  The published monthly average (defined below) for the calendar month ending 2 months before the date on which the rate is determined; or

2.  The rate used to compute the cash surrender values under the policy for that year plus 1 percent.

The published monthly average referred to above is defined as:

1.  Moody's Corporate Bond Yield Average—Monthly Average Corporates as published by Moody's Investors Service, Inc., or any successor thereto; or

2.  In the event that Moody's Corporate Bond Yield Average—Monthly Average Corporates is no longer published, a substantially similar average, established by regulation, or other method, issued by the Insurance Department of the state or other jurisdiction where this policy is issued.

A change from the rate being used for a policy year to a new rate to be used for the next policy year will be made as follows:

1.  The rate will be decreased to be equal to or less than the maximum rate if such maximum rate is at least ½% lower than the rate being used.

2.  The rate may be increased to be equal to or less than the maximum rate if such maximum rate is at least ½% higher than the rate being used.

If there is a lien in effect, we will notify you and any assignee of record 30 days before each policy anniversary of any increase in the rate for the next policy year. If a new lien is requested, we will notify you and any assignee of the rate in effect when the lien is made.

**Claims**

You must make written request for benefits under this rider.

**General Provisions**

This rider is subject to all of the applicable provisions of the policy except for the provisions contained in this rider. This rider will control in event of any conflict with the policy.

**Termination**

This rider will terminate:

1.  Upon written request and return of the policy for endorsement;

2.  On surrender or other termination of the policy; or

3.  Upon continuation of this policy under an extended term nonforfeiture option.

**Effective Date**

The effective date of this rider is the policy date of the policy unless a later date is shown below.

Secretary

**JEFFERSON-PILOT**
**LIFE INSURANCE COMPANY**

Home Office:    **100 North Greene Street**
                **P.O. Box 21008**
                **Greensboro, North Carolina 27420**

When writing the Home Office, please give the policy
number, Insured's full name and your address.

**Important Information**

This policy is a valuable asset.  Read it carefully and file it
with your other valuable papers.

If you need any of the following services, contact our nearest
representative or our Home Office:

1.   Information about this policy.

2.   Preparation of claims papers, or other notices, elections
     or requests.

3.   Examination of any proposal that you lapse or surrender
     this policy - this is for your own protection.

4.   Additional life insurance service.

**FLEXIBLE PREMIUM**
**ADJUSTABLE LIFE**

Proceeds payable at death. Flexible premiums payable during lifetime of Insured. Policy values may increase or
decrease as determined by declared interest and risk rates.  Non-participating.

F3700

# EXHIBIT 3

 **LINCOLN NATIONAL LIFE INSURANCE COMPANY**
PO BOX 26070
GREENSBORO, NC 27420

02608  672395  ********************MIXED AADC 430
WELLS FARGO BANK NA
P. O. BOX 1450
NW6182
MINNEAPOLIS, MN  55485-1450

01042608000



# Lincoln
**Financial Group®**

The Lincoln National Life Insurance Company
PO Box 26070
Greensboro, NC  27420

September 12, 2016

WELLS FARGO BANK NA
P. O. BOX 1450
NW6182
MINNEAPOLIS, MN 55485-1450

Re:      **IMPORTANT NOTIFICATION**
Policy Number:  JP5517504
Insured:     ▮▮▮▮▮▮

Dear WELLS FARGO BANK NA,

We are writing to provide you with important information regarding your life insurance policy.

As described in your policy, each month the company deducts certain charges from the policy value, including a charge for cost of insurance. For additional details about these charges, please refer to your annual statement of account.

**Beginning 10/17/2016 your policy's cost of insurance (COI) rates will increase.**

We are operating in a challenging and changing environment as we continue to face nearly a decade of persistently low interest rates, including recent historic lows, and volatile financial markets. Prudent management of our business and monitoring of the external environment have been crucial to Lincoln's 110-year track record of helping people secure their financial futures, and remains so today. This includes making fair and responsible adjustments as necessary and appropriate to ensure we are providing value to our customers while operating responsibly for the long-term.

**You have options and we can help.**
The best way to learn how these COI changes will impact policy performance and to make an informed decision on managing your policy is to request an inforce illustration. See the Frequently Asked Questions (FAQ) section on the following page for more information.

We encourage you to contact your advisor to discuss options tailored to your financial needs. Life insurance plays an important role in helping secure your financial future, and your advisor is your advocate in analyzing your specific situation and assisting you in preparing for the future.

Financial Representative(s):

PHILIP HILL

604 DEAN ST
WEST CHESTER, PA 19382-3301

Sincerely,

Your Life Customer Service Team

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates. The Lincoln National Life Insurance Company, is domiciled in Fort Wayne, IN
LCN-1568804-081116

CRTNMAILH



02040260B000



The Lincoln National Life Insurance Company
PO Box 26070
Greensboro, NC  27420

**Frequently Asked Questions**

1. **Why are Cost of Insurance (COI) rates changing on my policy and what does that mean?**
   Cost of Insurance (COI) rates are based on certain cost factors, including mortality, interest, expenses and lapses. Our future expectations for these cost factors have changed; therefore policy COI rates have been adjusted to appropriately reflect those future expectations.

2. **Are cost of insurance rates going up for all policies?**
   All policyholders holding the impacted products will have some form of COI adjustment. While the majority of the rate changes are increases, some adjustments will be decreases, depending on future expectations of policy cost factors.

3. **How much are the COI rates changing?**
   The amount of the COI rate change depends upon the product, underwriting class and duration. In no instance will the revised COI rates exceed the guaranteed maximum COI rates indicated in the policy. The best way to learn how these COI changes will impact policy performance is to request an inforce illustration.

   **An illustration is an example of how your policy might perform under certain conditions.**

4. **Under an EFT systematic (bank draft) payment arrangement, will premium payments automatically adjust as a result of this change?**
   No, these are flexible premium products, and therefore you need to notify us if you decide to change your systematic premium payments. A new EFT form is not required to change the premium amount, unless the bank account is changing. You may call, email, or write to us to make an adjustment.

5. **Will this impact any policy guarantees?**
   No. The policy guarantees under your policy will remain the same as prior to the change.

6. **If I have a COI increase, what are my options other than paying additional premiums?**

   Some options include:

   - Continue to pay the current planned periodic premium. If the policy has sufficient cash value, it can be maintained at the current specified amount. At some point premiums may need to be increased in order to keep the policy in force (subject to IRS limits)
   - Continue to pay the current planned periodic premium for a potentially shorter coverage period and/or reduced policy cash value
   - Reduce the specified amount (subject to any minimum amount or IRS rules) to the level supported by your current premium
   - Surrender the policy or Exchange for another product subject to underwriting

7. **Are these COI rate changes permanent?**
   The changes are based upon our current expectations of future cost factors. As a prudent business practice, we evaluate these expectations on an ongoing basis and it is possible our expectations will change and we will adjust the rates in the future.

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates. The Lincoln National Life Insurance Company, is domiciled in Fort Wayne, IN
LCN-1573817-081816

CRTNMAILH



8. **I don't know who my advisor is.  Where can I go to get my questions answered?**
In the event you do not know who your advisor is or do not currently have an advisor, please feel free to contact us.

9. **How may I contact Lincoln for additional information or to request an illustration?**
   - Send inquiries using the attached form and the return envelope provided to the following address:

     Include your policy number, full name, and daytime telephone number along with the specific details related to your question or request.

     Lincoln National Life Insurance Company
     PO BOX 26070
     Greensboro, NC 27420-6070

   - Email us at customersupport@lfg.com. Please include your policy number, full name, and daytime telephone number along with the specific details of your request.

   - Call us at 844-324-0297

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates. The Lincoln National Life Insurance Company, is domiciled in Fort Wayne, IN
CRTNMAILH
LCN-1573817-081816



**The Lincoln National Life Insurance Company**

**Life Customer Service Contact Information**
Mail: PO Box 26070, Greensboro, NC 27420
Phone: 844-324-0297
Email: CustomerSupport@LFG.com

# Policy Request Form

---

## General Information   (Please type or print clearly. This section must be completed.)

Policy/Certificate No.: JP5517504 _____        **Send email requests to** customersupport@lfg.com

---

## Owner Information   (If Business Entity or Trust, list full legal name; Submit more pages as necessary.)

Full Legal Name *(First, Middle, Last)*: _____

Owner's Mailing Address: _____

City: _____        State: _____        Zip: _____

Social Security Number/EIN*: _____        Date of Birth**: _____

Daytime Telephone Number: _____        ☐ Check here if new address

Email Address: _____

---

## Insured Information   (If different from Owner)

Full Legal Name *(First, Middle, Last)*: _____

---

## Change Billing Information

☐  Discontinue my automatic premium payments (After further review of your policy, you may resume your bank draft)

---

## Illustrations

If you would like to receive a policy illustration, please check one or more of the boxes below:

Illustration will be mailed to the address above unless an email is provided.

☐  As Is (Projection with current premium)

☐  Premium Search (Premium needed to carry policy to maturity)

☐  Reduction/Solve (Decrease needed to carry policy to maturity and continue paying current premium)

---

## Surrender/Tax

**Consult your tax advisor for additional information, if needed.**

Check the boxes if applicable:

☐  Request Surrender form

☐  Request Cost Basis (Taxable gain based on policy values)

---

\* The submission of a completed IRS Form W-9 may be required. Employer Identification Number for Trusts or Entities.
\*\*The date the trust was established



## Authorization and Signatures

**To ensure that this document has been signed properly, please refer to the Signature Requirements table.**

I certify that the information on this form is complete and correct.  (Submit more pages as necessary.)

_____          Title*_____

Owner's/Trustee's/Officer's Signature

_____          Date*_____

Name (print or type)

_____          Title*_____

Owner's/Trustee's/Officer's Signature**

_____          Date*_____

Name (print or type)

_____          Title*_____

Assignee/Irrevocable Beneficiary Signature (if applicable)

_____          Date*_____

Name (print or type)

\* Record the "Date" for all signatures. Include the "Title" for corporamctions, partnerships, or trusts.
\*\*For multiple owner policies, provide additional signatures on a separate page.

## Signature Requirements

| Owner | Signature(s) Required |
|---|---|
| Individual(s) | Signature of the Policyowner(s) |
| Power of Attorney (POA) | Signature of POA with title. We require a copy of the POA document to be on file with Lincoln. If the POA is more than 3 years old, we require an affidavit that the POA is still current to accompany the request. **Signature Example: John Doe, Attorney-in-Fact for Jane Doe.** |
| Conservator or Guardian | Signature of Conservator or Guardian with title. We require Letter(s) of Conservatorship or Letters of Guardianship of the Estate to be on file with Lincoln. |
| Custodian of Minor | Signature of Custodian with title.  We require a court order, or other documentation evidencing an appointment as Custodian under a state Uniform Transfers [Gifts] to Minors Act,  to be on file with Lincoln. |
| Corporation, Bank or Financial Institution | Signature of one officer with title, and a corporate resolution which names all officers authorized to sign on behalf of the corporation; or two officer's signatures, with title, without corporate resolution. |
| Pension Plan | Signature of the Pension Plan Administrator and a copy of Plan documents naming the Administrator. |
| Trust | Signature of all trustee(s) with title along with the completed Certification of Trustee Powers form. |
| Partnership or LLC | Signature of one general/managing partner with title and a copy of the Partnership agreement for Partnerships OR one managing member's signature with title and a copy of the operating agreement for LLCs. |
| Signed by an "X" | Signature notarized, if the signor is unable to sign and must sign with an "X". |
| Stamped signatures | We will not knowingly accept a stamped signature. |
| All other interested parties | Contact customer service to verify signature(s) needed. |
| Titles | If you are signing the form in any capacity other than as an individual an appropriate title is required. |

CS11561

NO POSTAGE
NECESSARY
IF MAILED
IN THE
UNITED STATES

# BUSINESS REPLY MAIL
FIRST–CLASS MAIL    PERMIT NO. 1    GREENSBORO, NC

POSTAGE WILL BE PAID BY ADDRESSEE

LINCOLN NATIONAL LIFE INSURANCE COMPANY
PO BOX 26070
GREENSBORO, NC 27499-2041

LF 1080 (08/2016)



Presorted
First Class Mail
US Postage
**PAID**
Columbus OH
43218
Permit 137

Form LIN10B-presort

# EXHIBIT 4

**Lincoln** Financial Group®

You're In Charge®

**Wealth**Protection Expertise℠

# The Lincoln Leader

LIFE INSURANCE

**ABBREVIATED Preview Edition
of the upcoming August 29, 2016,
Lincoln Leader**

*Lincoln LifeGuarantee*® **UL (2013)
09/12/16**

The life insurance industry is operating in a challenging environment, notably with pressure from historically low interest rates, making it increasingly important for us to take the fair and responsible steps necessary to ensure we both provide value to our policyholders and partners, and operate responsibly for the long-term.

This includes taking prudent measures in managing interest rate-sensitive products, while enhancing and expanding our broad portfolio of products that are less interest rate sensitive.  In response to the persistent low interest rates, including the recent historic lows, there will be pricing increases on the                                product effective 9/12/16.

While actions that impact customers are never a first course of action, this decision is consistent with our philosophy of providing valuable solutions appropriately priced for market conditions.

Lincoln remains committed to the Life Insurance business, and will continue to provide a comprehensive Life product portfolio with solutions that will help Lincoln and its advisors grow their businesses responsibly, and provide your clients with innovative options that help secure their financial futures.

## Index

*Lincoln LifeGuarantee*®
**UL (2013)
09/12/16**

**Policy Charges Update**

**Product Actions**
Premium increases of approximately 8-12% across all ages, underwriting classes, and funding patterns.

**Transition Guidelines**

For approved states, there will be a transition period that begins **September 12, 2016 and ends October 14, 2016.** Any states not available at rollout will have a 30-day transition period from the date they become available.

- Formal applications signed, dated and received in good order in Lincoln's home office on or before October 14, 2016 will receive the *Lincoln LifeGuarantee® UL* (2013) - 02/08/16 pricing

- Pending and issued business will also receive the *Lincoln LifeGuarantee® UL* (2013) - 02/08/16 pricing.

- For placed business, normal internal replacement guidelines apply. **Rewrites will not be allowed.**

State Availability Charts will be updated on 9/12/16 to reflect the withdrawal date of the old rates.

**Questions and Answers**

1. *Question:* What about cases already in underwriting?

   *Answer:* If a case has been submitted as an informal application or on a trial basis and Lincoln has not yet received the formal application in-house, fully completed applications must be signed, dated and received in good order (including the 1035 Policy Exchange Agreement/Absolute Assignment form if the case is a 1035 Exchange) in Lincoln's Home Office by the end of the transition period to qualify.

2. *Question:* Are there any circumstances under which the old rates will be available even if all paperwork is not received?

   *Answer:* Yes. There is one exception to the rule. Applications that have been signed by the insured with the owner TBD, received in the Home Office by the end of the transition period but Lincoln is still awaiting a trust to be set up as part of the normal course of business. The applicant will still qualify.  The only paperwork that Lincoln will not require at submission is the executed trust documents with the trustee/owner signature which must be received prior to issue.

3. *Question:* Once an application is received in good order in Lincoln's Home Office by the end of the transition period, can any changes be made to the application?

   *Answer:* That depends upon the change being requested.  Once an application has been received in good order in the Home Office, Lincoln will:

   - **Not allow** an increase to the face amount on the application on the same insured. However, in 1035 Exchange situations where Lincoln received more premium than anticipated from the losing carrier resulting in an increase in death benefit, if the death benefit is within reasonable limits, Lincoln would allow.

   - **Not allow** additional face amounts on a second policy using the same application.

4. **Question:** What is required to meet the transition period requirements for *LincXpress*<sup>SM</sup> Tele-App Cases?

   **Answer:** In lieu of a formal signed application, a complete ticket and required solicitation forms must be received in good order in Lincoln's home office within the same transition periods outlined above.

   Required solicitation forms include:

   - *LincXpress*<sup>SM</sup> Tele-App Ticket (LF11252)
   - Authorization for Release of Information (HIPAA) (LF02896 or state variations)
   - Important Notice: Replacement of Life Insurance or Annuities (LF10087 or state variations)— Must be signed on or before the earliest signed form in the ticket packet and is needed whether replacing or not replacing.
   - Receipt of Privacy Practices Notice and Important Notice Acknowledgment Form (LF10244)
   - Agent's Report (LF10971)—Completed and signed by agent only

5. **Question:** How will term conversions into *Lincoln LifeGuarantee® UL* (2013) meet the transition requirements?

   **Answer:** Term conversion applications must be signed, dated and received in good order in Lincoln's home office by October 14, 2016 in order to meet the transition requirements.

**Illustrations**
Illustrations for *Lincoln LifeGuarantee® UL* (2013) – rates as of 09/12/16 will be run on the current version of the Lincoln *DesignIt*<sup>SM</sup> platform (v34 .0C).  If you have an active internet connection, the software will automatically update to include the new rates on September 12, 2016.

If you need to download the Lincoln *DesignIt*<sup>SM</sup> platform, it is available on the Lincoln producer websites or from Field Office Technicians.

For Agent/Broker use only.  Not for use with the public.
Lincoln Life Leader – August 29, 2016

# Policy Charges Update

Prudent management of our business and monitoring of the external environment has been crucial to Lincoln's 110-year track record of helping people secure their financial futures, and remains so today.  Our industry faces challenges and changes including historically low interest rates, volatile financial markets and an evolving regulatory landscape. This environment makes it increasingly important for us to take the thoughtful steps necessary to ensure we are providing value to policyholders and partners, while operating responsibly for the long-term.

Effective October 9, 2016, current Cost of Insurance (COI) rates are being changed on some Legend Series Universal Life policies issued by Jefferson Pilot (now Lincoln National Life Insurance Company) between the years 1999 and 2007.  While the majority of these changes are increases, some policyholders will also see decreases, reflecting Lincoln's commitment to acting fairly and responsibly. It should be noted that a large percentage of those policyholders with a COI increase have a lapse protection rider or provision which remains in effect.

The majority of our partners are not impacted by these changes. However, we are sharing this information to ensure transparency. Below is a list of the products impacted by the changes.

| Product | Issued from | Guaranteed Interest Rate |
|---|---|---|
| **JP Legend 300** | | |
| **w/ Lapse Protection Rider** | **2000-2005** | 4.00% |
| **w/out Lapse Protection Rider** | **2000-2007** | 4.00% |
| **JP Lifewriter Legend 100** | **1999-2005** | 4.00% |
| **JP Lifewriter Legend 200** | **1999-2005** | 4.00% |
| **JP Lifewriter Legend 400** | **2001-2007** | 4.00% |

These adjustments are based on material changes in future expectations of key cost factors associated with providing this coverage, including:

- Lower investment income as a result of continued low interest rates
- Updated mortality assumptions, including instances of both higher and lower expected mortality rates versus prior expectations
- Updated expenses, including higher reinsurance rates.

Actions that impact our policyholders and partners are never a first course of action, and are only taken after a thorough and in-depth analysis and rigorous review process, including thoughtful consideration of the effect on all stakeholders. Lincoln's proven approach has allowed us to be a consistent partner that producers can count on; maintain the breadth and diversity of our existing portfolio, while investing and innovating to ensure partners have choice and relevant solutions; and remain financially sound to deliver on the long-term promises we make to your clients.

If you have any questions, please contact your Lincoln representative.

For Agent/Broker use only.  Not for use with the public.
Lincoln Life Leader – August 29, 2016

Page | 4 of 5

Products and features subject to state availability.  Guarantees are subject to the financial strength of the insurer.  Lincoln Financial Group is the marketing name for The Lincoln National Corporation and its affiliates.

Insurance policies are issued by The Lincoln National Life Insurance Company, Fort Wayne, IN. **The Lincoln National Life Insurance Company (Lincoln) does not solicit business in the state of New York, nor is it authorized to do so.  Contractual obligations are subject to the claims-paying ability of The Lincoln National Life Insurance Company.**

Insurance policies sold in New York are issued by Lincoln Life & Annuity Company of New York, Syracuse, NY. **The contractual obligations are subject to the claims-paying ability of Lincoln Life & Annuity Company of New York (Lincoln).**

All guarantees and benefits of the insurance policy are subject to the claims-paying ability of the issuing insurance company.  They are not backed by the broker-dealer and/or insurance agency selling the policy, or any affiliates of those entities other than the issuing company affiliates, and none makes any representations or guarantees regarding the claims-paying ability of the issuer.

**Variable products are sold by prospectus.  For more information about the variable products, including fees and charges, refer to the prospectus.  Variable products are distributed by Lincoln Financial Distributors and offered through broker dealers with effective selling agreements.**

Only registered representatives can sell variable products.

©2016 Lincoln National Corporation
LincolnFinancial.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates. Affiliates are separately responsible for their own financial and contractual obligations.

**LCN:1569527-081216**



# EXHIBIT 5

The Lincoln National Life Insurance Company
370 - Non-Guaranteed Opinion for Exhibit 5

*2010 NAIC Annual Statement of The Lincoln National Life Insurance Company*

## Exhibit 5, Interrogatory 3.

Does the company at present issue or have in force policies that contain nonguaranteed elements?

Answer: Yes. Policies being issued or in force that contain nonguaranteed elements include Universal Life, Variable Universal Life, Interest Sensitive Whole Life, Indeterminate Premium Term, and Deferred Annuity policies.

If so, attach a statement that contains (a) the determination procedures, (b) the answers to the interrogatories, and (c) an actuarial opinion as described in the instructions.

*Determination Procedures*

Policy to be Used in the Process of Determining Nonguaranteed Elements
for Nonparticipating Business

In the development of a new policy series, the Company determines its best estimate of future assumptions, including mortality, persistency, expenses, premium taxes, interest rates earned on investments, volatility of returns expected on variable investment options, the Company's federal income taxes, the Company's desired solvency objective, and other applicable assumptions. For each new policy series the policy cost factors are determined based on a stated profit objective. Policy cost factors such as premium rates, premium loads, interest rates credited on accumulated premiums, charges for mortality and other policy benefits, surrender charges, and expense fees are determined. Depending on the design of the product, some of the policy cost factors may be fixed or guaranteed at issue.

Cost factors that can vary are periodically reviewed and may be adjusted based on changes in prospective assumptions. These adjustments are made in such a way that past losses (i.e., experience less favorable to the Company than expected) are not recouped and past gains (i.e., experience more favorable to the Company than expected) are not distributed. These adjustments are made at the discretion of the Company. All adjustments made will be made in accordance with applicable statutes, rules, and contracts.

The initial determination of policy cost factors and any adjustments to policy cost factors are done in accordance with the actuarial principles and practices of the American Academy of Actuaries, which are applicable to the determination and redetermination of nonguaranteed elements.

This policy will be applicable for any and all presently issued or currently in force policies that contain nonguaranteed elements.

*2010 NAIC Annual Statement of The Lincoln National Life Insurance Company*

*Interrogatories*

1.  Since this statement was last filed, have there been any changes in the values of nonguaranteed elements on new or existing business authorized for illustration by the company? If yes, describe the changes that were made.

    Yes. The interest rates credited on the company's interest-sensitive life policies were reduced, subject to contractual guarantees. The changes in credited interest rates were a result of a continued decreasing trend in portfolio rates. There was no material spread change between the net investment income and the credited rate.

    The interest rates credited on the company's interest-sensitive annuities were increased and/or decreased during the year. The changes in credited interest rates were a result of normal investment yield fluctuations.

2.  Since this statement was last filed, have there been any changes in the values of nonguaranteed elements actually charged or credited? If yes, describe the changes that were made.

    Yes. The interest rates credited on the company's interest-sensitive life policies were reduced, subject to contractual guarantees. The changes in credited interest rates were a result of a continued decreasing trend in portfolio rates. There was no material spread change between the net investment income and the credited rate.

    The interest rates credited on the company's interest-sensitive annuities were increased and/or decreased during the year. The spread between the net investment income and the credited rate was increased in the renewal formula in 2010 for the annual reset business to reflect higher surplus.

    When customers performed an owner elected reset of their variable annuity living benefits in 2010 the rider charge was increased to the current rider charge level.

3.  Indicate to what extent any changes described in 1 or 2 vary from the policy and/or general methods and procedures last reported for the affected contracts.

    There are no material variations.

4.  Are the anticipated experience factors underlying any nonguaranteed elements different from current experience? If yes, describe in general terms the ways in which future experience is anticipated to differ from current experience and the nonguaranteed element factors which are affected by such anticipation.

    Yes. In the determination of policy cost factors for some nonguaranteed products, it is anticipated that policy administration expenses will continue to increase in the future with inflation. Mortality experience is also predicted to improve in the future.

*2010 NAIC Annual Statement of The Lincoln National Life Insurance Company*

5. State whether anticipated investment income experience factors are based on (a) a portfolio average approach, (b) an investment generation approach, or (c) other. If (b) or (c), describe the general basis used, including the investment generation groupings.

   Life insurance policies generally employ a portfolio average approach.

   Annuities generally follow an investment generation where initial year rates are set based upon new money rates. Annuity renewal rates can either follow an investment generation approach or a portfolio average approach depending upon the product. This generation approach generally groups funds by calendar month received.

6. Describe how the company allocates anticipated experience among its various classes of business.

   Anticipated experience is allocated to each product based on recent, credible, historical experience with policies of similar type.

7. Does the undersigned believe there is a substantial probability that illustrations authorized by the company to be presented on new and existing business cannot be supported by currently anticipated experience? If yes, indicate which classes and explain.

   No, however, continued investments (and reinvestments) at current yields may affect future declarations of excess interest rates or other nonguaranteed factors as appropriate, to reflect changes in investment returns.

8. Describe any aspects of the determination of nonguaranteed elements not covered above that involve material departures from the actuarial principles and practices of the American Academy of Actuaries applicable to the determination of nonguaranteed elements.

   None.

*2010 NAIC Annual Statement of The Lincoln National Life Insurance Company*

*Actuarial Opinion*

I, Jeff Coutts, FSA, FCIA, MAAA, Vice President, am an officer of The Lincoln National Life Insurance Company, and a Member of the American Academy of Actuaries. I and my associates have examined the actuarial assumptions and methods used in determining nonguaranteed elements for the individual life insurance and annuity contracts of the Company used for delivery in the United States. The nonguaranteed elements included are those:

    (i)    paid, credited, charged or determined in 2010; and

    (ii)    authorized by the Company to be illustrated on new and existing business during 2010.

Our examination included such review of the actuarial assumptions and methods of the underlying basic records and such tests of the actuarial calculations as we considered necessary. In my opinion, the nonguaranteed elements described above have been determined in accordance with generally accepted actuarial principles and practices applicable to the determination of nonguaranteed elements, except as described above.

Jeff Coutts, FSA, FCIA, MAAA
Vice President, The Lincoln National Life Insurance Company

February 4, 2011

# EXHIBIT 6

*2011 NAIC Annual Statement of The Lincoln National Life Insurance Company*

## Exhibit 5, Interrogatory 3.

Does the company at present issue or have in force policies that contain nonguaranteed elements?

Answer: Yes. Policies being issued or in force that contain nonguaranteed elements include Universal Life, Variable Universal Life, Interest Sensitive Whole Life, Indeterminate Premium Term, and Deferred Annuity policies.

If so, attach a statement that contains (a) the determination procedures, (b) the answers to the interrogatories, and (c) an actuarial opinion as described in the instructions.

*Determination Procedures*

Policy to be Used in the Process of Determining Nonguaranteed Elements

In the development of a new policy series, the Company determines its best estimate of future assumptions, including mortality, persistency, expenses, premium taxes, interest rates earned on investments, volatility of returns expected on variable investment options, the Company's federal income taxes, the Company's desired solvency objective, and other applicable assumptions. For each new policy series the policy cost factors are determined based on a stated profit objective. Policy cost factors such as premium rates, premium loads, interest rates credited on accumulated premiums, charges for mortality and other policy benefits, surrender charges, and expense fees are determined. Depending on the design of the product, some of the policy cost factors may be fixed or guaranteed at issue.

Cost factors that can vary are periodically reviewed and may be adjusted based on changes in prospective assumptions. These adjustments are made in such a way that past losses (i.e., experience less favorable to the Company than expected) are not recouped and past gains (i.e., experience more favorable to the Company than expected) are not distributed. These adjustments are made at the discretion of the Company. All adjustments made will be made in accordance with applicable statutes, rules, and contracts.

The initial determination of policy cost factors and any adjustments to policy cost factors are done in accordance with the actuarial principles and practices of the American Academy of Actuaries, which are applicable to the determination and redetermination of nonguaranteed elements.

This policy will be applicable for any and all presently issued or currently in force policies that contain nonguaranteed elements.

*2011 NAIC Annual Statement of The Lincoln National Life Insurance Company*

Yes.  In the determination of policy cost factors for some nonguaranteed products, it is anticipated that policy administration expenses will continue to increase in the future with inflation.  Mortality experience is also predicted to improve in the future.

5. State whether anticipated investment income experience factors are based on (a) a portfolio average approach, (b) an investment generation approach, or (c) other.  If (b) or (c), describe the general basis used, including the investment generation groupings.

Life insurance policies generally employ a portfolio average approach.

Annuities generally follow an investment generation where initial year rates are set based upon new money rates.  Annuity renewal rates can either follow an investment generation approach or a portfolio average approach depending upon the product.  This generation approach generally groups funds by calendar month received.

6. Describe how the company allocates anticipated experience among its various classes of business.

Anticipated experience is allocated to each product based on recent, credible, historical experience with policies of similar type.

7. Does the undersigned believe there is a substantial probability that illustrations authorized by the company to be presented on new and existing business cannot be supported by currently anticipated experience?  If yes, indicate which classes and explain.

No, however, continued investments (and reinvestments) at current yields may affect future declarations of excess interest rates or other nonguaranteed factors as appropriate, to reflect changes in investment returns.

8. Describe any aspects of the determination of nonguaranteed elements not covered above that involve material departures from the actuarial principles and practices of the American Academy of Actuaries applicable to the determination of nonguaranteed elements.

None.

*2011 NAIC Annual Statement of The Lincoln National Life Insurance Company*

*Actuarial Opinion*

I, Jeff Coutts, FSA, FCIA, MAAA, Senior Vice President, am an officer of The Lincoln National Life Insurance Company, and a Member of the American Academy of Actuaries. I and my associates have examined the actuarial assumptions and methods used in determining nonguaranteed elements for the individual life insurance and annuity contracts of the Company used for delivery in the United States. The nonguaranteed elements included are those:

    (i)     paid, credited, charged or determined in 2011; and

    (ii)    authorized by the Company to be illustrated on new and existing business during 2011.

Our examination included such review of the actuarial assumptions and methods of the underlying basic records and such tests of the actuarial calculations as we considered necessary. In my opinion, the nonguaranteed elements described above have been determined in accordance with generally accepted actuarial principles and practices applicable to the determination of nonguaranteed elements, except as described above.

Jeff Coutts, FSA, FCIA, MAAA
Senior Vice President, The Lincoln National Life Insurance Company

February 3, 2012

# EXHIBIT 7

The Lincoln National Life Insurance Company
370 - Non-Guaranteed Opinion for Exhibit 5

*2012 NAIC Annual Statement of The Lincoln National Life Insurance Company*

## Exhibit 5, Interrogatory 3.

Does the company at present issue or have in force policies that contain nonguaranteed elements?

Answer:  Yes.  Policies being issued or in force that contain nonguaranteed elements include Universal Life, Variable Universal Life, Interest Sensitive Whole Life, Indeterminate Premium Term, and Deferred Annuity policies.

If so, attach a statement that contains (a) the determination procedures, (b) the answers to the interrogatories, and (c) an actuarial opinion as described in the instructions.

**The answers below apply only to Universal Life, Variable Universal Life, Interest Sensitive Whole Life and Indeterminate Premium Term Policies.**

*Determination Procedures*

Policy to be Used in the Process of Determining Nonguaranteed Elements

In the development of a new policy series, the Company determines its best estimate of future assumptions, including mortality, persistency, expenses, premium taxes, interest rates earned on investments, volatility of returns expected on variable investment options, the Company's federal income taxes, the Company's desired solvency objective, and other applicable assumptions.  For each new policy series the policy cost factors are determined based on a stated profit objective.  Policy cost factors such as premium rates, premium loads, interest rates credited on accumulated premiums, charges for mortality and other policy benefits, surrender charges, and expense fees are determined.  Depending on the design of the product, some of the policy cost factors may be fixed or guaranteed at issue.

Cost factors that can vary are periodically reviewed and may be adjusted based on changes in prospective assumptions.  These adjustments are made in such a way that past losses (i.e., experience less favorable to the Company than expected) are not recouped and past gains (i.e., experience more favorable to the Company than expected) are not distributed.  These adjustments are made at the discretion of the Company.  All adjustments made will be made in accordance with applicable statutes, rules, and contracts.

The initial determination of policy cost factors and any adjustments to policy cost factors are done in accordance with the actuarial principles and practices of the American Academy of Actuaries, which are applicable to the determination and redetermination of nonguaranteed elements.

This policy will be applicable for any and all presently issued or currently in force policies that contain nonguaranteed elements.

*2012 NAIC Annual Statement of The Lincoln National Life Insurance Company*

*Interrogatories*

1. Since this statement was last filed, have there been any changes in the values of nonguaranteed elements on new or existing business authorized for illustration by the company? If yes, describe the changes that were made.

   Yes. The interest rates credited on the company's interest-sensitive life policies were reduced, subject to contractual guarantees. The changes in credited interest rates were a result of a continued decreasing trend in portfolio rates. There was no material spread change between the net investment income and the credited rate.

   Excess credits on the Company's Excess Credit Whole Life block were reduced to reflect the continued decreasing trend in portfolio rates. There was no change in the parameters of the formulas used to determine excess credits.

2. Since this statement was last filed, have there been any changes in the values of nonguaranteed elements actually charged or credited? If yes, describe the changes that were made.

   Yes. The interest rates credited on the company's interest-sensitive life policies were reduced, subject to contractual guarantees. The changes in credited interest rates were a result of a continued decreasing trend in portfolio rates. There was no material spread change between the net investment income and the credited rate.

   Excess credits on the Company's Excess Credit Whole Life block were reduced to reflect the continued decreasing trend in portfolio rates. There was no change in the parameters of the formulas used to determine excess credits.

3. Indicate to what extent any changes described in 1 or 2 vary from the policy and/or general methods and procedures last reported for the affected contracts.

   There are no material variations.

4. Are the anticipated experience factors underlying any nonguaranteed elements different from current experience? If yes, describe in general terms the ways in which future experience is anticipated to differ from current experience and the nonguaranteed element factors which are affected by such anticipation.

   Yes. In the determination of policy cost factors for some nonguaranteed products, it is anticipated that policy administration expenses will continue to increase in the future with inflation. Mortality experience is also predicted to improve in the future.

5. State whether anticipated investment income experience factors are based on (a) a portfolio average approach, (b) an investment generation approach, or (c) other. If (b) or (c), describe the general basis used, including the investment generation groupings.

*2012 NAIC Annual Statement of The Lincoln National Life Insurance Company*

Life insurance policies generally employ a portfolio average approach.

6. Describe how the company allocates anticipated experience among its various classes of business.

Anticipated experience is allocated to each product based on recent, credible, historical experience with policies of similar type.

7. Does the undersigned believe there is a substantial probability that illustrations authorized by the company to be presented on new and existing business cannot be supported by currently anticipated experience? If yes, indicate which classes and explain.

No, however, emerging investment, mortality, and expense experience will be continually monitored and changes to contractual nonguaranteed elements will be made as warranted.

8. Describe any aspects of the determination of nonguaranteed elements not covered above that involve material departures from the Actuarial Standards of Practice issued by the Actuarial Standards Board applicable to the determination of nonguaranteed elements.

None.

*2012 NAIC Annual Statement of The Lincoln National Life Insurance Company*

*Actuarial Opinion*

I, Michael L. Parker, FSA, MAAA, Vice President, am an officer of The Lincoln National Life Insurance Company, and a Member of the American Academy of Actuaries. I and my associates have examined the actuarial assumptions and methods used in determining nonguaranteed elements for the individual life insurance contracts of the Company used for delivery in the United States. The nonguaranteed elements included are those:

    (i)    paid, credited, charged or determined in 2012; and

    (ii)   authorized by the Company to be illustrated on new and existing business during 2012.

Our examination included such review of the actuarial assumptions and methods of the underlying basic records and such tests of the actuarial calculations as we considered necessary. In my opinion, the nonguaranteed elements described above have been determined in accordance with generally accepted actuarial principles and practices applicable to the determination of nonguaranteed elements, except as described above.

*[signature]*

Michael L. Parker, FSA, MAAA Vice President, The Lincoln National Life Insurance Company

February 6, 2013



The Lincoln National Life Insurance Company
370 - Non-Guaranteed Opinion for Exhibit 5

*2012 NAIC Annual Statement of The Lincoln National Life Insurance Company*

### Exhibit 5, Interrogatory 3.

Does the company at present issue or have in force policies that contain nonguaranteed elements?

Answer: Yes. Policies being issued or in force that contain nonguaranteed elements include Universal Life, Variable Universal Life, Interest Sensitive Whole Life, Indeterminate Premium Term, and Deferred Annuity policies.

If so, attach a statement that contains (a) the determination procedures, (b) the answers to the interrogatories, and (c) an actuarial opinion as described in the instructions.

**The answers below apply only to Deferred Annuity Policies.**

*Determination Procedures*

Policy to be Used in the Process of Determining Nonguaranteed Elements

In the development of a new policy series, the Company determines its best estimate of future assumptions, including mortality, persistency, expenses, premium taxes, interest rates earned on investments, volatility of returns expected on variable investment options, the Company's federal income taxes, the Company's desired solvency objective, and other applicable assumptions. For each new policy series the policy cost factors are determined based on a stated profit objective. Policy cost factors such as premium rates, premium loads, interest rates credited on accumulated premiums, charges for mortality and other policy benefits, surrender charges, and expense fees are determined. Depending on the design of the product, some of the policy cost factors may be fixed or guaranteed at issue.

Cost factors that can vary are periodically reviewed and may be adjusted based on changes in prospective assumptions. These adjustments are made in such a way that past losses (i.e., experience less favorable to the Company than expected) are not recouped and past gains (i.e., experience more favorable to the Company than expected) are not distributed. These adjustments are made at the discretion of the Company. All adjustments made will be made in accordance with applicable statutes, rules, and contracts.

The initial determination of policy cost factors and any adjustments to policy cost factors are done in accordance with the actuarial principles and practices of the American Academy of Actuaries, which are applicable to the determination and redetermination of nonguaranteed elements.

This policy will be applicable for any and all presently issued or currently in force policies that contain nonguaranteed elements.

*2012 NAIC Annual Statement of The Lincoln National Life Insurance Company*

*Interrogatories*

1. Since this statement was last filed, have there been any changes in the values of nonguaranteed elements on new or existing business authorized for illustration by the company? If yes, describe the changes that were made.

   Yes. The interest rates credited on the company's interest-sensitive annuities were increased and/or decreased during the year. The changes in credited interest rates were a result of normal investment yield fluctuations.

2. Since this statement was last filed, have there been any changes in the values of nonguaranteed elements actually charged or credited? If yes, describe the changes that were made.

   Yes. The interest rates credited on the company's interest-sensitive annuities were increased and/or decreased during the year. The spread between the net investment income and the credited rate was increased in the renewal formula in 2012 to reflect and increase in overhead costs. We also completed a review of our rate setting procedures and refined the process to better reflect our assets and liability management within our rate setting.

   When customers performed an owner elected reset of their variable annuity living benefits in 2012 the rider charge was increased to the current rider charge level.

3. Indicate to what extent any changes described in 1 or 2 vary from the policy and/or general methods and procedures last reported for the affected contracts.

   There are no material variations.

4. Are the anticipated experience factors underlying any nonguaranteed elements different from current experience? If yes, describe in general terms the ways in which future experience is anticipated to differ from current experience and the nonguaranteed element factors which are affected by such anticipation.

   Yes. In the determination of policy cost factors for some nonguaranteed products, it is anticipated that policy administration expenses will continue to increase in the future with inflation. Mortality experience is also predicted to improve in the future and we added a dynamic lapse formula to take into account expected impacts from differences between future market crediting rates and the expected crediting rates offered on our products.

*2012 NAIC Annual Statement of The Lincoln National Life Insurance Company*

5.  State whether anticipated investment income experience factors are based on (a) a portfolio average approach, (b) an investment generation approach, or (c) other. If (b) or (c), describe the general basis used, including the investment generation groupings.

    Annuities generally follow an investment generation where initial year rates are set based upon new money rates. Annuity renewal rates can either follow an investment generation approach or a portfolio average approach depending upon the product and age of the policy. This generation approach generally groups funds by calendar month received.

6.  Describe how the company allocates anticipated experience among its various classes of business.

    Anticipated experience is allocated to each product based on recent, credible, historical experience with policies of similar type.

7.  Does the undersigned believe there is a substantial probability that illustrations authorized by the company to be presented on new and existing business cannot be supported by currently anticipated experience? If yes, indicate which classes and explain.

    No, however, continued investments (and reinvestments) at current yields may affect future declarations of excess interest rates or other nonguaranteed factors as appropriate, to reflect changes in investment returns.

8.  Describe any aspects of the determination of nonguaranteed elements not covered above that involve material departures from the Actuarial Standards of Practice issued by the Actuarial Standards Board applicable to the determination of nonguaranteed elements.

    None.

*2012 NAIC Annual Statement of The Lincoln National Life Insurance Company*

*Actuarial Opinion*

I, Stephen Turer, FSA, MAAA, am Vice President of The Lincoln National Life Insurance Company. I and my associates have examined the actuarial assumptions and methods used in determining nonguaranteed elements for the individual annuity contracts of the Company used for delivery in the United States. The nonguaranteed elements included are those:

(i)     paid, credited, charged or determined in 2012; and

(ii)    authorized by the Company to be illustrated on new and existing business during 2012.

Our examination included such review of the actuarial assumptions and methods of the underlying basic records and such tests of the actuarial calculations as we considered necessary. In my opinion, the nonguaranteed elements described above have been determined in accordance with generally accepted actuarial principles and practices applicable to the determination of nonguaranteed elements, except as described above.

Stephen Turer, FSA, MAAA
Vice President, The Lincoln National Life Insurance Company

February 1, 2013

# EXHIBIT 8

The Lincoln National Life Insurance Company
370 - Non-Guaranteed Opinion for Exhibit 5

*2013 NAIC Annual Statement of The Lincoln National Life Insurance Company*

## Exhibit 5, Interrogatory 3.

Does the company at present issue or have in force policies that contain nonguaranteed elements?

Answer: Yes. Policies being issued or in force that contain nonguaranteed elements include Universal Life, Variable Universal Life, Interest Sensitive Whole Life, Indeterminate Premium Term, and Deferred Annuity policies.

If so, attach a statement that contains (a) the determination procedures, (b) the answers to the interrogatories, and (c) an actuarial opinion as described in the instructions.

**The answers below apply only to Universal Life, Variable Universal Life, Interest Sensitive Whole Life and Indeterminate Premium Term Policies.**

*Determination Procedures*

Policy to be Used in the Process of Determining Nonguaranteed Elements

In the development of a new policy series, the Company determines its best estimate of future assumptions, including mortality, persistency, expenses, premium taxes, interest rates earned on investments, volatility of returns expected on variable investment options, the Company's federal income taxes, the Company's desired solvency objective, and other applicable assumptions. For each new policy series the policy cost factors are determined based on a stated profit objective. Policy cost factors such as premium rates, premium loads, interest rates credited on accumulated premiums, charges for mortality and other policy benefits, surrender charges, and expense fees are determined. Depending on the design of the product, some of the policy cost factors may be fixed or guaranteed at issue.

Cost factors that can vary are periodically reviewed and may be adjusted based on changes in prospective assumptions. These adjustments are made in such a way that past losses (i.e., experience less favorable to the Company than expected) are not recouped and past gains (i.e., experience more favorable to the Company than expected) are not distributed. These adjustments are made at the discretion of the Company. All adjustments made will be made in accordance with applicable statutes, rules, and contracts.

The initial determination of policy cost factors and any adjustments to policy cost factors are done in accordance with the actuarial principles and practices of the American Academy of Actuaries, which are applicable to the determination and redetermination of nonguaranteed elements.

This policy will be applicable for any and all presently issued or currently in force policies that contain nonguaranteed elements.

*2013 NAIC Annual Statement of The Lincoln National Life Insurance Company*

*Interrogatories*

1.  Since this statement was last filed, have there been any changes in the values of nonguaranteed elements on new or existing business authorized for illustration by the company?  If yes, describe the changes that were made.

    Yes. The interest rates credited on the company's interest-sensitive life policies and premium deposit funds were reduced, subject to contractual guarantees.  The changes in credited interest rates were a result of a continued decreasing trend in portfolio rates.  There was no material spread change between the net investment income and the credited rate.

    Excess credits on the Company's Excess Credit Whole Life block were reduced to reflect the continued decreasing trend in portfolio rates. There was no change in the parameters of the formulas used to determine excess credits.

2.  Since this statement was last filed, have there been any changes in the values of nonguaranteed elements actually charged or credited? If yes, describe the changes that were made.

    Yes. The interest rates credited on the company's interest-sensitive life policies and premium deposit funds were reduced, subject to contractual guarantees.  The changes in credited interest rates were a result of a continued decreasing trend in portfolio rates.  There was no material spread change between the net investment income and the credited rate.

    Excess credits on the Company's Excess Credit Whole Life block were reduced to reflect the continued decreasing trend in portfolio rates. There was no change in the parameters of the formulas used to determine excess credits.

3.  Indicate to what extent any changes described in 1 or 2 vary from the policy and/or general methods and procedures last reported for the affected contracts.

    There are no material variations.

4.  Are the anticipated experience factors underlying any nonguaranteed elements different from current experience? If yes, describe in general terms the ways in which future experience is anticipated to differ from current experience and the nonguaranteed element factors which are affected by such anticipation.

    Yes.  In the determination of policy cost factors for some nonguaranteed products, it is anticipated that policy administration expenses will continue to increase in the future with inflation.  Mortality experience is also predicted to improve in the future.

*2013 NAIC Annual Statement of The Lincoln National Life Insurance Company*

5. State whether anticipated investment income experience factors are based on (a) a portfolio average approach, (b) an investment generation approach, or (c) other.  If (b) or (c), describe the general basis used, including the investment generation groupings.

   Life insurance policies generally employ a portfolio average approach.

6. Describe how the company allocates anticipated experience among its various classes of business.

   Anticipated experience is allocated to each product based on recent, credible, historical experience with policies of similar type.

7. Does the undersigned believe there is a substantial probability that illustrations authorized by the company to be presented on new and existing business cannot be supported by currently anticipated experience?  If yes, indicate which classes and explain.

   No, however, emerging investment, mortality, and expense experience will be continually monitored and changes to contractual nonguaranteed elements will be made as warranted.

8. Describe any aspects of the determination of nonguaranteed elements not covered above that involve material departures from the Actuarial Standards of Practice issued by the Actuarial Standards Board applicable to the determination of nonguaranteed elements.

   None.

*2013 NAIC Annual Statement of The Lincoln National Life Insurance Company*

*Actuarial Opinion*

I, Michael L. Parker, FSA, MAAA, Vice President, am an officer of The Lincoln National Life Insurance Company, and a Member of the American Academy of Actuaries. I and my associates have examined the actuarial assumptions and methods used in determining nonguaranteed elements for the individual life insurance contracts of the Company used for delivery in the United States. The nonguaranteed elements included are those:

(i)     paid, credited, charged or determined in 2013; and

(ii)    authorized by the Company to be illustrated on new and existing business during 2013.

Our examination included such review of the actuarial assumptions and methods of the underlying basic records and such tests of the actuarial calculations as we considered necessary. In my opinion, the nonguaranteed elements described above have been determined in accordance with Actuarial Standards of Practice issued by the Actuarial Standards Board applicable to the determination of nonguaranteed elements, except as described above.

Michael L. Parker, FSA, MAAA
Vice President, The Lincoln National Life Insurance Company

Feb 7-2014
Date

The Lincoln National Life Insurance Company
370 - Non-Guaranteed Opinion for Exhibit 5

*2013 NAIC Annual Statement of The Lincoln National Life Insurance Company*

## Exhibit 5, Interrogatory 3.

Does the company at present issue or have in force policies that contain nonguaranteed elements?

Answer: Yes. Policies being issued or in force that contain nonguaranteed elements include Universal Life, Variable Universal Life, Interest Sensitive Whole Life, Indeterminate Premium Term, and Deferred Annuity policies.

If so, attach a statement that contains (a) the determination procedures, (b) the answers to the interrogatories, and (c) an actuarial opinion as described in the instructions.

**The answers below apply only to Deferred Annuity Policies.**

*Determination Procedures*

Policy to be Used in the Process of Determining Nonguaranteed Elements

In the development of a new policy series, the Company determines its best estimate of future assumptions, including mortality, persistency, expenses, premium taxes, interest rates earned on investments, volatility of returns expected on variable investment options, the Company's federal income taxes, the Company's desired solvency objective, and other applicable assumptions. For each new policy series the policy cost factors are determined based on a stated profit objective. Policy cost factors such as premium rates, premium loads, interest rates credited on accumulated premiums, charges for mortality and other policy benefits, surrender charges, and expense fees are determined. Depending on the design of the product, some of the policy cost factors may be fixed or guaranteed at issue.

Cost factors that can vary are periodically reviewed and may be adjusted based on changes in prospective assumptions. These adjustments are made in such a way that past losses (i.e., experience less favorable to the Company than expected) are not recouped and past gains (i.e., experience more favorable to the Company than expected) are not distributed. These adjustments are made at the discretion of the Company. All adjustments made will be made in accordance with applicable statutes, rules, and contracts.

The initial determination of policy cost factors and any adjustments to policy cost factors are done in accordance with the actuarial principles and practices of the American Academy of Actuaries, which are applicable to the determination and redetermination of nonguaranteed elements.

This policy will be applicable for any and all presently issued or currently in force policies that contain nonguaranteed elements.

*2013 NAIC Annual Statement of The Lincoln National Life Insurance Company*

*Interrogatories*

1.  Since this statement was last filed, have there been any changes in the values of nonguaranteed elements on new or existing business authorized for illustration by the company? If yes, describe the changes that were made.

    Yes. The interest rates credited on the company's interest-sensitive annuities were increased and/or decreased during the year. The changes in credited interest rates were a result of normal investment yield fluctuations and refinements to our rate setting process.

2.  Since this statement was last filed, have there been any changes in the values of nonguaranteed elements actually charged or credited? If yes, describe the changes that were made.

    Yes. The interest rates credited on the company's interest-sensitive annuities were increased and/or decreased during the year. The spread between the net investment income and the credited rate was increased in the renewal formula in 2013 to reflect an update of the overhead cost assumption.

    When customers performed an owner elected reset of their variable annuity living benefits in 2013 the rider charge was increased to the current rider charge level.

3.  Indicate to what extent any changes described in 1 or 2 vary from the policy and/or general methods and procedures last reported for the affected contracts.

    There are no material variations.

4.  Are the anticipated experience factors underlying any nonguaranteed elements different from current experience? If yes, describe in general terms the ways in which future experience is anticipated to differ from current experience and the nonguaranteed element factors which are affected by such anticipation.

    Yes. In the determination of policy cost factors for some nonguaranteed products, it is anticipated that policy administration expenses will continue to increase in the future with inflation. Mortality experience is also predicted to improve in the future and we added a dynamic lapse formula to take into account expected impacts from differences between future market crediting rates and the expected crediting rates offered on our products.

5.  State whether anticipated investment income experience factors are based on (a) a portfolio average approach, (b) an investment generation approach, or (c) other. If (b) or (c), describe the general basis used, including the investment generation groupings.

*2013 NAIC Annual Statement of The Lincoln National Life Insurance Company*

Annuities generally follow an investment generation where initial year rates are set based upon new money rates.  Annuity renewal rates can either follow an investment generation approach or a portfolio average approach depending upon the product and age of the policy.  This generation approach generally groups funds by calendar month received.

6.  Describe how the company allocates anticipated experience among its various classes of business.

Anticipated experience is allocated to each product based on recent, credible, historical experience with policies of similar type.

7.  Does the undersigned believe there is a substantial probability that illustrations authorized by the company to be presented on new and existing business cannot be supported by currently anticipated experience?  If yes, indicate which classes and explain.

No, however, continued investments (and reinvestments) at current yields may affect future declarations of excess interest rates or other nonguaranteed factors as appropriate, to reflect changes in investment returns.

8.  Describe any aspects of the determination of nonguaranteed elements not covered above that involve material departures from the Actuarial Standards of Practice issued by the Actuarial Standards Board applicable to the determination of nonguaranteed elements.

None.

*2013 NAIC Annual Statement of The Lincoln National Life Insurance Company*

*Actuarial Opinion*

I, Stephen Turer, FSA, MAAA, am Vice President of The Lincoln National Life Insurance Company. I and my associates have examined the actuarial assumptions and methods used in determining nonguaranteed elements for the individual annuity contracts of the Company used for delivery in the United States. The nonguaranteed elements included are those:

    (i)       paid, credited, charged or determined in 2013; and

    (ii)      authorized by the Company to be illustrated on new and existing business during 2013.

Our examination included such review of the actuarial assumptions and methods of the underlying basic records and such tests of the actuarial calculations as we considered necessary. In my opinion, the nonguaranteed elements described above have been determined in accordance with Actuarial Standards of Practice issued by the Actuarial Standards Board applicable to the determination of nonguaranteed elements, except as described above.

Stephen Turer, FSA, MAAA
Vice President, The Lincoln National Life Insurance Company

2/6/14
Date

# EXHIBIT 9



The Lincoln National Life Insurance Company
370 - Non-Guaranteed Opinion for Exhibit 5

*2014 NAIC Annual Statement of The Lincoln National Life Insurance Company*

## Exhibit 5, Interrogatory 3.

Does the company at present issue or have in force policies that contain nonguaranteed elements?

Answer:  Yes.  Policies being issued or in force that contain nonguaranteed elements include Universal Life, Variable Universal Life, Interest Sensitive Whole Life, Indeterminate Premium Term, and Deferred Annuity policies.

If so, attach a statement that contains (a) the determination procedures, (b) the answers to the interrogatories, and (c) an actuarial opinion as described in the instructions.

**The answers below apply only to Universal Life, Variable Universal Life, Interest Sensitive Whole Life and Indeterminate Premium Term Policies.**

*Determination Procedures*

Policy to be Used in the Process of Determining Nonguaranteed Elements

In the development of a new policy series, the Company determines its best estimate of future assumptions, including mortality, persistency, expenses, premium taxes, interest rates earned on investments, volatility of returns expected on variable investment options, the Company's federal income taxes, the Company's desired solvency objective, and other applicable assumptions.  For each new policy series the policy cost factors are determined based on a stated profit objective.  Policy cost factors such as premium rates, premium loads, interest rates credited on accumulated premiums, charges for mortality and other policy benefits, surrender charges, and expense fees are determined.  Depending on the design of the product, some of the policy cost factors may be fixed or guaranteed at issue.

Cost factors that can vary are periodically reviewed and may be adjusted based on changes in prospective assumptions.  These adjustments are made in such a way that past losses (i.e., experience less favorable to the Company than expected) are not recouped and past gains (i.e., experience more favorable to the Company than expected) are not distributed.  These adjustments are made at the discretion of the Company.  All adjustments made will be made in accordance with applicable statutes, rules, and contracts.

The initial determination of policy cost factors and any adjustments to policy cost factors are done in accordance with the actuarial principles and practices of the American Academy of Actuaries, which are applicable to the determination and redetermination of nonguaranteed elements.

This policy will be applicable for any and all presently issued or currently in force policies that contain nonguaranteed elements.

*2014 NAIC Annual Statement of The Lincoln National Life Insurance Company*

*Interrogatories*

1. Since this statement was last filed, have there been any changes in the values of nonguaranteed elements on new or existing business authorized for illustration by the company? If yes, describe the changes that were made.

   No.

2. Since this statement was last filed, have there been any changes in the values of nonguaranteed elements actually charged or credited? If yes, describe the changes that were made.

   No.

3. Indicate to what extent any changes described in 1 or 2 vary from the policy and/or general methods and procedures last reported for the affected contracts.

   There are no material variations.

4. Are the anticipated experience factors underlying any nonguaranteed elements different from current experience? If yes, describe in general terms the ways in which future experience is anticipated to differ from current experience and the nonguaranteed element factors which are affected by such anticipation.

   Yes. In the determination of policy cost factors for some nonguaranteed products, it is anticipated that policy administration expenses will continue to increase in the future with inflation. Mortality experience is also predicted to improve in the future.

5. State whether anticipated investment income experience factors are based on (a) a portfolio average approach, (b) an investment generation approach, or (c) other. If (b) or (c), describe the general basis used, including the investment generation groupings.

   Life insurance policies generally employ a portfolio average approach.

6. Describe how the company allocates anticipated experience among its various classes of business.

   Anticipated experience is allocated to each product based on recent, credible, historical experience with policies of similar type.

7. Does the undersigned believe there is a substantial probability that illustrations authorized by the company to be presented on new and existing business cannot be supported by currently anticipated experience? If yes, indicate which classes and explain.

*2014 NAIC Annual Statement of The Lincoln National Life Insurance Company*

No, however, emerging investment, mortality, and expense experience will be continually monitored and changes to contractual nonguaranteed elements will be made as warranted.

8. Describe any aspects of the determination of nonguaranteed elements not covered above that involve material departures from the Actuarial Standards of Practice issued by the Actuarial Standards Board applicable to the determination of nonguaranteed elements.

None.

*2014 NAIC Annual Statement of The Lincoln National Life Insurance Company*

*Actuarial Opinion*

I, Michael L. Parker, FSA, MAAA, Vice President, am an officer of The Lincoln National Life Insurance Company, and a Member of the American Academy of Actuaries. I and my associates have examined the actuarial assumptions and methods used in determining nonguaranteed elements for the individual life insurance contracts of the Company used for delivery in the United States. The nonguaranteed elements included are those:

    (i)     paid, credited, charged or determined in 2014; and

    (ii)    authorized by the Company to be illustrated on new and existing business during 2014.

Our examination included such review of the actuarial assumptions and methods of the underlying basic records and such tests of the actuarial calculations as we considered necessary. In my opinion, the nonguaranteed elements described above have been determined in accordance with Actuarial Standards of Practice issued by the Actuarial Standards Board applicable to the determination of nonguaranteed elements, except as described above.


Michael L. Parker, FSA, MAAA
Vice President, The Lincoln National Life Insurance Company


Date  Jan 29-2015



*2014 NAIC Annual Statement of The Lincoln National Life Insurance Company*

## Exhibit 5, Interrogatory 3.

Does the company at present issue or have in force policies that contain nonguaranteed elements?

Answer: Yes. Policies being issued or in force that contain nonguaranteed elements include Universal Life, Variable Universal Life, Interest Sensitive Whole Life, Indeterminate Premium Term, and Deferred Annuity policies.

If so, attach a statement that contains (a) the determination procedures, (b) the answers to the interrogatories, and (c) an actuarial opinion as described in the instructions.

**The answers below apply only to Deferred Annuity Policies.**

*Determination Procedures*

Policy to be Used in the Process of Determining Nonguaranteed Elements

In the development of a new policy series, the Company determines its best estimate of future assumptions, including mortality, persistency, expenses, premium taxes, interest rates earned on investments, volatility of returns expected on variable investment options, the Company's federal income taxes, the Company's desired solvency objective, and other applicable assumptions. For each new policy series the policy cost factors are determined based on a stated profit objective. Policy cost factors such as premium rates, premium loads, interest rates credited on accumulated premiums, charges for mortality and other policy benefits, surrender charges, and expense fees are determined. Depending on the design of the product, some of the policy cost factors may be fixed or guaranteed at issue.

Cost factors that can vary are periodically reviewed and may be adjusted based on changes in prospective assumptions. These adjustments are made in such a way that past losses (i.e., experience less favorable to the Company than expected) are not recouped and past gains (i.e., experience more favorable to the Company than expected) are not distributed. These adjustments are made at the discretion of the Company. All adjustments made will be made in accordance with applicable statutes, rules, and contracts.

The initial determination of policy cost factors and any adjustments to policy cost factors are done in accordance with the actuarial principles and practices of the American Academy of Actuaries, which are applicable to the determination and redetermination of nonguaranteed elements.

This policy will be applicable for any and all presently issued or currently in force policies that contain nonguaranteed elements.

*2014 NAIC Annual Statement of The Lincoln National Life Insurance Company*

*Interrogatories*

1.  Since this statement was last filed, have there been any changes in the values of nonguaranteed elements on new or existing business authorized for illustration by the company? If yes, describe the changes that were made.

    Yes. The interest rates credited on the company's interest-sensitive annuities were increased and/or decreased during the year. The changes in credited interest rates were a result of normal investment yield fluctuations and refinements to our rate setting process.

2.  Since this statement was last filed, have there been any changes in the values of nonguaranteed elements actually charged or credited? If yes, describe the changes that were made.

    Yes. The interest rates credited on the company's interest-sensitive annuities were increased and/or decreased during the year. The changes in credited interest rates were a result of normal investment yield fluctuations and refinements to our rate setting process.

    When customers performed an owner elected reset of their variable annuity living benefits in 2014 the rider charge was increased to the current rider charge level.

3.  Indicate to what extent any changes described in 1 or 2 vary from the policy and/or general methods and procedures last reported for the affected contracts.

    There are no material variations.

4.  Are the anticipated experience factors underlying any nonguaranteed elements different from current experience? If yes, describe in general terms the ways in which future experience is anticipated to differ from current experience and the nonguaranteed element factors which are affected by such anticipation.

    Yes. In the determination of policy cost factors for some nonguaranteed products, it is anticipated that policy administration expenses will continue to increase in the future with inflation. Mortality experience is also predicted to improve in the future and we added a dynamic lapse formula to take into account expected impacts from differences between future market crediting rates and the expected crediting rates offered on our products.

5.  State whether anticipated investment income experience factors are based on (a) a portfolio average approach, (b) an investment generation approach, or (c) other. If (b) or (c), describe the general basis used, including the investment generation groupings.

*2014 NAIC Annual Statement of The Lincoln National Life Insurance Company*

Annuities generally follow an investment generation where initial year rates are set based upon new money rates. Annuity renewal rates can either follow an investment generation approach or a portfolio average approach depending upon the product and age of the policy. This generation approach generally groups funds by calendar month received.

6.  Describe how the company allocates anticipated experience among its various classes of business.

    Anticipated experience is allocated to each product based on recent, credible, historical experience with policies of similar type.

7.  Does the undersigned believe there is a substantial probability that illustrations authorized by the company to be presented on new and existing business cannot be supported by currently anticipated experience? If yes, indicate which classes and explain.

    No, however, continued investments (and reinvestments) at current yields may affect future declarations of excess interest rates or other nonguaranteed factors as appropriate, to reflect changes in investment returns.

8.  Describe any aspects of the determination of nonguaranteed elements not covered above that involve material departures from the Actuarial Standards of Practice issued by the Actuarial Standards Board applicable to the determination of nonguaranteed elements.

    None.

*2014 NAIC Annual Statement of The Lincoln National Life Insurance Company*

*Actuarial Opinion*

I, Stephen Turer, FSA, MAAA, am Vice President of The Lincoln National Life Insurance Company. I and my associates have examined the actuarial assumptions and methods used in determining nonguaranteed elements for the individual annuity contracts of the Company used for delivery in the United States. The nonguaranteed elements included are those:

    (i)      paid, credited, charged or determined in 2014; and

    (ii)    authorized by the Company to be illustrated on new and existing business during 2014.

Our examination included such review of the actuarial assumptions and methods of the underlying basic records and such tests of the actuarial calculations as we considered necessary. In my opinion, the nonguaranteed elements described above have been determined in accordance with Actuarial Standards of Practice issued by the Actuarial Standards Board applicable to the determination of nonguaranteed elements, except as described above.

Stephen Turer, FSA, MAAA
Vice President, The Lincoln National Life Insurance Company

1/29/15
Date

# EXHIBIT 10

The Lincoln National Life Insurance Company
370 - Non-Guaranteed Opinion for Exhibit 5

*2015 NAIC Annual Statement of The Lincoln National Life Insurance Company*

## Exhibit 5, Interrogatory 3.

Does the company at present issue or have in force policies that contain nonguaranteed elements?

Answer:  Yes.  Policies being issued or in force that contain nonguaranteed elements include Universal Life, Variable Universal Life, Interest Sensitive Whole Life, Indeterminate Premium Term, and Deferred Annuity policies.

If so, attach a statement that contains (a) the determination procedures, (b) the answers to the interrogatories, and (c) an actuarial opinion as described in the instructions.

**The answers below apply only to Universal Life, Variable Universal Life, Interest Sensitive Whole Life and Indeterminate Premium Term Policies.**

*Determination Procedures*

Policy to be Used in the Process of Determining Nonguaranteed Elements

In the development of a new policy series, the Company determines its best estimate of future assumptions, including mortality, persistency, expenses, reinsurance costs, premium taxes, interest rates earned on investments, volatility of returns expected on variable investment options, the Company's federal income taxes, the Company's desired solvency objective, and other applicable assumptions.  For each new policy series the policy cost factors are determined based on a stated profit objective.  Policy cost factors such as premium rates, premium loads, interest rates credited on accumulated premiums, charges for mortality and other policy benefits, surrender charges, and expense fees are determined.  Depending on the design of the product, some of the policy cost factors may be fixed or guaranteed at issue.

Cost factors that can vary are periodically reviewed and may be adjusted based on changes in prospective assumptions.  These adjustments are made in such a way that past losses (i.e., experience less favorable to the Company than expected) are not recouped and past gains (i.e., experience more favorable to the Company than expected) are not distributed.  These adjustments are made at the discretion of the Company.  All adjustments made will be made in accordance with applicable statutes, rules, and contracts.

The initial determination of policy cost factors and any adjustments to policy cost factors are done in accordance with the actuarial principles and practices of the American Academy of Actuaries, which are applicable to the determination and redetermination of nonguaranteed elements.

This policy will be applicable for any and all presently issued or currently in force policies that contain nonguaranteed elements.

*2015 NAIC Annual Statement of The Lincoln National Life Insurance Company*

*Interrogatories*

1. Since this statement was last filed, have there been any changes in the values of nonguaranteed elements on new or existing business authorized for illustration by the company? If yes, describe the changes that were made.

   No.

2. Since this statement was last filed, have there been any changes in the values of nonguaranteed elements actually charged or credited? If yes, describe the changes that were made.

   No.

3. Indicate to what extent any changes described in 1 or 2 vary from the policy and/or general methods and procedures last reported for the affected contracts.

   There are no material variations.

4. Are the anticipated experience factors underlying any nonguaranteed elements different from current experience? If yes, describe in general terms the ways in which future experience is anticipated to differ from current experience and the nonguaranteed element factors which are affected by such anticipation.

   Yes. In the determination of policy cost factors for some nonguaranteed products, it is anticipated that expenses will continue to increase in the future with inflation. Reinsurance costs may increase based on reinsurer rate actions. Investment yields may continue to decline and result in compression of spreads between earned rates and crediting rates.

5. State whether anticipated investment income experience factors are based on (a) a portfolio average approach, (b) an investment generation approach, or (c) other. If (b) or (c), describe the general basis used, including the investment generation groupings.

   Life insurance policies generally employ a portfolio average approach.

6. Describe how the company allocates anticipated experience among its various classes of business.

   Anticipated experience is allocated to each product based on recent, credible, historical experience with policies of similar type.

*2015 NAIC Annual Statement of The Lincoln National Life Insurance Company*

7. Does the undersigned believe there is a substantial probability that illustrations authorized by the company to be presented on new and existing business cannot be supported by currently anticipated experience? If yes, indicate which classes and explain.

   There is a probability that certain aged universal life policies may have changes made to non-guaranteed elements due to emerging experience implicating the prospective assumptions detailed in response to Interrogatory 3.

8. Describe any aspects of the determination of nonguaranteed elements not covered above that involve material departures from the Actuarial Standards of Practice issued by the Actuarial Standards Board applicable to the determination of nonguaranteed elements.

   None.

*2015 NAIC Annual Statement of The Lincoln National Life Insurance Company*

*Actuarial Opinion*

I, Michael L. Parker, FSA, MAAA, Senior Vice President, am an officer of The Lincoln National Life Insurance Company, and a Member of the American Academy of Actuaries. I and my associates have examined the actuarial assumptions and methods used in determining nonguaranteed elements for the individual life insurance contracts of the Company used for delivery in the United States. The nonguaranteed elements included are those:

    (i)     paid, credited, charged or determined in 2015; and

    (ii)    authorized by the Company to be illustrated on new and existing business during 2015.

Our examination included such review of the actuarial assumptions and methods of the underlying basic records and such tests of the actuarial calculations as we considered necessary. In my opinion, the nonguaranteed elements described above have been determined in accordance with Actuarial Standards of Practice issued by the Actuarial Standards Board applicable to the determination of nonguaranteed elements, except as described above.


*Michael L. Parker*
Michael L. Parker, FSA, MAAA
Senior Vice President, The Lincoln National Life Insurance Company


January 29, 2016
Date

The Lincoln National Life Insurance Company
370 - Non-Guaranteed Opinion for Exhibit 5

*2015 NAIC Annual Statement of The Lincoln National Life Insurance Company*

## Exhibit 5, Interrogatory 3.

Does the company at present issue or have in force policies that contain nonguaranteed elements?

Answer: Yes. Policies being issued or in force that contain nonguaranteed elements include Universal Life, Variable Universal Life, Interest Sensitive Whole Life, Indeterminate Premium Term, and Deferred Annuity policies.

If so, attach a statement that contains (a) the determination procedures, (b) the answers to the interrogatories, and (c) an actuarial opinion as described in the instructions.

**The answers below apply only to Deferred Annuity Policies.**

*Determination Procedures*

Policy to be Used in the Process of Determining Nonguaranteed Elements

In the development of a new policy series, the Company determines its best estimate of future assumptions, including mortality, persistency, expenses, premium taxes, interest rates earned on investments, volatility of returns expected on variable investment options, the Company's federal income taxes, the Company's desired solvency objective, and other applicable assumptions. For each new policy series the policy cost factors are determined based on a stated profit objective. Policy cost factors such as premium rates, premium loads, interest rates credited on accumulated premiums, charges for mortality and other policy benefits, surrender charges, and expense fees are determined. Depending on the design of the product, some of the policy cost factors may be fixed or guaranteed at issue.

Cost factors that can vary are periodically reviewed and may be adjusted based on changes in prospective assumptions. These adjustments are made in such a way that past losses (i.e., experience less favorable to the Company than expected) are not recouped and past gains (i.e., experience more favorable to the Company than expected) are not distributed. These adjustments are made at the discretion of the Company. All adjustments made will be made in accordance with applicable statutes, rules, and contracts.

The initial determination of policy cost factors and any adjustments to policy cost factors are done in accordance with the actuarial principles and practices of the American Academy of Actuaries, which are applicable to the determination and redetermination of nonguaranteed elements.

This policy will be applicable for any and all presently issued or currently in force policies that contain nonguaranteed elements.

*2015 NAIC Annual Statement of The Lincoln National Life Insurance Company*

*Interrogatories*

1.  Since this statement was last filed, have there been any changes in the values of nonguaranteed elements on new or existing business authorized for illustration by the company? If yes, describe the changes that were made.

    Yes. The interest rates credited on the company's interest-sensitive annuities were increased and/or decreased during the year. The changes in credited interest rates were a result of normal investment yield fluctuations and refinements to our rate setting process.

2.  Since this statement was last filed, have there been any changes in the values of nonguaranteed elements actually charged or credited? If yes, describe the changes that were made.

    Yes. The interest rates credited on the company's interest-sensitive annuities were increased and/or decreased during the year. The changes in credited interest rates were a result of normal investment yield fluctuations and refinements to our rate setting process.


    When customers performed an owner elected reset of their variable annuity living benefits in 2015 the rider charge was increased to the current rider charge level.

3.  Indicate to what extent any changes described in 1 or 2 vary from the policy and/or general methods and procedures last reported for the affected contracts.

    There are no material variations.

    Are the anticipated experience factors underlying any nonguaranteed elements different from current experience? If yes, describe in general terms the ways in which future experience is anticipated to differ from current experience and the nonguaranteed element factors which are affected by such anticipation. Yes. In the determination of policy cost factors for some nonguaranteed products, it is anticipated that policy administration expenses will continue to increase in the future with inflation. Mortality experience is also predicted to improve in the future and we added a dynamic lapse formula to take into account expected impacts from differences between future market crediting rates and the expected crediting rates offered on our products. VA Lapse experience also continues to be lower than expected.


4.  State whether anticipated investment income experience factors are based on (a) a portfolio average approach, (b) an investment generation approach, or (c) other. If (b) or (c), describe the general basis used, including the investment generation groupings.

*2015 NAIC Annual Statement of The Lincoln National Life Insurance Company*

Annuities generally follow an investment generation where initial year rates are set based upon new money rates. Annuity renewal rates can either follow an investment generation approach or a portfolio average approach depending upon the product and age of the policy. This generation approach generally groups funds by calendar month received.

5. Describe how the company allocates anticipated experience among its various classes of business.

   Anticipated experience is allocated to each product based on recent, credible, historical experience with policies of similar type.

6. Does the undersigned believe there is a substantial probability that illustrations authorized by the company to be presented on new and existing business cannot be supported by currently anticipated experience? If yes, indicate which classes and explain.

   No, however, continued investments (and reinvestments) at current yields may affect future declarations of excess interest rates or other nonguaranteed factors as appropriate, to reflect changes in investment returns.

7. Describe any aspects of the determination of nonguaranteed elements not covered above that involve material departures from the Actuarial Standards of Practice issued by the Actuarial Standards Board applicable to the determination of nonguaranteed elements.

   None.

*2015 NAIC Annual Statement of The Lincoln National Life Insurance Company*

*Actuarial Opinion*

I, Stephen Turer, FSA, MAAA, am Vice President of The Lincoln National Life Insurance Company. I and my associates have examined the actuarial assumptions and methods used in determining nonguaranteed elements for the individual annuity contracts of the Company used for delivery in the United States. The nonguaranteed elements included are those:

(i)     paid, credited, charged or determined in 2015; and

(ii)     authorized by the Company to be illustrated on new and existing business during 2015.

Our examination included such review of the actuarial assumptions and methods of the underlying basic records and such tests of the actuarial calculations as we considered necessary. In my opinion, the nonguaranteed elements described above have been determined in accordance with Actuarial Standards of Practice issued by the Actuarial Standards Board applicable to the determination of nonguaranteed elements, except as described above.


Stephen Turer, FSA, MAAA
Vice President, The Lincoln National Life Insurance Company


1/25/16
Date

# EXHIBIT 11

The Lincoln National Life Insurance Company
370 - Non-Guaranteed Opinion for Exhibit 5

*2017 NAIC Annual Statement of The Lincoln National Life Insurance Company*

## Exhibit 5, Interrogatory 3.

Does the company at present issue or have in force policies that contain nonguaranteed elements?

Answer:  Yes.  Policies being issued or in force that contain nonguaranteed elements include Universal Life, Variable Universal Life, Interest Sensitive Whole Life, Indeterminate Premium Term, and Deferred Annuity policies.

If so, attach a statement that contains (a) the determination procedures, (b) the answers to the interrogatories, and (c) an actuarial opinion as described in the instructions.

**The answers below apply only to Universal Life, Variable Universal Life, Interest Sensitive Whole Life and Indeterminate Premium Term Policies.**

*Determination Procedures*

Policy to be Used in the Process of Determining Nonguaranteed Elements

In the development of a new policy series, the Company determines its best estimate of future assumptions, including mortality, persistency, expenses, reinsurance costs, premium taxes, interest rates earned on investments, volatility of returns expected on variable investment options, the Company's federal income taxes, the Company's desired solvency objective, and other applicable assumptions.  For each new policy series the policy cost factors are determined based on a stated profit objective.  Policy cost factors such as premium rates, premium loads, interest rates credited on accumulated premiums, charges for mortality and other policy benefits, surrender charges, and expense fees are determined.  Depending on the design of the product, some of the policy cost factors may be fixed or guaranteed at issue.

Cost factors that can vary are periodically reviewed and may be adjusted based on changes in prospective assumptions.  These adjustments are made in such a way that past losses (i.e., experience less favorable to the Company than expected) are not recouped and past gains (i.e., experience more favorable to the Company than expected) are not distributed.  These adjustments are made at the discretion of the Company.  All adjustments made will be made in accordance with applicable statutes, rules, and contracts.

The initial determination of policy cost factors and any adjustments to policy cost factors are done in accordance with the actuarial principles and practices of the American Academy of Actuaries, which are applicable to the determination and redetermination of nonguaranteed elements.

This policy will be applicable for any and all presently issued or currently in force policies that contain nonguaranteed elements.

*2017 NAIC Annual Statement of The Lincoln National Life Insurance Company*

*Interrogatories*

1. Since this statement was last filed, have there been any changes in the values of nonguaranteed elements on new or existing business authorized for illustration by the company? If yes, describe the changes that were made.

   Yes.
   The current cost of insurance rates on some products were increased to reflect the best estimates of future cost factors such as mortality, investment income, expenses, and the length of time policies stay in force.
   The interest rate bonuses on some products were decreased to reflect the best estimates of future investment income.
   The non-guaranteed post-level term period premiums were decreased for some level term products.

2. Since this statement was last filed, have there been any changes in the values of nonguaranteed elements actually charged or credited? If yes, describe the changes that were made.

   Yes.
   The current cost of insurance rates on some products were increased to reflect the best estimates of future cost factors such as mortality, investment income, expenses, and the length of time policies stay in force.
   The interest rate bonuses on some products were decreased to reflect the best estimates of future investment income.
   The non-guaranteed post-level term period premiums were decreased for some level term products.

3. Indicate to what extent any changes described in 1 or 2 vary from the policy and/or general methods and procedures last reported for the affected contracts.

   There are no material variations.

4. Are the anticipated experience factors underlying any nonguaranteed elements different from current experience? If yes, describe in general terms the ways in which future experience is anticipated to differ from current experience and the nonguaranteed element factors which are affected by such anticipation.

   Yes. In the determination of policy cost factors for some nonguaranteed life insurance products, it is anticipated that expenses will continue to increase in the future with inflation. Reinsurance costs may increase based on reinsurer rate actions. Investment yields may continue to decline and result in compression of spreads

*2017 NAIC Annual Statement of The Lincoln National Life Insurance Company*

between earned rates and crediting rates. Future mortality experience may vary from past and current experience.

5. State whether anticipated investment income experience factors are based on (a) a portfolio average approach, (b) an investment generation approach, or (c) other. If (b) or (c), describe the general basis used, including the investment generation groupings.

   Life insurance policies generally employ a portfolio average approach.

6. Describe how the company allocates anticipated experience among its various classes of business.

   Anticipated experience is allocated to each product or group of products based on recent, credible, historical experience with policies of similar type.

7. Does the undersigned believe there is a substantial probability that illustrations authorized by the company to be presented on new and existing business cannot be supported by currently anticipated experience? If yes, indicate which classes and explain.

   There is a probability that certain aged universal life policies may have changes made to non-guaranteed elements due to emerging experience implicating the prospective assumptions detailed in response to Interrogatory 3.

8. Describe any aspects of the determination of nonguaranteed elements not covered above that involve material departures from the Actuarial Standards of Practice issued by the Actuarial Standards Board applicable to the determination of nonguaranteed elements.

   None.

*2017 NAIC Annual Statement of The Lincoln National Life Insurance Company*

*Actuarial Opinion*

I, Stafford L. Thompson, Jr., FSA, MAAA, Senior Vice President, am an officer of The Lincoln National Life Insurance Company, and a Member of the American Academy of Actuaries. I and my associates have examined the actuarial assumptions and methods used in determining nonguaranteed elements for the individual life insurance contracts of the Company used for delivery in the United States. The nonguaranteed elements included are those:

    (i)    paid, credited, charged or determined in 2017; and

    (ii)    authorized by the Company to be illustrated on new and existing business during 2017.

Our examination included such review of the actuarial assumptions and methods of the underlying basic records and such tests of the actuarial calculations as we considered necessary. In my opinion, the nonguaranteed elements described above have been determined in accordance with Actuarial Standards of Practice issued by the Actuarial Standards Board applicable to the determination of nonguaranteed elements, except as described above.


Stafford L. Thompson, Jr., FSA, MAAA
Senior Vice President, The Lincoln National Life Insurance Company


   1-29-18
Date

The Lincoln National Life Insurance Company
370 - Non-Guaranteed Opinion for Exhibit 5

*2017 NAIC Annual Statement of The Lincoln National Life Insurance Company*

## Exhibit 5, Interrogatory 3.

Does the company at present issue or have in force policies that contain nonguaranteed elements?

Answer: Yes. Policies being issued or in force that contain nonguaranteed elements include Universal Life, Variable Universal Life, Interest Sensitive Whole Life, Indeterminate Premium Term, and Deferred Annuity policies.

If so, attach a statement that contains (a) the determination procedures, (b) the answers to the interrogatories, and (c) an actuarial opinion as described in the instructions.

**The answers below apply only to Deferred Annuity Policies.**

*Determination Procedures*

Policy to be Used in the Process of Determining Nonguaranteed Elements

In the development of a new policy series, the Company determines its best estimate of future assumptions, including mortality, persistency, expenses, premium taxes, interest rates earned on investments, volatility of returns expected on variable investment options, the Company's federal income taxes, the Company's desired solvency objective, and other applicable assumptions. For each new policy series the policy cost factors are determined based on a stated profit objective. Policy cost factors such as premium rates, premium loads, interest rates credited on accumulated premiums, charges for mortality and other policy benefits, surrender charges, and expense fees are determined. Depending on the design of the product, some of the policy cost factors may be fixed or guaranteed at issue.

Cost factors that can vary are periodically reviewed and may be adjusted based on changes in prospective assumptions. These adjustments are made in such a way that past losses (i.e., experience less favorable to the Company than expected) are not recouped and past gains (i.e., experience more favorable to the Company than expected) are not distributed. These adjustments are made at the discretion of the Company. All adjustments made will be made in accordance with applicable statutes, rules, and contracts.

The initial determination of policy cost factors and any adjustments to policy cost factors are done in accordance with the actuarial principles and practices of the American Academy of Actuaries, which are applicable to the determination and redetermination of nonguaranteed elements.

This policy will be applicable for any and all presently issued or currently in force policies that contain nonguaranteed elements.

*2017 NAIC Annual Statement of The Lincoln National Life Insurance Company*

*Interrogatories*

1. Since this statement was last filed, have there been any changes in the values of nonguaranteed elements on new or existing business authorized for illustration by the company?  If yes, describe the changes that were made.

   Yes. The interest rates credited on the company's interest-sensitive annuities were increased and/or decreased during the year.  The changes in credited interest rates were a result of normal investment yield fluctuations and changes in the cost of options supporting the indexed account interest credited.

2. Since this statement was last filed, have there been any changes in the values of nonguaranteed elements actually charged or credited?  If yes, describe the changes that were made.

   Yes. The interest rates credited on the company's interest-sensitive annuities were increased and/or decreased during the year.  The changes in credited interest rates were a result of normal investment yield fluctuations and changes in the cost of options supporting the indexed account interest credited.

   When customers performed an owner elected reset of their variable annuity living benefits in 2016 the rider charge was increased to the current rider charge level.

3. Indicate to what extent any changes described in 1 or 2 vary from the policy and/or general methods and procedures last reported for the affected contracts.

   There are no material variations.

4. Are the anticipated experience factors underlying any nonguaranteed elements different from current experience?  If yes, describe in general terms the ways in which future experience is anticipated to differ from current experience and the nonguaranteed element factors which are affected by such anticipation.

   In the determination of policy cost factors for some nonguaranteed products, it is anticipated that policy administration expenses will continue to increase in the future with inflation.  For policy behavior experience, mortality experience is predicted to improve in the future and the dynamic lapse formula will take into account expected impacts from differences between future market conditions and the expected policy holder benefits offered on our fixed and variable annuity products

*2017 NAIC Annual Statement of The Lincoln National Life Insurance Company*

5. State whether anticipated investment income experience factors are based on (a) a portfolio average approach, (b) an investment generation approach, or (c) other. If (b) or (c), describe the general basis used, including the investment generation groupings.

   Annuities generally follow an investment generation where initial year rates are set based upon new money rates. Annuity renewal rates can either follow an investment generation approach or a portfolio average approach depending upon the product and age of the policy. This generation approach generally groups funds by calendar month received.

6. Describe how the company allocates anticipated experience among its various classes of business.

   Anticipated experience is allocated to each product based on recent, credible, historical experience with policies of similar type.

7. Does the undersigned believe there is a substantial probability that illustrations authorized by the company to be presented on new and existing business cannot be supported by currently anticipated experience? If yes, indicate which classes and explain.

   No, however, continued investments (and reinvestments) at current yields may affect future declarations of excess interest rates or other nonguaranteed factors as appropriate, to reflect changes in investment returns.

8. Describe any aspects of the determination of nonguaranteed elements not covered above that involve material departures from the Actuarial Standards of Practice issued by the Actuarial Standards Board applicable to the determination of nonguaranteed elements.

   None.

*2017 NAIC Annual Statement of The Lincoln National Life Insurance Company*

*Actuarial Opinion*

I, Stephen Turer, FSA, MAAA, am Senior Vice President of The Lincoln National Life Insurance Company. I and my associates have examined the actuarial assumptions and methods used in determining nonguaranteed elements for the individual annuity contracts of the Company used for delivery in the United States. The nonguaranteed elements included are those:

    (i)       paid, credited, charged or determined in 2017; and

    (ii)      authorized by the Company to be illustrated on new and existing business during 2017.

Our examination included such review of the actuarial assumptions and methods of the underlying basic records and such tests of the actuarial calculations as we considered necessary. In my opinion, the nonguaranteed elements described above have been determined in accordance with Actuarial Standards of Practice issued by the Actuarial Standards Board applicable to the determination of nonguaranteed elements, except as described above.


Stephen Turer, FSA, MAAA
Senior Vice President, The Lincoln National Life Insurance Company

1|24|19
Date

JS 44   (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

LSH Co, and Wells Fargo Bank, National Association

**(b)** County of Residence of First Listed Plaintiff   Foreign
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

See Attachment

## DEFENDANTS

Lincoln National Corporation and the Lincoln National Life Insurance Company

County of Residence of First Listed Defendant   Delaware County
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
      Plaintiff

☐ 2  U.S. Government
      Defendant

☐ 3  Federal Question
      *(U.S. Government Not a Party)*

☒ 4  Diversity
      *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                    *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☒ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☒ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment<br>    & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted<br>    Student Loans<br>    (Excludes Veterans)<br>☐ 153 Recovery of Overpayment<br>    of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product<br>    Liability<br>☐ 320 Assault, Libel &<br>    Slander<br>☐ 330 Federal Employers'<br>    Liability<br>☐ 340 Marine<br>☐ 345 Marine Product<br>    Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle<br>    Product Liability<br>☐ 360 Other Personal<br>    Injury<br>☐ 362 Personal Injury -<br>    Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury -<br>    Product Liability<br>☐ 367 Health Care/<br>    Pharmaceutical<br>    Personal Injury<br>    Product Liability<br>☐ 368 Asbestos Personal<br>    Injury Product<br>    Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal<br>    Property Damage<br>☐ 385 Property Damage<br>    Product Liability | ☐ 625 Drug Related Seizure<br>    of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal<br>    28 USC 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated<br>    New Drug Application<br>☐ 840 Trademark | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC<br>    3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and<br>    Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/<br>    Exchange |
| | | | **LABOR** | **SOCIAL SECURITY** | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 710 Fair Labor Standards<br>    Act<br>☐ 720 Labor/Management<br>    Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical<br>    Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement<br>    Income Security Act | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information<br>    Act |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/<br>    Accommodations<br>☐ 445 Amer. w/Disabilities -<br>    Employment<br>☐ 446 Amer. w/Disabilities -<br>    Other<br>☐ 448 Education | **Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate<br>    Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee -<br>    Conditions of<br>    Confinement | **IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration<br>    Actions | **FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff<br>    or Defendant)<br>☐ 871 IRS—Third Party<br>    26 USC 7609 | ☐ 896 Arbitration<br>☐ 899 Administrative Procedure<br>    Act/Review or Appeal of<br>    Agency Decision<br>☐ 950 Constitutionality of<br>    State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
    Proceeding

☐ 2 Removed from
    State Court

☐ 3 Remanded from
    Appellate Court

☐ 4 Reinstated or
    Reopened

☐ 5 Transferred from
    Another District
    *(specify)*

☐ 6 Multidistrict
    Litigation -
    Transfer

☐ 8 Multidistrict
    Litigation -
    Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 1332

Brief description of cause:
Diversity action; breach of contract regarding insurance coverage

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
  UNDER RULE 23, F.R.Cv.P.

DEMAND $
≥ $150,000

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*

JUDGE   Pappert

DOCKET NUMBER   17-2592

DATE
12/21/2018

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #            AMOUNT            APPLYING IFP            JUDGE            MAG. JUDGE

# **Attachment**

Section I(c):  Plaintiffs' Attorneys:

John G. Papianou, Esquire (PA ID No. 88149)
Brett M. Waldron, Esquire (PA ID No. 316773)
Montgomery McCracken Walker & Rhoads LLP
1735 Market Street, 21st Floor
Philadelphia PA, 19103
Telephone:  215-772-1500
Facsimile:  215-772-7620
Email:  jpapianou@mmwr.com
Email:  bwaldron@mmwr.com


Avi Israeli, Esquire*
Holwell Shuster & Goldberg LLP
425 Lexington Avenue, 14th Floor
New York, New York 10017
Telephone: 646-837-5151
Facsimile: 646-837-5150
Email: aisraeli@hsgllp.com

*Counsel for Plaintiffs*
*\*Application for admission pro hac vice to be submitted*

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ 14, rue Edward Steichen, L- 2540 Luxembourg _____

Address of Defendant: _____ 150 North Radnor-Chester Rd., Radnor, Pennsylvania 19087 _____

Place of Accident, Incident or Transaction: _____ 150 North Radnor-Chester Rd., Radnor, Pennsylvania 19087 _____

---

**RELATED CASE, IF ANY:**

Case Number: __17-2592__    Judge: __Pappert__    Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?     Yes ☐   No ☐

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?     Yes ☑   No ☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?     Yes ☐   No ☐

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?     Yes ☐   No ☐

I certify that, to my knowledge, the within case ☑ is / ☐ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: __12/21/2018__    _____    __88149__
            Attorney-at-Law / Pro Se Plaintiff          Attorney I.D. # (if applicable)

---

**CIVIL: (Place a √ in one category only)**

**A.** *Federal Question Cases:*

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Patent
- ☐ 6. Labor-Management Relations
- ☐ 7. Civil Rights
- ☐ 8. Habeas Corpus
- ☐ 9. Securities Act(s) Cases
- ☐ 10. Social Security Review Cases
- ☐ 11. All other Federal Question Cases
   *(Please specify):* _____

**B.** *Diversity Jurisdiction Cases:*

- ☑ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify):* _____
- ☐ 7. Products Liability
- ☐ 8. Products Liability – Asbestos
- ☐ 9. All other Diversity Cases
   *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____ John G. Papianou _____, counsel of record or pro se plaintiff, do hereby certify:

- ☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

- ☑ Relief other than monetary damages is sought.

DATE: __12/21/2018__    _____    __88149__
            Attorney-at-Law / Pro Se Plaintiff          Attorney I.D. # (if applicable)

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

*Civ. 609 (5/2018)*

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____14, rue Edward Steichen, L- 2540 Luxembourg_____

Address of Defendant: _____150 North Radnor-Chester Rd., Radnor, Pennsylvania 19087_____

Place of Accident, Incident or Transaction: _____150 North Radnor-Chester Rd., Radnor, Pennsylvania 19087_____

---

**RELATED CASE, IF ANY:**

Case Number: ___17-2592___     Judge: ___Pappert___     Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?     Yes ☐   No ☐

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?     Yes ☑   No ☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?     Yes ☐   No ☐

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?     Yes ☐   No ☐

I certify that, to my knowledge, the within case ☑ is / ☐ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: __12/21/2018__     _____     ___88149___
　　　　　　　　　　　　　　*Attorney-at-Law / Pro Se Plaintiff*     *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.** *Federal Question Cases:*

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Patent
☐ 6. Labor-Management Relations
☐ 7. Civil Rights
☐ 8. Habeas Corpus
☐ 9. Securities Act(s) Cases
☐ 10. Social Security Review Cases
☐ 11. All other Federal Question Cases
　　　*(Please specify):* _____

**B.** *Diversity Jurisdiction Cases:*

☑ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify):* _____
☐ 7. Products Liability
☐ 8. Products Liability – Asbestos
☐ 9. All other Diversity Cases
　　　*(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, ___John G. Papianou___, counsel of record *or pro se plaintiff*, do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☑ Relief other than monetary damages is sought.

DATE: __12/21/2018__     _____     ___88149___
　　　　　　　　　　　　　　*Attorney-at-Law / Pro Se Plaintiff*     *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

LSH CO, and Wells Fargo Bank, National      :      **CIVIL ACTION**
Association      :
        v.      :
Lincoln National Corporation, and      :
the Lincoln National Life Insurance Company      :      **NO.**

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.      ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.      ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.      ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.      ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases.)      ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.      (X)

12/21/18
**Date**
215-772-7389
**Telephone**

**Attorney-at-law**
215-772-7620
**FAX Number**

Plaintiffs
**Attorney for**
jpapianu@mmwr.com
**E-Mail Address**

(Civ. 660) 10/02

## Civil Justice Expense and Delay Reduction Plan
### Section 1:03 - Assignment to a Management Track

(a)　　　The clerk of court will assign cases to tracks (a) through (d) based on the initial pleading.

(b)　　　In all cases not appropriate for assignment by the clerk of court to tracks (a) through (d), the plaintiff shall submit to the clerk of court and serve with the complaint on all defendants a case management track designation form specifying that the plaintiff believes the case requires Standard Management or Special Management.  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

(c)　　　The court may, on its own initiative or upon the request of any party, change the track assignment of any case at any time.

(d)　　　Nothing in this Plan is intended to abrogate or limit a judicial officer's authority in any case pending before that judicial officer, to direct pretrial and trial proceedings that are more stringent than those of the Plan and that are designed to accomplish cost and delay reduction.

(e)　　　Nothing in this Plan is intended to supersede Local Civil Rules 40.1 and 72.1, or the procedure for random assignment of Habeas Corpus and Social Security cases referred to magistrate judges of the court.

## SPECIAL MANAGEMENT CASE ASSIGNMENTS
### (See §1.02 (e) Management Track Definitions of the
### Civil Justice Expense and Delay Reduction Plan)

Special Management cases will usually include that class of cases commonly referred to as "complex litigation" as that term has been used in the Manuals for Complex Litigation.  The first manual was prepared in 1969 and the Manual for Complex Litigation Second, MCL 2d was prepared in 1985.  This term is intended to include cases that present unusual problems and require extraordinary treatment.  See §0.1 of the first manual.  Cases may require special or intense management by the court due to one or more of the following factors:  (1) large number of parties; (2) large number of claims or defenses; (3) complex factual issues; (4) large volume of evidence; (5) problems locating or preserving evidence; (6) extensive discovery; (7) exceptionally long time needed to prepare for disposition; (8) decision needed within an exceptionally short time; and (9) need to decide preliminary issues before final disposition.  It may include two or more related cases.  Complex litigation typically includes such cases as antitrust cases; cases involving a large number of parties or an unincorporated association of large membership; cases involving requests for injunctive relief affecting the operation of large business entities; patent cases; copyright and trademark cases; common disaster cases such as those arising from aircraft crashes or marine disasters; actions brought by individual stockholders; stockholder's derivative and stockholder's representative actions; class actions or potential class actions; and other civil (and criminal) cases involving unusual multiplicity or complexity of factual issues.  See §0.22 of the first Manual for Complex Litigation and Manual for Complex Litigation Second, Chapter 33.